No. 25-4988

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

SAN FRANCISCO AIDS FOUNDATION, *et al.*,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *et al.*,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## BRIEF FOR APPELLANTS

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
JACK STARCHER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION ....................................................2

STATEMENT OF THE ISSUES .........................................................3

PERTINENT STATUTES AND REGULATIONS...............................3

STATEMENT OF THE CASE.............................................................3

      A. The Challenged Executive Orders .........................................3

      B.  Prior Proceedings....................................................................4

SUMMARY OF ARGUMENT .............................................................12

STANDARD OF REVIEW ..................................................................16

ARGUMENT.......................................................................................17

I.      Plaintiffs Have No Likelihood of Success on the Merits ......................17

      A.     Plaintiffs' challenges fail at the threshold....................................17

            1.      Standing.................................................................................17

            2.      The Tucker Act ......................................................................21

      B.     Plaintiffs' challenges fail on the merits ........................................26

            1.      First Amendment ..................................................................26

2.      Fifth Amendment Void-for-Vagueness ..............................36

3.      Fifth Amendment Equal Protection ....................................43

4.      As-Applied Separation of Powers ......................................52

II.     The Remaining Equitable Factors Favor the Government ..................57

III.    At the Very Least, the Injunction is Overbroad ....................................61

CONCLUSION ........................................................................................................63

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ................................................................ 30, 31

*Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.,*
    357 F.3d 62 (D.C. Cir. 2004) ............................................................ 23

*Ballou v. McElvain,*
    29 F.4th 413 (9th Cir. 2022) ............................................................ 51

*Beck v. McDonald,*
    848 F.3d 262 (4th Cir. 2017) ............................................................ 18

*Board of Regents of the Univ. of Wis. Sys. v. Southworth,*
    529 U.S. 217 (2000) ...................................................................... 33

*Boaz Hous. Auth. v. United States,*
    994 F.3d 1359 (Fed. Cir. 2021) ........................................................ 23

*Broadrick v. Oklahoma,*
    413 U.S. 601, 613 (1973)) .................................................................41

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ......................................................................... 28

*Building & Constr. Trades Dep't v. Allbaugh,*
    295 F.3d 28 (D.C. Cir. 2002) .............................................. 43, 55, 56

*California v. U.S. Dep't of Educ.,*
    132 F.4th 92 (1st Cir. 2025) ............................................................ 24

*California ex rel. Becerra v. Azar,*
    950 F.3d 1067 (9th Cir. 2020) ......................................................... 31

*City & Cnty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) .................................................... 54, 55

*City of Los Angeles v. Lyons,*
  461 U.S. 95 (1983) ......................................................... 19

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................... 17-18, 21

*Crowley Gov't Servs., Inc. v. GSA,*
  38 F.4th 1099 (D.C. Cir. 2022) .......................................... 22

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2012) ............................................ 60

*Department of Educ. v. California,*
  145 S. Ct. 966 (2025) ............................ 1, 16, 24, 25, 26, 59, 60, 61

*FDA v. Alliance for Hippocratic Med.,*
  144 S. Ct. 1540 (2024) .................................................. 44

*Finley v. National Endowment for the Arts,*
  100 F.3d 671 (9th Cir. 1996), *rev'd,*
  524 U.S. 569 (1998) ................................................. 34, 35

*Fleck & Assocs., Inc. v. City of Phoenix,*
  471 F.3d 1100 (9th Cir. 2006) ........................................... 44

*Grayned v. City of Rockford,*
  408 U.S. 104 (1972) ..................................................... 37

*Harris v. McRae,*
  448 U.S. 297 (1980) ..................................................... 28

*Hecox v. Little,*
  79 F.4th 1009 (9th Cir. 2023) ........................................... 51

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ..................................................... 44

*Humanitarian Law Project v. U.S. Treasury Dep't,*
  578 F.3d 1133 (9th Cir. 2012) ........................................... 38

*Kowalski v. Tesmer,*
  543 U.S. 125 (2004) ..................................................... 45

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................. 21

*Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,*
    508 U.S. 384 (1993) ............................................. 33

*Legal Aid Servs. of Or. v. Legal Servs. Corp.,*
    608 F.3d 1084, (9th Cir. 2010) .......................... 32

*Legal Servs. Corp. v. Velazquez,*
    531 U.S. 533 (2001) ............................................. 32

*Lyng v. International Union, United Auto., Aerospace & Agr.*
    *Implement Workers of Am.,*
    485 U.S. 360 (1988) ....................................... 28, 29

*Marijuana Policy Project v. United States,*
    304 F.3d 82 (D.C. Cir. 2002) .............................. 33

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) .................................... 22-23, 23

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) ............................................. 42

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ........................... 24

*Mezibov v. Allen,*
    411 F.3d 712 (6th Cir. 2005) ............................. 32

*Mills v. United States,*
    742 F.3d 400 (9th Cir. 2014) ............................. 45

*Munaf v. Geren,*
    553 U.S. 674 (2008) ....................................... 16, 41

*National Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) .............. 28, 29, 30, 32, 33, 35, 40, 41

*National Park Hosp. Ass'n v. Department of the Interior,*
    538 U.S. 803 (2003) ............................................. 18

*National Wildlife Fed'n v. National Marine Fisheries Serv.,*
    422 F.3d 782 (9th Cir. 2005) ................................................ 17

*NIH v. American Pub. Health Ass'n,*
    No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) .................. 1, 20, 22, 25

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................... 58

*Northrop Grumman v. United States,*
    46 Fed. Cl. 622 (2000) ...................................................... 42

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) .......................................................... 18

*Powers v. Ohio,*
    499 U.S. 400 (1991) .......................................................... 46

*Regan v. Taxation With Representation of Washington,*
    461 U.S. 540 (1983) ....................................................... 27, 28

*Reno v. Catholic Soc. Servs., Inc.,*
    509 U.S. 43 (1993) ........................................................... 18

*Rosenberger v. Rector & Visitors of the Univ. of Va.,*
    515 U.S. 819 (1995) ....................................................... 34, 35

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ....................................................... 28, 30

*Sabri v. United States,*
    541 U.S. 600 (2004) .......................................................... 41

*Seila Law LLC v. Consumer Fin. Prot. Bureau,*
    591 U.S. 197 (2020) ....................................................... 59, 60

*Texas v. United States,*
    523 U.S. 296 (1998) ....................................................... 18, 19

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ............................................ 45, 46

vi

*Trump v. Boyle*,
   No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025) ...................................... 61

*Trump v. New York*,
   592 U.S. 125 (2020) ...................................................................................... 18

*United Aeronautical Corp. v. U.S. Air Force*,
   80 F.4th 1017 (9th Cir. 2023) ........................................................................ 24

*United States v. American Libr. Ass'n*,
   539 U.S. 194 (2003) ...................................................................................... 32

*United States v. Moriello*,
   980 F.3d 924 (4th Cir. 2020) ......................................................................... 41

*United States v. Peninsula Commc'ns, Inc.*,
   287 F.3d 832 (9th Cir. 2002) ..........................................................................17

*United States v. Skrmetti*,
   145 S. Ct. 1816 (2025) ............................................................. 15, 49, 49-50, 50

*United States v. Stewart*,
   311 U.S. 60 (1940) ........................................................................................ 54

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008) ...................................................................................... 40

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .......................................................................................... 17

**U.S. Constitution:**

Art. II § 1, cl. 1 ................................................................................................. 59

**Statutes:**

28 U.S.C. § 1292(a)(1) .................................................................................... 2
28 U.S.C. § 1331 ............................................................................................. 2
28 U.S.C. § 1491(a)(1) .................................................................................... 23
44 U.S.C. § 2107 ............................................................................................. 1

20 U.S.C. § 954(d)(1) ............................................................... 39

**Regulatory Materials:**

Exec. Order No. 14,151,
  *Ending Radical and Wasteful Government DEI Programs and Preferencing*,
  90 Fed. Reg. 8339 (Jan. 20, 2025) ............................................. 3, 53

Exec. Order No. 13,985, § 1, 86 Fed. Reg. 7009 (Jan. 25, 2021) ......................36

Executive Order 14,173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 1, 2025).........................................4

Exec. Order No. 14,168,
  *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*,
  90 Fed. Reg. 8650 (Jan. 20, 2025) ............................................ 4, 47, 48, 49, 53

**Other Authorities:**

Order, *National Ass'n of Diversity Officers in Higher Educ. v. Trump (Diversity Officers)*, No. 25-1189 (4th Cir. Mar. 14, 2025),
  ECF No. 29 ...................................................................20

Office of Legal Counsel, *Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 60 (1981) ...........................................59

viii

## INTRODUCTION

The preliminary injunction at issue here inserts the district court between the President and the agencies he is constitutionally charged with supervising. It enjoins provisions in two Executive Orders that merely direct federal officials to take lawful actions consistent with the President's priorities. The district court erred in entering that injunction and this Court should now vacate it.

The district court allowed plaintiffs to facially challenge presidential directives instructing federal agencies to lawfully terminate grants that are inconsistent with presidential policy priorities. It did so based entirely on plaintiffs' allegations that they have had grant awards terminated, or fear awards being terminated in the future. And its injunction directed defendants to reinstate plaintiffs' terminated awards, an order that cannot be reconciled with the Supreme Court's recent decisions in *Department of Education v. California,* 145 S. Ct. 966 (2025), and *NIH v. American Public Health Ass'n*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025).

The district court's decision was riddled with numerous additional errors. The district court ignored the text of the challenged provisions, which merely direct federal agencies to carry out their lawful authorities

consistent with the President's policy priorities, and instead presumed that agencies would take unlawful actions in violation of both governing law and the Executive Orders themselves. These errors caused the district court to conclude that plaintiffs had standing to facially challenge the presidential directives themselves, rather than any particular application of them, and that plaintiffs were likely to succeed on the merits. The same errors infected the court's assessment of the relative harms, causing the court to downplay the importance of vindicating the President's lawful directives and to foresee harms that no plausible understanding of the Executive Orders would create.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, although plaintiffs' standing is contested. *See infra* Part I.A. This Court has jurisdiction to review the district court's order granting plaintiffs' motion for preliminary injunction under 28 U.S.C. § 1292(a)(1). The district court issued that order on June 9, 2025, ER-9-60, and defendants filed their notice of appeal on August 7, 2025, ER-61-62, within the 60-day period for seeking review pursuant to Federal Rule of Appellate Procedure 4(a)(1)(B).

2

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in concluding that plaintiffs are likely to succeed on the merits of their claims.

2.      Whether the district court erred in concluding that plaintiffs satisfied the remaining preliminary-injunction factors.

3.      Whether the district court's injunction is otherwise overbroad.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. The Challenged Executive Orders

On January 20, 2025, the President issued Executive Order 14,151, 90 Fed. Reg. 8339, entitled *Ending Radical and Wasteful Government DEI Programs and Preferencing* (DEI Order), to eliminate "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," in the government. DEI Order § 1. As relevant here, EO 14,151 includes a provision that has been referred to as the Equity Termination Provision, which directs "[e]ach agency, department, or

3

commission head" to "terminate, to the maximum extent allowed by law, ... 'equity-related' grants or contracts." *Id.* § 2(b)(i).

That same day, the President signed Executive Order No. 14,168, 90 Fed. Reg. 8615, *Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government* (Gender Ideology Order). As relevant here, that Order broadly disapproves of so-called "gender ideology," which the Order describes as the replacement of a biological, binary understanding of sex with "an ever-shifting concept of self-assessed gender identity." The Order contains provisions requiring agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," *id.* § 3(e), 90 Fed. Reg. at 8616 (the Gender Termination Provision), and to "assess grant conditions and grantee preferences [to] ensure grant funds do not promote gender ideology," *id.* § 3(g), Fed. Reg. at 8616 (the Gender Promotion Provision).[1]

---

[1] Plaintiffs also challenged various provisions in a third Executive Order—Executive Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025), entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, which directed agencies to "enforc[e] our civil-rights law" by "ending illegal preferences and discrimination." *Id.* § 1, 90 Fed. Reg. at 8633. But the district court concluded plaintiffs are not likely to succeed in their challenges to that Order and refused to enjoin any part of it. Plaintiffs have not appealed that denial.

## B.    Prior Proceedings

1. Plaintiffs are nonprofit organizations that receive federal funding to support their work in providing services to members of the LGBTQ community. Plaintiffs filed this lawsuit challenging, as relevant here, numerous provisions of the DEI Order and Gender Ideology Order. Shortly after filing this action, plaintiffs filed a motion seeking a preliminary injunction against those provisions.

2. The district court issued an order granting in part and denying in part plaintiffs' motion.

a. The district court began by addressing various threshold jurisdictional issues. As relevant here, the district court held that plaintiffs had established standing to challenge three provisions of the challenged Executive Orders—the Equity Termination Provision, the Gender Termination Provision, and the Gender Promotion Provision (collectively, the termination provisions).[2] It held that plaintiffs have standing to

---

[2] The district court held that plaintiffs likely do not have standing to challenge provisions directing agencies and the Attorney General to take steps to enforce existing federal antidiscrimination, ER-20-21, and provisions directing OMB and DOJ to review, revise, or terminate internal government processes and programs that promote DEI, ER-21-22. It also

*Continued on next page.*

challenge those provisions because the provisions direct agencies to terminate funding for certain categories of grants or contracts, and because plaintiffs alleged that they have lost or will lose funding pursuant to those provisions. ER-23-25. And the court rejected the government's argument that it lacked jurisdiction under the Tucker Act because, in the district court's judgment, plaintiffs' challenges to the termination provisions were constitutional in nature, and therefore "not contractually based." ER-27.

Finally, the district court held that plaintiffs had third-party standing to raise equal protection claims on behalf of the transgender clients and patients that they serve. The court concluded that plaintiffs suffer their own injury in the form of lost funds, have a close relationship with their transgender clients because they provide community and healthcare services, and the transgender patients themselves face barriers to vindicating their rights in the form of stigma and discrimination. ER-28-30.

---

held that plaintiffs have standing to challenge a provision that requires agencies to include a certification of compliance with federal anti-discrimination laws, ER-25-26, but held that plaintiffs were not likely to succeed in any of their challenges to that provision and therefore refused to enjoin it. ER-39-42, 49-50.

b.  Turning to the merits of plaintiffs' facial challenges to the Orders, the district court held that plaintiffs were likely to succeed on several of their facial challenges to the three challenged termination provisions.

The district court concluded that all three of the challenged provisions likely violate plaintiffs' First Amendment rights. Those provisions, the district court recognized, apply only to activities paid for by the federal government. But even though the government generally has broad latitude to determine which activities to fund, the court nevertheless held that the provisions violate the First Amendment because they further no legitimate objectives related to the programs that they burden, and instead simply single out a disfavored group on the basis of the content of their speech. ER-36-37. The district court also held the provisions likely to be unlawful because they aim to withhold subsidies for a "censorious purpose," amounting to the kind of "invidious viewpoint discrimination" that, according to the district court, raises First Amendment concerns even in the context of federal subsidies. ER-38.

Next, the district court held that plaintiffs are likely to succeed on their Fifth Amendment void-for-vagueness challenge, but only as to the Equity Termination Provision. The court first concluded that it could apply

7

void-for-vagueness principles to presidential directives that merely provide direction within the Executive Branch rather than regulate any private conduct. It was enough, the court held, that the Orders "command action" and that "various agencies have already taken" action against plaintiffs "pursuant to" the Orders. ER-43. The court held that it was not sufficiently clear what would qualify as an "equity-related" grant or contract, thereby inviting arbitrary enforcement and giving recipients insufficient notice as to what kinds of speech might trigger termination. ER-44-47. But the district court held that plaintiffs were not likely to succeed on their Fifth Amendment challenge to the Gender Termination and Gender Promotion Provisions because the terms in those provisions were defined with enough specificity to satisfy constitutional review.

Finally, the district court held that plaintiffs are likely to succeed in showing that the Gender Termination and Gender Promotion Provisions violate the equal-protection component of the Due Process Clause. As with its standing analysis, the district court accepted that those provisions themselves terminate federal grants on the relevant gender-identity topics. The district court therefore rejected the government's argument that the provisions merely espoused a policy view and did not themselves amount

8

to a discriminatory action that could be subject to equal-protection review. The court also rejected the argument that the provisions are permissible content-based funding determinations targeting topics, not any suspect classification. The court concluded that the provisions are facially discriminatory because they "singl[e] out grants that serve transgender people" and therefore necessarily "singl[e] out transgender people" themselves and "exclud[e] them" from the benefit of federal funds. ER-32. In the alternative, the district court held the provisions had an impermissible discriminatory purpose. ER-33. The district court therefore concluded that heightened scrutiny applied and that the provisions failed to satisfy heightened scrutiny. ER-33-34.

   c.  The district court also ruled in plaintiffs' favor on some of their as-applied separation-of-powers and ultra vires claims.[3] The district court rejected the government's argument that, because each provision only requires termination to the extent consistent with law, the provisions do not conflict with any statute. The court concluded that those limitations

---

[3] The district court rejected plaintiffs' facial separation-of-powers claim against the challenged provisions because they failed to establish there were "no set of circumstances" under which the challenged provisions would be lawful. ER-50-51.

were not controlling because the provisions "unambiguously command action" and the "savings clause" cannot "override" the provisions' plain meaning. ER-55-56. Turning to the merits of plaintiffs' as-applied claims, plaintiffs identified three programs under which they receive funding—the Ryan White Program, the Housing Opportunities for People with AIDS (HOPWA) program, and the Federally Qualified Health Centers (FQHC) program. Plaintiffs did not, however, demonstrate that the government had interpreted the statutes to permit the termination of those grants or point to any agency determination regarding the potential applicability of the Executive Order to those programs. The district court nonetheless reviewed the underlying statutory funding authorization for the Ryan White and FQHC programs in the first instance and concluded that mandatory language in those statutes forecloses the federal government from terminating equity- or gender-related awards under those programs. ER-52-54. For the HOPWA program, the court concluded that the government failed to respond to plaintiffs' argument that the provisions conflict with implementing regulations and therefore forfeited any defense of that as-applied challenge. ER-53.

Finally, the district court held that the Gender Termination and Gender Promotion Provisions conflicted with the statutory prohibitions against sex discrimination contained in the Affordable Care Act and the Public Health Service Act. For the same reasons that the court found that plaintiffs were likely to succeed on their equal-protection claims, the court concluded that the Gender Termination and Gender Promotion Provisions amounted to unlawful sex discrimination in contravention of those statutory prohibitions. ER-54.

d.  Turning to the remaining preliminary-injunction factors, the district court held that plaintiffs suffered irreparable harm in the form of deprivation of their constitutional rights, and that the government suffered no cognizable harm from being prevented from engaging in unconstitutional activity. ER-57. The court therefore entered a preliminary injunction preventing the defendant agencies from "enforcing the Gender Termination Provision, Gender Promotion Provision, and Equity Termination Provision" against plaintiffs. ER-58. But the court deferred issuing a preliminary-injunction order, instead directing plaintiffs to file a proposed order.

11

Plaintiffs filed a proposed order and the district court signed it the same day. In addition to preventing defendant agencies from enforcing the challenged provisions, the order also directed the agencies to reinstate within five business days any grant or contract that had been terminated pursuant to the enjoined provisions, including but not limited to a list of specific grant awards. ER-3-8.

## SUMMARY OF ARGUMENT

I. The district court's preliminary injunction was premised on a misunderstanding of the three Executive Order provisions at issue that caused multiple errors relating both to jurisdiction and the merits.

A. 1. Plaintiffs are not likely to succeed on the merits of any of their claims because the district court did not have jurisdiction to consider them. As a panel of the Fourth Circuit recognized when considering a nearly identical challenge, plaintiffs' case raises standing and ripeness concerns because they bring facial challenges to general policy directives contained in Executive Orders rather than any particular agency action implementing those directives. Any prospective injury would thus depend on an intervening agency action, which is both speculative and would raise issues of the legality of actions that have not yet occurred. If plaintiffs think

12

any future agency action is unlawful, they must wait until that unlawful action comes to pass and then challenge it in an appropriate forum.

2.      The Supreme Court has now twice made clear that the district court also lacked jurisdiction to consider plaintiffs' claims to the extent that they sought relief from terminations of existing grant contracts. As the Court explained, such claims must be brought in the Court of Federal Claims, not in district court.

B.      Even if the district court had jurisdiction to consider plaintiffs' claims, none is likely to succeed.

1.      The district court erred in holding that plaintiffs are likely to succeed on the merits of their First Amendment claims. The Supreme Court has made clear that the government is not required to subsidize particular projects or to subsidize on a content- or viewpoint-neutral basis. Rather, when acting as a *patron* rather than a *regulator*, the government can generally choose what to fund. Regardless, the district court's implicit conclusion that it is constitutional to *award grants* because of their DEI content but unconstitutional to *terminate them* for the same reason is a one-way constitutional ratchet that finds no purchase in First Amendment doctrine.

13

2.    The district court also erred in holding that plaintiffs are likely to succeed in showing that a provision that directs federal agencies, to the extent consistent with law, to terminate equity-related grants or contracts is likely void for vagueness. The district court's analysis was driven by its erroneous view that private parties were required to assess what was meant by "equity-related." The provision at issue is a directive within the Executive Branch and relates only to contracting decisions over which federal agencies have discretion. Plaintiffs thus have no reason to curtail their activities to attempt to conform to the definition, and the provision gives rise to no vagueness concerns of the sort that would apply if the government were regulating primary conduct of private parties.

3.    Plaintiffs lack standing to raise an equal-protection challenge to the gender-ideology provisions on behalf of their clients and patients. Individuals have brought numerous challenges to the provisions at issue here, belying any suggestion that third-party standing is necessary here to vindicate the interests of individuals who believe the Gender Ideology Executive Order is discriminatory. Even if they had standing, plaintiffs have not identified any government action, let alone government action that discriminates on any suspect basis. The Supreme Court's recent

decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), confirms that the district court's contrary conclusion cannot stand.

4.      Finally, the district court was not at liberty to disregard the plain text of the challenged provisions in assessing plaintiffs' separation-of-powers claims. The challenged provisions direct agencies to terminate grants only to the extent consistent with law. That is no mere fig leaf or savings clause—it is central to the President's directive.

II.      The district court separately erred by concluding that the remaining factors supported granting a preliminary injunction. The extraordinary injunction in this case interferes with core executive functions and prevents the President from directing and controlling executive officers in their exercise of lawful authority. The enjoined provisions simply guide agencies' exercise of pre-existing authority to terminate grants or contracts. By enjoining those directives, the district court inhibits agencies from exercising their authority in a way that furthers the President's priorities. The injunction thus inflicts irreparable constitutional harm by eroding the President's control over subordinates and frustrates the public's interest in having the elected President

effectuate policy priorities through lawful direction of the executive branch.

And as the Supreme Court has twice explained in staying injunctions that similarly ordered the reinstatement of grants, the government separately suffers irreparable harm when it is ordered to pay grant funds because it is "unlikely to recover the grant funds once they are disbursed." *California*, 145 S. Ct. at 969. In contrast, the gravamen of plaintiffs' claim is monetary, and plaintiffs will receive any funds they are owed if they ultimately prevail in an appropriate forum.

III.    At the very least, the injunction is overbroad to the extent it orders agencies to reinstate grants and contracts without regard to whether they were terminated pursuant to the challenged Executive Orders or for some other reason. Neither plaintiffs nor the district court provided any basis why awards that were terminated independent of the challenged provisions should be reinstated pending resolution of this litigation. This Court should at the very least vacate that aspect of the district court's injunction and remand for the district court to determine in the first instance which grants and contracts were, in fact, terminated pursuant to the challenged provisions.

16

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (quotation marks omitted). A district court's decision to grant or deny a preliminary injunction is reviewed for abuse of discretion, but a district court necessarily abuses its discretion when it makes an error of law. *National Wildlife Fed'n v. National Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) (per curiam) (quoting *United States v. Peninsula Commc'ns, Inc.*, 287 F.3d 832, 839 (9th Cir. 2002)).

## ARGUMENT

I. **Plaintiffs Have No Likelihood of Success on the Merits.**

   A. **Plaintiffs' challenges fail at the threshold.**

      1. **Standing**

To demonstrate standing, a plaintiff must allege an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v.*

17

*Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks omitted). To satisfy that standard, the injury in question cannot be "conjectural or hypothetical"; it must be "concrete in both a qualitative and temporal sense." *Beck v. McDonald*, 848 F.3d 262, 270-71 (4th Cir. 2017) (quotation marks omitted). A supposed future injury that is "too speculative" and might never occur does not satisfy that standard. *Id.* at 274.

The related doctrine of ripeness "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *National Park Hosp. Ass'n v. Department of the Interior*, 538 U.S. 803, 807 (2003) (quotation marks omitted). A claim is unripe for judicial review if it depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). The Supreme Court has repeatedly held that challenges to intra-governmental directives are not ripe because such a directive, by itself, "does not affect [anyone's] primary conduct." *National Park*, 538 U.S. at 810; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726 (1998); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58-61 (1993). It is, moreover, "too

18

speculative whether the problem [plaintiffs] presen[t] will ever need solving." *Texas*, 523 U.S. at 302.

a.     The district court held that plaintiffs had standing to challenge the termination provisions based on allegations that they have lost or fear losing federal funds pursuant to those provisions. The district court placed significant weight on plaintiffs' allegations that some individual grant awards had already been terminated pursuant to those provisions. ER-23-25. But it is unclear why an injunction against the future operation of the challenged termination provisions—as opposed to relief related to the already-terminated grant contracts themselves—would redress any injury. *See City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). That raises both redressability problems and ripeness concerns. And it underscores that there is no basis to consider plaintiffs' abstract challenges to the text of the Executive Orders instead of waiting for a concrete claim raised in the context of a particular contract termination. Indeed, the district court's preliminary injunction tacitly acknowledges this disconnect: It enjoins defendants from enforcing the challenged provisions against plaintiffs, and then separately directs defendants to reinstate various terminated grants. "If one simply flowed from the other, the [d]istrict [c]ourt would have

19

needed only" to enjoin the challenged provisions. *NIH v. American Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *2 (U.S. Aug. 21, 2025) (Barrett, J., concurring). Moreover, as discussed below, plaintiffs' challenge to those terminations is precluded by the Tucker Act. *See infra* pp. 22-26.

Nor can plaintiffs base their standing on the possibility of future terminations. As a Fourth Circuit panel recognized in staying a similar injunction against grant-termination provisions, such a request for prospective relief presents standing and ripeness problems because plaintiffs raise facial challenges against general directives in an Executive Order, rather than any particular funding termination itself. *See* Order at 9, *National Ass'n of Diversity Officers in Higher Educ. v. Trump (Diversity Officers)*, No. 25-1189 (4th Cir. Mar. 14, 2025), ECF No. 29 ("[T]his case does not challenge any particular agency action implementing the Executive Orders. Yet, … the district court relied on evidence of how various agencies are implementing, or may implement, the Executive Orders. That highlights serious questions about the ripeness of this lawsuit and plaintiffs' standing to bring it."); *id.* at 8 (Harris, J., concurring) ("This case, however, does not directly challenge any [agency enforcement] action, and I therefore concur."); *id.* at 5 n.2 (Diaz, CJ., concurring) (joining Judge

Harris' concurrence and further noting that "the Orders only purport to direct executive policy and actors").

It is speculative that plaintiffs will experience additional contract terminations, and even more speculative what legal issues might be presented by any such termination. If plaintiffs contend that the termination of a particular contract in the future is unlawful, they could challenge it in a concrete factual scenario in the appropriate forum. But plaintiffs cannot demonstrate Article III standing "simply by claiming that they experienced a 'chilling effect' that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part." *Clapper*, 568 U.S. at 419; *see Laird v. Tatum*, 408 U.S. 1, 11 (1972) (plaintiff alleging chilling effect lacks standing where government policy is not "regulatory, proscriptive, or compulsory in nature"). That is all plaintiffs have challenged here: The provisions merely direct Executive Branch officials to terminate certain contracts to the maximum extent allowed by law; they do not regulate plaintiffs or their members at all, much less subject them to threat of enforcement if they engage in particular protected activity. The possibility that a government contract will be terminated because the government no longer wishes to fund the kinds of

21

activities described in the provisions does not give rise to any cognizable chilling effect, unlike the threat of criminal enforcement or other punishment for private conduct.

### 2. The Tucker Act

The Supreme Court also recently made clear, in remarkably similar circumstances, that even if plaintiffs could establish standing to challenge the directives, the district court lacked jurisdiction to consider any claims "'based on' [their] research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH v. American Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025). Rather, any such claims must be pursued under the Tucker Act.

The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). And although the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking relief other than money damages, *id.*, that waiver does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012)

22

(quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

In particular, when a party seeks to force the government to comply with the terms of a contract or grant, the proper remedy is typically suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court." *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, like those at issue here, that are implemented through "contracts to set the terms of and receive commitments from recipients." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The proper recourse for asserted violations of those grant agreements is a "suit in the Claims Court for damages relating to [the] alleged breach." *Id.*

23

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1025 (9th Cir. 2023) (noting that this Court applies *Megapulse*).

In the past few months, the Supreme Court has twice stayed other district-court orders that sought to undo the termination of grant agreements, concluding in both cases that the government was likely to succeed in showing that the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over suits to order the payment of money. First, in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), the Supreme Court confronted a challenge brought by a number of states to the Department of Education's termination of various education-related grants. The district court temporarily enjoined the terminations, and the First Circuit denied a motion to stay that injunction. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92 (1st Cir. 2025). The Supreme

24

Court granted the government's request for emergency relief, reaffirming that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted).

The Supreme Court reaffirmed that holding in *NIH v. American Public Health Ass'n*, No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025). There, the Court confronted a decision that vacated agency decisions to terminate various research-related grants. In granting the government's motion for a stay of that decision, the Supreme Court again held that the APA does not provide district courts with jurisdiction to consider "claims 'based on'" the research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH*, 2025 WL 2415669, at *1. And the controlling opinion specifically rejected the argument that authority to review a directive on which the termination was ostensibly based provided jurisdiction to review the termination itself. *See id.* at *2 (Barrett, J., concurring).

The district court lacked jurisdiction to invalidate plaintiffs' grant terminations here for the same reasons. As in *California* and *NIH*, plaintiffs

25

in this case allege that the government has violated "a contractual obligation to pay money" assertedly embodied in plaintiffs' grant agreements. 145 S. Ct. at 968 (quotation omitted). And as in *California* and *NIH*, the grants here were awarded by federal executive agencies to specific grantees like plaintiffs from a generalized fund. As a result—and again like in *California* and *NIH*—the source of plaintiffs' purported rights to payment from the agencies are not the underlying statutes but rather are plaintiffs' grant agreements, which bear the hallmarks of a contract. *Id.*

The harm that plaintiffs alleged and the relief they sought (and received) from the district court underscores that this dispute is, at base, contractual. Plaintiffs' concern is the loss of federal funds. To remedy that asserted harm, plaintiffs sought, and the district court issued, an order compelling the reinstatement and continued payment of funds under particular grants and contracts.

## B. Plaintiffs' challenges fail on the merits.

Even if the district court had jurisdiction to consider plaintiffs' various challenges to the termination provisions, none is likely to succeed.

26

### 1. First Amendment

The district court erred in holding that plaintiffs are likely to succeed on the merits of their First Amendment claims. Each of the challenged provisions merely directs agencies, to the maximum extent possible, to deploy preexisting authority to ensure that government funds are not spent to support programs and activities that the government no longer believes to be in the public interest. The provisions look only to the nature of the funded programs and do not penalize or scrutinize recipients' speech outside of the funded initiative. That kind of decision-making about what the government will and will not fund is subject only to deferential review, and the district court erred by analogizing to cases where the government seeks to use funding conditions to coerce or control a recipients' speech more broadly.

a. The Supreme Court has long been clear that the First Amendment provides the government significant flexibility when it acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it. The "decision not to subsidize the exercise of a fundamental right does not infringe the right," *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983), and "[t]he Government can, without violating the

Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest," *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). The government may permissibly "cho[ose] to fund one activity to the exclusion of the other," *id.*, and "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake," *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998).

The government can thus, for example, permissibly refrain from funding abortions, *Harris v. McRae*, 448 U.S. 297, 315 (1980), from subsidizing government lobbying, *Regan*, 461 U.S. at 550, and from subsidizing striking employees, *Lyng v. International Union, United Auto., Aerospace & Agr. Implement Workers of Am.*, 485 U.S. 360, 371 (1988), and can withhold funding from political candidates who do not enter party primaries, *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (per curiam).

The government is no less entitled to cease funding programs that the government no longer believes are in the public interest based on the subject matter of those programs. The First Amendment does not require funding grants to research programs that the government believes no longer serve the public interest, any more than funding anti-drug programs

28

requires the government to also fund speech advocating for the use of dangerous drugs.

The district court was thus manifestly mistaken to equate the government's refusal to subsidize speech with an effort to censor or to suppress speech. ER-37-39. The district court did not dispute that the challenged provisions look only to the content of the grant-funded activities themselves and do not seek to regulate recipients' speech generally. ER-35-36. Whenever the government chooses to stop subsidizing an activity, there may be less of that activity, but that reduction alone is a far cry from suppression of protected activity. *Cf. Lyng*, 485 U.S. at 371 (acknowledging that a constitutionally permissible spending statute "works at least some discrimination" against the otherwise protected activity).

b. Even though the government "may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake," *Finley*, 524 U.S. at 587-88, funding decisions are subject to a constitutional constraint insofar as the government cannot leverage its funding power to impose an unconstitutional condition—such as conditioning grants on refraining from

29

expressive conduct "that [is] separate and independent from the project that receives … funds." *Rust*, 500 U.S. at 196. The Supreme Court explained this distinction in *Finley*, and later Supreme Court cases have clarified it.

Thus, the First Amendment precludes the government from using its regulatory power to "drive 'certain ideas or viewpoints from the marketplace,'" and any regulation that "ai[ms] at the suppression of dangerous ideas" is subject to the most stringent First Amendment scrutiny. *Finley*, 524 U.S. at 587 (citations omitted). These concerns are not generally implicated, however, by selective government funding that leaves private entities free to express themselves as they wish using their own resources. As the Supreme Court explained in *Finley*, "cho[osing] to fund one activity to the exclusion of the other" is permissible. *Id.* at 588 (citation omitted). Constitutional concerns arise only when Congress is using the funding to affect speech outside of the program. For example, while limitations on the use of federal funds for a specific purpose—such as "promot[ing] or advocat[ing] [for] the legalization or practice of prostitution or sex trafficking"—are constitutionally permissible, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217-18 (2013) (quotation omitted), conditioning federal funds on a pledge to adopt a

30

policy "explicitly opposing prostitution and sex trafficking" is not, *id.* at 210 (quotation omitted).

Here, that means the government can choose to stop funding DEI- and gender-ideology-related grants. If the government had refused to provide any funding to entities that engaged in those activities using their own funds—assuming those activities constituted protected expression— this case would implicate the constitutional rules that apply when the government "seek[s] to leverage funding" to limit or penalize "speech outside the contours of the program itself." *Agency for Int'l Dev.*, 570 U.S. at 214-15. That is a form of coercion that actively suppresses a protected private activity rather than just refraining from publicly funding it.

But nothing remotely like that is present here. "The Supreme Court has repeatedly reaffirmed … that the government may constitutionally preclude recipients of federal funds from addressing specified subjects so long as the limitation does not interfere with a recipient's conduct outside the scope of the federally funded program." *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1093 n.24 (9th Cir. 2020). The government getting out of the business of funding DEI- and gender-ideology-related projects does not plausibly "aim at the suppression of dangerous ideas" in the sense of

31

driving the idea from the marketplace. *Finley*, 524 U.S. at 587. The government "does not 'penalize'" institutions that choose to do DEI or gender-ideology research, "or deny them the right to" do that research; it has merely made a constitutionally permissible "decision not to subsidize their doing so." *United States v. American Libr. Ass'n*, 539 U.S. 194, 212 (2003) (plurality opinion).

c.  The district court rested its contrary conclusion almost entirely on its reading of the Supreme Court's decision in *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 536 (2001), reading that decision to stand for the proposition that, even in the context of funding conditions, the government cannot make content- or viewpoint-based distinctions unless doing so furthers specific "legitimate objectives" enumerated by Congress. ER-37-38. But as this Court has since explained, *Velazquez* turned on the Supreme Court's conclusion that the grant program at issue there effectively created a limited public forum. *Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084, (9th Cir. 2010) ("The [*Velazquez*] Court analyzed the grantee plaintiffs' unconstitutional conditions claim through the lens of the Court's limited public forum cases."); *see also Mezibov v. Allen,* 411 F.3d 712, 720 (6th Cir. 2005) (stating that "*Velazquez* involved ... a government funding program

that the Court deemed a limited public forum for First Amendment purposes"); *Marijuana Policy Project v. United States,* 304 F.3d 82, 87 (D.C. Cir. 2002) (stating that *Velazquez* "rests on limited public forum doctrine").

The "limited public forum" doctrine has no application here. Limited public forum cases recognize that certain funding programs open to all comers must comply with "[t]he standard of viewpoint neutrality found in the public forum cases." *Board of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 230 (2000). Those cases draw on the principle that when the government creates a "limited public forum," open to discussion of a particular "subject matter"—such as an in-person space for discussion or a bulletin board—the government must be "viewpoint neutral." *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 389, 393 (1993). But when the government decides to "selectively fund a program," as here, it may choose grants that advance its policy goals and reject grants that do not. *Finley*, 524 U.S. at 588 (quoting *Rust*, 500 U.S. at 193); *accord id.* at 590 (Scalia, J., concurring in the judgment) (evaluating "grant applications" on "content- and viewpoint-based criteria" is "perfectly constitutional").

The Supreme Court extended this doctrine to certain government "funding decisions" in *Rosenberger v. Rector & Visitors of the University of*

33

*Virginia*, 515 U.S. 819, 833 (1995), even though funding programs are "a forum more in a metaphysical than in a spatial or geographic sense," *id.* at 830. That case involved a public university's funding of a variety of student groups in order to provide "a wide range of opportunities" for students. *Id.* at 824 (quotation omitted). The Court emphasized that it addressed a situation in which "the University … expends funds to encourage a diversity of views from private speakers." *Id.* at 834.

The Supreme Court's subsequent decision in *Finley* was a direct response to an opinion by a divided panel of this Court that applied *Rosenberger*'s viewpoint-neutrality requirement to the National Endowment of the Arts' selective grant program. *Finley v. National Endowment for the Arts*, 100 F.3d 671, 683 (9th Cir. 1996) ("Although NEA awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint."), *rev'd*, 524 U.S. 569 (1998). The dissenting judge in this Court would have held that "[w]hether government can consider content and viewpoint depends on whether the money it gives out is generally available to all who meet some basic standard, or whether it is a prize given to a select few." *Id.* at 684 (Kleinfeld, J., dissenting). The Supreme Court held that the Ninth Circuit majority's

34

"reliance on …. *Rosenberger* … [was] misplaced" for the reason stated in the Ninth Circuit dissent, notably that the NEA's grant program was "distinguish[ed] … from *Rosenberger*" because of "the competitive process according to which the grants are allocated." *Finley*, 524 U.S. at 586. Where, as in *Finley*, "the Government does not indiscriminately 'encourage a diversity of views from private speakers'" and is not making similarly "objective decisions on allocating public benefits," *Rosenberger* is inapplicable. *Id.* (quoting *Rosenberger*, 515 U.S. at 834). Thus, unless the provision at issue in *Finley* was "applied in a manner that raises concern about the suppression of disfavored viewpoints," it was constitutional. *Id.* at 587. Such suppression could not be attributed merely to selective funding decisions, whose validity the Court reaffirmed. *Id.* at 588.

Through this series of cases, the Supreme Court has thus clarified that as a general matter, when engaged in selective funding, the government need not be agnostic about whether it supports the activity being funded. Indeed, that principle gave rise to the grants at issue here in the first place: The government explicitly favored means of promoting equity in its grantmaking. *See, e.g.*, Exec. Order No. 13,985, § 1, 86 Fed. Reg. 7009, 7009 (Jan. 25, 2021) ("It is therefore the policy of [the Biden]

35

Administration that the Federal Government should pursue a comprehensive approach to advancing equity … ."). Plaintiffs presumably do not believe that this selectivity was unconstitutional when it was deployed to their benefit. The only thing that has changed is that the government no longer wishes to fund this particular type of grant, and nothing about that change alters the relevant legal principles. Rather, if the government was entitled to award grants because it wished to subsidize the grants' viewpoints, there is no constitutional basis to prevent the government from terminating them if it no longer wishes to do so (even assuming that terminating grants on particular topics is properly treated as viewpoint rather than content discrimination).

### 2. Fifth Amendment Void-for-Vagueness

The district court also erred in concluding that plaintiffs were likely to succeed in challenging the Equity Termination Provision under the Fifth Amendment. Treating the President's policy directive as it would a criminal statute, the district court concluded that plaintiffs were likely to succeed in showing the provision is void for vagueness. That holding rested on multiple fundamental errors.

36

a. At a basic level, a presidential policy directive to federal officers is not subject to constitutional vagueness standards. Those standards derive from the Fifth Amendment's Due Process Clause, which requires that restrictions on private conduct be sufficiently clear to give a person of "ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The doctrine thus serves to ensure notice and prohibit arbitrary enforcement of the requirements with which the public must comply. *Id*. But none of these concerns arise if the President gives his subordinates an unclear directive, and that is true whether the directive is made in a phone call, a speech, or an Executive Order. The Equity Termination Provision is not a law, and it does not prohibit private conduct—it is instead an instruction that articulates the President's policy priorities to subordinate officers in the Executive Branch.

The district court cited no case invalidating a directive in an Executive Order under the void-for-vagueness doctrine. ER-43. Instead, the district court concluded that because the challenged Executive Order provisions "expressly command action" from agencies, they "implicate[] the traditional concerns under the vagueness doctrine" and "encourage

37

arbitrary and discriminatory enforcement" of the President's directive. ER-43. Not so. The provision commands action only of executive branch employees; it does not direct any action from plaintiffs or otherwise regulate any private conduct. Nor does the provision "encourage arbitrary and discriminatory enforcement." ER-43. That the President's directive leaves room for individual agencies to decide how to implement it does not transform the directive into something akin to a vague criminal prohibition. The President is manifestly allowed to direct federal employees to achieve policy goals—even in general or imprecise terms— without triggering void-for-vagueness concerns.

This Court's decision in *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1140, 1145-47 (9th Cir. 2012), is not to the contrary. While this Court assumed that it could review the Order under the void-for-vagueness doctrine, no party appears to have contested that proposition and this Court ultimately concluded that the Executive Order was not unconstitutional in any event. Furthermore, the executive action at issue in *Humanitarian Law Project* is distinguishable from the policy directives at issue here. There, this Court confronted an Executive Order freezing assets of certain terrorist organizations and authorizing the

38

Secretary of Treasury to designate other groups that provided material support to those organizations as terrorists themselves. *See id.* at 1137-38. The Executive Order therefore had direct, substantial consequences both for the designated organizations and for private parties—like the plaintiff—that provided support to lawful activities of designated organizations. Those facts are a far cry from those presented here, and the decision provides no support for applying vagueness doctrine to policy directives within the Executive Branch.

b. Even apart from the intragovernmental nature of the provision, the Supreme Court has squarely held that there is no constitutional guarantee of clarity in grant or contract criteria, even if these criteria are set by statute. In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Court rejected a vagueness challenge to the National Foundation on the Arts and Humanities Act, which provides that grants shall be awarded according to "artistic excellence and artistic merit ... , taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1). The Court recognized that these standards were "undeniably opaque," such that they

39

would raise "substantial vagueness concerns" in the context of a "criminal statute or regulatory scheme." 524 U.S. at 588.

In the context of competitive grants, however, the Court explained that this imprecision raised no such concerns. That is because "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Finley*, 524 U.S. at 589. The challenged statute "merely add[ed] some imprecise considerations to an already subjective selection process," and neither these considerations nor the underlying selection process "impermissibly infringe[d] on First or Fifth Amendment rights." *Id.* at 590. A contrary conclusion would render unconstitutional "all Government programs awarding scholarships and grants on the basis of subjective criteria such as 'excellence,'" which the Supreme Court declined to do. *Id.* at 589 (citation omitted).

The district court's conclusion that the term "equity-related" was unconstitutionally vague replicates the analysis that the Supreme Court rejected in *Finley*. A directive to terminate "equity-related" grants creates no greater constitutional problem than a directive to terminate grants that are not "excellent"—and that is so even if, "as a practical matter," putative

40

grantees "may conform … to what they believe to be the decisionmaking criteria in order to acquire funding." *Finley*, 524 U.S. at 589.

c. The district court's errors in these respects are particularly pronounced given the facial nature of plaintiffs' challenge. "Facial challenges are disfavored for several reasons," including that they "often rest on speculation" and "consequen[tly] … raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)). And given its scope, "[f]acial invalidation 'is, manifestly, strong medicine' that 'has been employed by the Court sparingly and only as a last resort.'" *Finley*, 524 U.S. at 580 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)).

As a general rule, a vagueness claim under the Fifth Amendment "must be examined in light of the facts of the case at hand," not on an abstract, facial basis. *United States v. Moriello*, 980 F.3d 924 (4th Cir. 2020). That is because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk."

41

*Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). Here, plaintiffs' claims cannot be examined in light of any relevant facts because they are not challenging any particular grant decision.

d. Finally, the district court's analysis fundamentally misunderstands the Equity Termination Provision's role in agency decisionmaking. Without the Executive Order, federal agencies still have discretion to determine how to exercise their lawful authority to terminate grants or contracts. That authority is often broad and may be exercised based on policy preferences rather than any concrete standard. *See, e.g.*, 2 C.F.R. § 200.340(a)(4) (authority to terminate award "to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities"); *Northrop Grumman v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad."). That breadth has never been thought to create a vagueness problem, as private parties have no obligation to ascertain, or comply with, any standard that might affect the agency's own contracting decisions.

It makes no sense that guidance to agencies on how to exercise that broad discretion somehow *creates* a vagueness problem. As exemplified by the district court's decision here, that approach would allow for searching

42

judicial review of all presidential policy directives and effectively prohibit the President from directing executive officials unless he can do so with the same degree of specificity required of a criminal statute.

Of course, to the extent a counterparty believes that a particular termination is unlawful, it could raise that concern in an appropriate forum. But no such claim has been brought in this action, which sought instead to pretermit entirely the review of certain grants. Nor could such a claim be directed at the Equity Termination Provision, which directs termination only as "allowed by law." As the D.C. Circuit has recognized in analyzing an analogous Executive Order, a directive to agencies cannot be unlawful when "the Executive Order itself instructs the agency to follow the law." *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

### 3. Fifth Amendment Equal Protection

For multiple independent reasons, the district court erred in concluding that plaintiffs are likely to succeed on the merits of their facial equal-protection challenge to the gender-ideology provisions.

a. First, the district court erred in even considering plaintiffs' Equal Protection claim because plaintiffs do not have standing to raise equal-protection challenges on behalf of their clients and patients.

The district court concluded that plaintiffs had third-party standing to raise equal protection claims on behalf of their transgender clients. But as already discussed, *supra* pp. 17-22, plaintiffs have not established that they have standing to challenge the gender-ideology provisions at all. That alone is fatal to any theory of standing based on supposed injuries to their clients and patients because "even when [the Supreme Court] ha[s] allowed litigants to assert the interests of others, the litigants themselves still must have suffered an injury in fact." *FDA v. Alliance for Hippocratic Med.*, 144 S. Ct. 1540, 1563 n.5 (2024) (citation omitted). As the Supreme Court recently reiterated, "[t]he third-party standing doctrine does not allow doctors to shoehorn themselves into Article III standing simply by showing that their patients have suffered injuries or may suffer future injuries." *Id.*; *see also Hollingsworth v. Perry*, 570 U.S. 693, 708-09 (2013).

Even if plaintiffs could establish that the challenged provisions cause them some injury in fact, they fail to sufficiently assert third-party standing on behalf of their individual clients. As a general rule, third-party standing

44

is "disfavored." *Fleck & Assocs., Inc. v. City of Phoenix*, 471 F.3d 1100, 1105 n.3 (9th Cir. 2006); *see also Mills v. United States*, 742 F.3d 400, 407 (9th Cir. 2014) ("Courts 'typically decline to hear cases asserting rights properly belonging to third parties rather than the plaintiff.'" (citation omitted)). An exception to this rule applies only when the party seeking third-party standing shows that: (1) it has "a 'close' relationship with the person who possesses the right" and (2) there is "a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted).

Contrary to the district court's conclusion, plaintiffs failed to carry their burden to establish third-party standing. Specifically, plaintiffs do not, and cannot, show that their individual clients' ability to protect their own interest has been sufficiently hindered to warrant third-party standing. *See Tingley v. Ferguson*, 47 F.4th 1055, 1069-70 (9th Cir. 2022). To the contrary, individual plaintiffs have already challenged the Gender Ideology Executive Order on various grounds, including Equal Protection grounds. *See, e.g., Orr v. Trump*, 25-cv-10313 (D. Mass. Feb. 7, 2025) (a group of individuals filed a putative class action with respect to Executive Order 14,168 asserting Equal Protection claims); *Kingdom v. Trump*, 25-cv-691

45

(D.D.C. Mar. 10, 2025) (another putative class action with respect to Executive Order 14,168 pursuant to the Equal Protection Clause); *see also Moe v. Trump*, 25-cv-10195 (D. Mass. Jan. 26, 2025); *Doe v. McHenry, III*, 25-cv-286 (D.D.C. Jan. 30, 2025); *PFLAG, Inc. v. Trump*, 25-cv-337 (D. Md. Feb. 4, 2025); *Jones v. Trump*, 25-cv-401 (D.D.C. Feb. 10, 2025); *Tirrell v. Edelblut*, 24-cv-00251 (D.N.H. Feb. 12, 2025); *Ireland v. Hegseth*, 25-cv-1918 (D.N.J. Mar. 17, 2025). These pending cases involving similarly situated plaintiffs asserting their own claims against the same defendants challenging the same government action undercut the district court's conclusion that plaintiffs had demonstrated the kind of "hindrance" required to establish third-party standing. *See Tingley*, 47 F.4th 1069-70 (hinderance not established where individuals in the same position as clients brought their own lawsuits in other states, and where risk of stigma could be redressed using pseudonyms filing).

Simply put, this is not a case where potential individual litigants face "daunting" barriers or have "little incentive" to litigate their own claims. *Powers v. Ohio*, 499 U.S. 400, 414-15 (1991). As such, plaintiff organizations need not—and therefore cannot—litigate individuals' claims for them.

46

Because plaintiffs have failed to identify any discriminatory government conduct against themselves and cannot assert third-party standing on behalf of their individual clients, the district court lacked jurisdiction to consider their Equal Protection claim.

b.  Even if plaintiffs had standing to raise an equal-protection challenge to the gender-ideology provisions, any equal-protection challenge is not likely to succeed.

To succeed, plaintiffs would have to establish that the Executive Order instructs agencies to take actions that discriminate on the basis of some protected status. But the challenged provisions do not direct agencies to do so. On their face, the challenged gender-ideology provisions do not draw any distinctions based on sex or any other protected characteristic. Instead, the Order expresses a view that sex and gender identity are distinct concepts, and that for a number of reasons it is not workable or appropriate to replace sex with gender identity for purposes of identifying or sorting people. *See* Gender Ideology Order § 2(f) (defining "gender ideology"). And the challenged provisions direct agencies to ensure that, to the extent permitted by law, federal money is not being used to fund programs or projects that treat sex and gender identity as interchangeable.

47

*See id.* § 3(e), (g) (directing agencies to ensure government monies are not used to fund or promote "gender ideology").

Plaintiffs evidently disagree with that view and would prefer to continue receiving federal funding for projects that "replace[] the biological category of sex with … self-assessed gender identity." Gender Ideology Order § 2(f). But that does not transform a facially neutral Order into discriminatory government action that singles out transgender status. Indeed, the Order does not even draw a distinction between transgender identity and any other gender identity—it defines "gender ideology" to mean replacing sex with gender identity generally, and the Order notes that the *diversity* of gender identities is one of the principal reasons why sex remains a useful, independent concept.

The district court concluded otherwise only by departing entirely from what the Gender Identity Order says and embarking on a series of speculations about what the "intended consequences" of the Order must be. ER-32-33. The district court asserted that the Order facially "withholds funding based on the transgender status of the individuals that grantees serve," "preclude[s] providing health and social services that acknowledge the existence of transgender people," and requires grantees to "remove

48

references" to the existence of transgender people. ER-32. But as noted, the Order says no such thing. By its terms, the Order only requires agencies to terminate funding that promotes "gender ideology," which is defined to mean replacing sex with self-assessed gender identity, requiring others to accept this replacement as true, and thereby diminishing or eliminating "sex as an identifiable or useful category." Gender Ideology Order § 3(f). None of that requires grantees to disavow the existence of transgender people or otherwise categorizes people based on their gender identity in any way.

The Supreme Court's recent decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), confirms the district court's error. The Supreme Court there confronted a law that prohibited medical interventions for "gender dysphoria, gender identity disorder, or gender incongruence" in minors. *Id.* at 1829. Like plaintiffs here, the *Skrmetti* plaintiffs argued that the law "discriminates on the basis of sex and transgender status" and cannot withstand intermediate scrutiny. *Id.* at 1834. The Supreme Court rejected these arguments and upheld Tennessee's law on rational-basis review. It first held that Tennessee's law does not classify based on sex because it "does not prohibit conduct for one sex that it permits for the other." *Id.* at

49

1831. Rather, the prohibition turns on "the underlying medical concern the treatment is intended to address"—*e.g.*, gender dysphoria—and applies regardless of a minor's sex." *Id.* at 1830. The same is true here: The challenged provisions direct agencies to terminate funds based not on any individual's sex, but based on whether the program receiving funds promotes a view that treats sex and gender identity as interchangeable or diminishes the importance of sex, and that directive applies to all programs and does not turn on the sex of any individual or group.

The Supreme Court further held in *Skrmetti* that the law does not classify based on transgender status. 145 S. Ct. at 1834. The Court explained that it "divides minors into two groups: those who might seek puberty blockers or hormones to treat the excluded diagnoses, and those who might seek puberty blockers or hormones to treat other conditions." *Id.* at 1833. Because "transgender individuals" fall into both groups, the Court concluded that "there is a 'lack of identity' between transgender status and the excluded medical diagnoses." *Id.* The same is true here. Even accepting the district court's assertion that the challenged provision would require agencies to strip funding for programs that provide services to people exclusively based on their gender identity, transgender people would still

50

be able to receive services from programs that impose no such gender-identity based restrictions. In other words, there is a "lack of identity between transgender status" and any line-drawing contained in the challenged provisions because transgender people receive services from both "groups"—programs that continue to receive funds and those that do not—created by the Order. The district court's conclusion that the challenged provisions nevertheless discriminate based on transgender status cannot be reconciled with the Supreme Court's decision.[4]

The absence of any discrimination based on sex defeats plaintiffs' claim, and they cannot revive it based on a generalized critique of the substance and motivations for the Executive Order. It is black-letter law that only government *action* can violate the Equal Protection Clause. *See Ballou v. McElvain*, 29 F.4th 413, 422 (9th Cir. 2022) ("The central inquiry in

---

[4] The Supreme Court recently granted certiorari to review this Court's decision in *Hecox v. Little*, 79 F.4th 1009 (9th Cir. 2023), which subjected a law discriminating against transgender students to heightened scrutiny under the Equal Protection clause. If the Supreme Court were to hold in that case that transgender status is not a suspect class under equal-protection principles, that would provide yet another basis to vacate the district court's decision here. The government respectfully preserves this argument for further review while acknowledging that it is foreclosed by circuit precedent for now.

an Equal Protection Clause claim is whether a government action was motivated by a discriminatory purpose."). As discussed above, plaintiffs fail to identify any action by the government that plausibly violates their equal-protection rights; to the contrary, the only actions contemplated are termination of grants that are inconsistent with the Executive Branch's funding priorities that do not discriminate on the basis of sex.

That the Executive Order espouses a view of gender identity with which plaintiffs or the district court disagree does not transform the Order into discriminatory government action. Plaintiffs, for example, complained in district court that the Order "facially discriminates against transgender people by declaring they do not exist and deeming their identities to be 'false.'" And the district court similarly concluded that the evident purpose of the Order is to "deny the existence of transgender persons entirely." ER-32-33. Even accepting that interpretation of the Order, *but see supra* pp. 47-51, such allegations about government rhetoric are inadequate to make out an equal-protection claim. The relevant question is whether the operative provisions of the Executive Order caused some action to be taken on an impermissible ground, and as discussed above, they did not. Absent any allegation that any of the Executive Order's provisions direct agencies to

engage in discriminatory actions, the district court had no basis to enjoin or police an Executive Order's language.

### 4. As-Applied Separation of Powers

Finally, the district court erred in considering plaintiffs' claims that the funding termination provisions are inconsistent with several specific funding statutes. The district court held that, if an agency were to terminate grants issued under five statutes, doing so would violate particular requirements of those grant schemes. That holding was error.

a. First, the district court's decision runs headlong into the text of the very provisions that plaintiffs challenge. Each of the challenged provisions direct agencies to terminate funding only to the extent authorized by law. *See* DEI Order § 2(b)(i), 90 Fed. Reg. 8339 (directing agencies to "terminate, to the maximum extent allowed by law, . . . 'equity-related' grants or contracts"), Gender Ideology Order § 3(e), 90 Fed. Reg. 8615 (directing agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology").[5] The provisions thus contemplate

---

[5] Although § 3(g) of the Gender Ideology Order does not expressly restate the qualifier that is explicit in § 3(e)—"as permitted by law"—the two provisions must be read together because they appear in the same

*Continued on next page.*

that, in some instances, agencies will not be able to lawfully terminate

covered grants. The President's judgment that certain categories of

contracts should be terminated to the maximum extent permissible is a

general policy directive that does not conflict with any statute. And that is

all that plaintiffs challenge. Once again, the decision to target only

directives contained in two Executive Orders, as opposed to any particular

action taken to implement those Orders, is fatal to their claim.

Contrary to the district court's conclusion, this Court's decision in

*City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), does

not suggest otherwise. There, this Court confronted an Executive Order

that directed that certain agencies "shall ensure" that certain jurisdictions

"are not eligible to receive Federal grants, except as deemed necessary for

law enforcement purposes" by the relevant agency heads. This Court

concluded that that directive—for the agencies to "ensure" certain

jurisdictions are "not eligible" to receive grants except in limited

---

section and address the same subject matter. *See United States v. Stewart*, 311
U.S. 60, 64 (1940) ("[A]ll acts *in pari materia* are to be taken together, as if
they were one law."). Moreover, Section 8(b) of the Order specifically
provides that that the Executive Order in full must be "implemented
consistent with applicable law."

54

circumstances—was sufficiently "clear and specific" that it could not be "overridden" by language indicating that the agencies should carry it out "in their discretion and to the extent consistent with law." *Id*. at 1239.

By contrast, here, the challenged provisions do not unequivocally compel agencies to improperly withhold congressionally appropriated funds. Instead, the Executive Orders direct agencies to align government funding with policy priorities while explicitly directing them to yield to any and all applicable laws before terminating any funding. In that way, this case is analogous to the Executive Order the D.C. Circuit considered in *Allbaugh*, 295 F.3d 28. There, the Executive Order "provide[d] that, to the extent permitted by law, no federal agency, and no entity that receives federal assistance for a construction project, may either require bidders or contractors to enter, or prohibit them from entering, into a project labor agreement (PLA)." *Id.* at 29. As the *Allbaugh* court recognized, the permitted-by-law qualifier "instructs the agency to follow the law." *Id.* at 33. Thus, "if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order," then it may not. *Id.* The court went on to conclude that "[t]he mere

55

possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that, so far as the present record reveals, is above suspicion in the ordinary course of administration." *Id.*

The same is true here, and a contrary decision would expand this Court's decision in *San Francisco* in a way that not only is inconsistent with precedent from other circuits but also would sweep so broadly as to be plainly incorrect. It is commonplace for Executive Branch officials to announce broad policy priorities and direct their subordinates to implement them, to the extent consistent with law. There is no basis for allowing such directives to be invalidated merely because—as the directives themselves contemplate—implementation of those priorities may in some circumstances be constrained by the law. Doing so would eliminate an important tool that allows high-level officials to give direction to their subordinates without working out every detail of implementation or addressing every potential legal hurdle. This Court concluded in *San Francisco* that the general presumption that a directive to act only as consistent with law means what it says was overcome based on the

particular circumstances of that case, but the case cannot properly be read to treat such directives as a nullity across the board.

b.    Relatedly, three of plaintiffs' as-applied challenges—those for grants under the Ryan White Program, the HOPWA program, and as FQHCs—suffer from threshold problems because plaintiffs identify no grant that has been terminated under those statutes (though, even if they did, their claims would properly be pursued only under the Tucker Act as discussed above). Any claim that terminations for those grants would be unlawful is therefore unripe for review. It is entirely speculative whether agencies will disagree with the arguments made by plaintiffs and the district court and conclude that grants awarded under those statutes can be terminated notwithstanding the Executive Orders' direction that grants must be terminated only to the extent consistent with law. And as discussed above, if any such grant is terminated by an agency, the appropriate course is for plaintiffs to challenge that particular termination in an appropriate venue, not to seek a blunderbuss pre-enforcement injunction. Any such case would allow evaluation of the agency's actual interpretation of the statutory provisions at issue, rather than getting courts

57

ahead of agencies and resolving hypothetical disputes with no administrative record.

c. Finally, the district court's decision as to the remaining two statutes—the Affordable Care Act and Public Health Service Act—collapses entirely with its analysis of plaintiffs' equal-protection claim. The court concluded that, for the same reasons plaintiffs were likely to succeed on their equal protection claim, they were likely to show that the Gender Ideology Order violates specific antidiscrimination provisions contained in those two statutes. ER-54-55. For the reasons given above, *supra* pp. 47-53, that is wrong because the district court's conclusion that the Gender Ideology Order discriminates based on sex or transgender status was error.

## II. The Remaining Equitable Factors Favor the Government.

The balance of equities and the public interest counsel against a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). In particular, the district court's order will cause significant and irreparable harm to the government. The court's injunction restrains the government from carrying out lawful and important policies with respect to federal funding priorities. "Under our Constitution, the 'executive power'—all of it—is vested in a

58

President," who must "take Care that the laws be faithfully executed." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. art. II, § 1, cl. 1; *id.* § 3). "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Id.* at 203-04. The President also has authority, "as head of the Executive Branch, to 'supervise and guide' executive officers in 'their construction of the statutes under which they act.'" Office of Legal Counsel, *Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 60 (1981) (quoting *Myers v. United States*, 272 U.S. 52, 135 (1926)).

The extraordinary injunction in this case interferes with these core executive functions and prevents the President from directing and controlling executive officers in their exercise of lawful authority. The challenged provisions simply guide agencies' exercise of pre-existing authority to terminate grants or contracts, and enjoining those directives inhibits agencies from exercising their authority in a way that furthers the President's priorities. The injunction thus inflicts irreparable constitutional harm by eroding the President's control over subordinates and frustrates the public's interest in having the elected President effectuate policy

59

priorities through lawful direction of the executive branch. As the Supreme Court has emphasized, under the "constitutional strategy" chosen by the Framers, individual executive officials' authority "remains subject to the ongoing supervision and control of the elected President." *Seila*, 591 U.S. at 224. The district court's assertion of authority to parse and analyze the way the President provides that supervision and direction unlawfully usurps the President's Article II authority.

Beyond the harms to the President's ability to execute core Executive Branch policies, the order irreparably harms the public fisc. The order requires the agencies to reinstate grantees' access to funds. ER-5-7. As in *Department of Education v. California* and *NIH v. American Public Health Ass'n*, the government "is unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. Thus, the challenged order will result in the immediate outflow of significant amounts of money from the public fisc and limited prospects for recovery if it is ultimately determined that the grant terminations were lawful. Conversely, even absent preliminary relief, nothing would prevent plaintiffs from seeking an order to restore "any wrongfully withheld funds through suit in an appropriate forum." *California*, 145 S. Ct. at 969.

60

In contrast, the gravamen of plaintiffs' claim is monetary—they ask to continue receiving funds under their grant agreements during the pendency of this litigation. The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original) (quotation omitted).

Finally, the Supreme Court recently assessed the equitable factors in two cases involving materially similar injunctive relief—*California* and *NIH*—and its weighing of the equities in a stay posture in those cases demonstrates that the balance weighs against an injunction. As the Court explained, the government suffers irreparable harm because it is "unlikely to recover the grant funds once they are disbursed." 145 S. Ct. at 969. The Supreme Court has since reiterated that its stay decisions "inform how a court should exercise its equitable discretion in like cases"; accordingly, the Supreme Court's balancing of the equities "squarely control[s]" here. *Trump v. Boyle*, No. 25A11, 2025 WL 2056889 (U.S. July 23, 2025).

### III.    At the Very Least, the Injunction is Overbroad.

Even if the district court did not err in granting plaintiffs' motion for a preliminary injunction, the injunction order it issued should still be vacated and remanded in part because it is overbroad. The district court concluded that the challenged termination provisions are likely unlawful and enjoined defendants from enforcing those provisions against plaintiffs or taking other action to implement those provisions. But the district court's injunction went further and ordered defendants to reinstate a list of specific grant and contract awards (and any other grant award that had been terminated since plaintiffs' complaint was filed) *regardless* of whether those awards were terminated pursuant to the challenged provisions. ER-5-7.

In addition to being beyond the district court's jurisdiction due to the preclusive effect of the Tucker Act, that aspect of the injunction is plainly divorced from plaintiffs' claims and the district court's legal conclusions. Plaintiffs have not established any likelihood of success or harm arising from any grants or contracts that were terminated for some reason independent of the challenged Executive Order provisions. This Court should therefore, at the very least, vacate the injunction to the extent it

requires defendants to reinstate grants or contracts that were not terminated pursuant to the challenged termination provisions and (assuming the Court rejects the government's Tucker Act argument) remand to the district court to determine in the first instance whether any of the grants and contracts listed in paragraph 2 of its order (or any other grants) were in fact terminated pursuant to the challenged provisions.

# CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated or, at the very least, vacated in part.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant*
*Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
*/s Jack Starcher*_____
JACK STARCHER
*Attorneys, Appellate Staff*
*Civil Division, Room 7515*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-8877*

SEPTEMBER 2025

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they are aware of the following related case pending in this Court: *Thakur v. Trump*, No. 25-4249 (9th Cir.) raises some similar or related issues as this appeal. In particular, *Thakur* involves similar First Amendment challenges to one of the Executive Orders at issue in this appeal. In addition, *Thakur* raises similar questions about district court jurisdiction to consider grant-related claims under the Tucker Act.

*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,363 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jack Starcher*

Jack Starcher

# ADDENDUM

# TABLE OF CONTENTS

28 U.S.C. § 1491.................................................................................. A1

Executive Order 14,151, Ending Radical and Wasteful Government
       DEI Programs and Preferencing, 90 Fed. Reg 8339 ............................ A2

Executive Order 14,168, Defending Women from Gender Ideology
       Extremism and Restoring Biological Truth to the Federal
       Government, 90 Fed. Reg 8615 ............................................................ A5

**28 U.S.C. § 1491**

**§ 1491. Claims against United States generally; actions involving Tennessee Valley Authority**

(a)

(1) The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

(2) To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just. The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41, including a dispute concerning termination of a contract, rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

**Executive Order 14,151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg 8339**

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1. Purpose and Policy. The Biden Administration forced illegal and immoral discrimination programs, going by the name "diversity, equity, and inclusion" (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."

Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted "Equity Action Plans" to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

Sec. 2. Implementation.

(a) The Director of the Office of Management and Budget (OMB), assisted by the Attorney General and the Director of the Office of Personnel Management (OPM), shall coordinate the termination of all discriminatory programs, including illegal DEI and "diversity, equity, inclusion, and accessibility" (DEIA) mandates, policies, programs, preferences and activities in the Federal Government, under whatever name they appear. To carry out this directive, the Director of OPM, with the assistance of the Attorney General as requested, shall review and revise, as appropriate, all existing Federal employment practices, union contracts, and training policies or programs to comply with this order. Federal employment practices, including Federal employee performance reviews, shall reward individual initiative, skills, performance, and hard work and shall not under any circumstances consider DEI or DEIA factors, goals, policies, mandates, or requirements.

A2

(b) Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:

(i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

(ii) provide the Director of the OMB with a list of all:

(A) agency or department DEI, DEIA, or "environmental justice" positions, committees, programs, services, activities, budgets, and expenditures in existence on November 4, 2024, and an assessment of whether these positions, committees, programs, services, activities, budgets, and expenditures have been misleadingly relabeled in an attempt to preserve their pre-November 4, 2024 function;

(B) Federal contractors who have provided DEI training or DEI training materials to agency or department employees; and

(C) Federal grantees who received Federal funding to provide or advance DEI, DEIA, or "environmental justice" programs, services, or activities since January 20, 2021.

(iii) direct the deputy agency or department head to:

(A) assess the operational impact (e.g., the number of new DEI hires) and cost of the prior administration's DEI, DEIA, and "environmental justice" programs and policies; and

(B) recommend actions, such as Congressional notifications under 28 U.S.C. 530D, to align agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including set-asides), grants, consent orders, and litigating positions with the policy of equal dignity and respect identified in section 1 of this order. The agency or department head and the Director of OMB shall

A3

jointly ensure that the deputy agency or department head has the authority and resources needed to carry out this directive.

(c) To inform and advise the President, so that he may formulate appropriate and effective civil-rights policies for the Executive Branch, the Assistant to the President for Domestic Policy shall convene a monthly meeting attended by the Director of OMB, the Director of OPM, and each deputy agency or department head to:

(i) hear reports on the prevalence and the economic and social costs of DEI, DEIA, and "environmental justice" in agency or department programs, activities, policies, regulations, guidance, employment practices, enforcement activities, contracts (including setasides), grants, consent orders, and litigating positions;

(ii) discuss any barriers to measures to comply with this order; and

(iii) monitor and track agency and department progress and identify potential areas for additional Presidential or legislative action to advance the policy of equal dignity and respect.

Sec. 3. Severability. If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected.

Sec. 4. General Provisions.

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

January 20, 2025.


**Executive Order 14,168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg 8615**


By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 7301 of title 5, United States Code, it is hereby ordered:

Section 1. Purpose. Across the country, ideologues who deny the biological reality of sex have increasingly used legal and other socially coercive means to permit men to self-identify as women and gain access to intimate single-sex spaces and activities designed for women, from women's domestic abuse shelters to women's workplace showers. This is wrong. Efforts to eradicate the biological reality of sex fundamentally attack women by depriving them of their dignity, safety, and well-being. The erasure of sex in language and policy has a corrosive impact not just on women but on the validity of the entire American system. Basing Federal policy on truth is critical to scientific inquiry, public safety, morale, and trust in government itself.

This unhealthy road is paved by an ongoing and purposeful attack against the ordinary and longstanding use and understanding of biological and scientific terms, replacing the immutable biological reality of sex with an internal, fluid, and subjective sense of self unmoored from biological facts. Invalidating the true and biological category of "woman" improperly transforms laws and policies designed to protect sex-based opportunities into laws and policies that undermine them, replacing longstanding,

A5

cherished legal rights and values with an identity-based, inchoate social concept.

Accordingly, my Administration will defend women's rights and protect freedom of conscience by using clear and accurate language and policies that recognize women are biologically female, and men are biologically male.

Sec. 2. Policy and Definitions. It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality. Under my direction, the Executive Branch will enforce all sex-protective laws to promote this reality, and the following definitions shall govern all Executive interpretation of and application of Federal law and administration policy:

(a) "Sex" shall refer to an individual's immutable biological classification as either male or female. "Sex" is not a synonym for and does not include the concept of "gender identity."

(b) "Women" or "woman" and "girls" or "girl" shall mean adult and juvenile human females, respectively.

(c) "Men" or "man" and "boys" or "boy" shall mean adult and juvenile human males, respectively.

(d) "Female" means a person belonging, at conception, to the sex that produces the large reproductive cell.

(e) "Male" means a person belonging, at conception, to the sex that produces the small reproductive cell.

(f) "Gender ideology" replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true. Gender ideology includes the idea that there is a vast spectrum of genders that are disconnected from one's sex. Gender ideology is internally inconsistent, in that it diminishes sex as an identifiable or useful category but nevertheless maintains that it is possible for a person to be born in the wrong sexed body.

A6

(g) "Gender identity" reflects a fully internal and subjective sense of self, disconnected from biological reality and sex and existing on an infinite continuum, that does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex.

Sec. 3. Recognizing Women Are Biologically Distinct From Men.

(a) Within 30 days of the date of this order, the Secretary of Health and Human Services shall provide to the U.S. Government, external partners, and the public clear guidance expanding on the sex-based definitions set forth in this order.

(b) Each agency and all Federal employees shall enforce laws governing sex-based rights, protections, opportunities, and accommodations to protect men and women as biologically distinct sexes. Each agency should therefore give the terms "sex", "male", "female", "men", "women", "boys" and "girls" the meanings set forth in section 2 of this order when interpreting or applying statutes, regulations, or guidance and in all other official agency business, documents, and communications.

(c) When administering or enforcing sex-based distinctions, every agency and all Federal employees acting in an official capacity on behalf of their agency shall use the term "sex" and not "gender" in all applicable Federal policies and documents.

(d) The Secretaries of State and Homeland Security, and the Director of the Office of Personnel Management, shall implement changes to require that government-issued identification documents, including passports, visas, and Global Entry cards, accurately reflect the holder's sex, as defined under section 2 of this order; and the Director of the Office of Personnel Management shall ensure that applicable personnel records accurately report Federal employees' sex, as defined by section 2 of this order.

(e) Agencies shall remove all statements, policies, regulations, forms, communications, or other internal and external messages that promote or otherwise inculcate gender ideology, and shall cease issuing such statements, policies, regulations, forms, communications or other messages. Agency forms that require an individual's sex shall list male

A7

or female, and shall not request gender identity. Agencies shall take all necessary steps, as permitted by law, to end the Federal funding of gender ideology.

(f) The prior Administration argued that the Supreme Court's decision in Bostock v. Clayton County (2020), which addressed Title VII of the Civil Rights Act of 1964, requires gender identity-based access to single-sex spaces under, for example, Title IX of the Educational Amendments Act. This position is legally untenable and has harmed women. The Attorney General shall therefore immediately issue guidance to agencies to correct the misapplication of the Supreme Court's decision in Bostock v. Clayton County (2020) to sex-based distinctions in agency activities. In addition, the Attorney General shall issue guidance and assist agencies in protecting sex-based distinctions, which are explicitly permitted under Constitutional and statutory precedent.

(g) Federal funds shall not be used to promote gender ideology. Each agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology.

Sec. 4. Privacy in Intimate Spaces.

(a) The Attorney General and Secretary of Homeland Security shall ensure that males are not detained in women's prisons or housed in women's detention centers, including through amendment, as necessary, of Part 115.41 of title 28, Code of Federal Regulations and interpretation guidance regarding the Americans with Disabilities Act.

(b) The Secretary of Housing and Urban Development shall prepare and submit for notice and comment rulemaking a policy to rescind the final rule entitled "Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs" of September 21, 2016, 81 FR 64763, and shall submit for public comment a policy protecting women seeking single-sex rape shelters.

(c) The Attorney General shall ensure that the Bureau of Prisons revises its policies concerning medical care to be consistent with this order, and shall ensure that no Federal funds are expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex.

A8

(d) Agencies shall effectuate this policy by taking appropriate action to ensure that intimate spaces designated for women, girls, or females (or for men, boys, or males) are designated by sex and not identity.

Sec. 5. Protecting Rights. The Attorney General shall issue guidance to ensure the freedom to express the binary nature of sex and the right to single-sex spaces in workplaces and federally funded entities covered by the Civil Rights Act of 1964. In accordance with that guidance, the Attorney General, the Secretary of Labor, the General Counsel and Chair of the Equal Employment Opportunity Commission, and each other agency head with enforcement responsibilities under the Civil Rights Act shall prioritize investigations and litigation to enforce the rights and freedoms identified.

* * *

Sec. 8. General Provisions.

(a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

(d) If any provision of this order, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this order and the application of its provisions to any other persons or circumstances shall not be affected thereby.

THE WHITE HOUSE,

January 20, 2025.