**Case No. 25-4988**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

SAN FRANCISCO AIDS FOUNDATION, et al.,

Plaintiffs-Appellees,

*v.*

DONALD J. TRUMP, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Northern District of California

_____

**ANSWERING BRIEF FOR PLAINTIFFS-APPELLEES
SAN FRANCISCO AIDS FOUNDATION, et al.**

_____

Camilla B. Taylor
Kenneth D. Upton, Jr.
**Lambda Legal Defense and
Education Fund, Inc.**
3656 North Halsted Street
Chicago, Illinois 60613-5974
312-663-4413

Jennifer C. Pizer
**Lambda Legal Defense and
Education Fund, Inc.**
800 South Figueroa Street, Ste. 1260
Los Angeles, California 90017-2521
213-382-7600

Jose Abrigo
Omar Gonzalez-Pagan
**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005-3919
212-809-8585

Karen L. Loewy
**Lambda Legal Defense and
Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
202-804-6245

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ........................................................2

STATEMENT OF THE ISSUES ..............................................................3

PERTINENT STATUTES AND REGULATIONS...............................4

STATEMENT OF THE CASE ..................................................................4

SUMMARY OF ARGUMENT.................................................................15

STANDARD OF REVIEW .......................................................................19

ARGUMENT...............................................................................................19

I.     The District Court Correctly Ruled that Plaintiffs Have Standing. ....19

    A.    Plaintiffs Have Article III Standing. ..............................................19

    B.    Plaintiffs Have Standing to Challenge the Funding Provisions. ...................................................................................................22

    C.    The Tucker Act Does Not Apply Because Plaintiffs Bring Constitutional Law Claims, Not Contract or APA Claims. ........25

    D.    Plaintiffs Have Third-Party and Individual Standing to Assert Equal Protection Claims Against the Gender Termination and Gender Promotion Provisions. .......................................................28

II.    The District Court Correctly Determined that Plaintiffs Are Likely to Succeed on the Merits of Their Claims under Fifth Amendment Equal Protection, First Amendment Freedom of Speech, Fifth Amendment Due Process, and Separation of Powers. ....................................................34

    A.    The Gender Order's Facially Discriminatory Animus Against Transgender People Fails Any Standard of Review. ...................34

        1.    Fifth Amendment Equal Protection ....................................34

        2.    The Gender Order Fails Heightened Scrutiny....................35

        3.    The Gender Order Fails Even Rational Basis Review ......38

    B.    The Funding Provisions Violate Plaintiffs' First Amendment Rights Because They Target Ideas the Government Disfavors and Impose a Categorical Ban on Funding Untethered to any Congressionally Authorized Program. .........................................43

i

        1.     The First Amendment ...........................................................43

        2.     The Funding Provisions ......................................................44

   C.    The District Court Correctly Determined that the Equity Termination Provision is Void for Vagueness on Both a Facial and As-Applied Basis. ......................................................49

        1.     Fifth Amendment Due Process ...........................................49

        2.     The Term "Equity-related" Is Unconstitutionally Vague 51

   D.    The Funding Provisions Are Ultra Vires and Violate the Separation of Powers on an As-Applied Basis Because They Conflict with Statutes Applicable to Plaintiffs............................53

III.   The District Court Properly Determined that Plaintiffs Otherwise Established the Elements Necessary for a Preliminary Injunction. ....61

   A.    Plaintiffs Made a Sufficient Showing of Irreparable Harm .......61

   B.    The Balance of Harms and Public Interest Factors Favor Plaintiffs. ....................................................................................62

IV.   The Injunction is Properly Tailored to Provide Plaintiffs Complete Relief. ..................................................................................................66

CONCLUSION ..................................................................................................67

STATEMENT OF RELATED CASES ..................................................................69

CERTIFICATE OF COMPLIANCE FOR BRIEFS.............................................70

CERTIFICATE OF SERVICE .............................................................................71

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*A&M Records v. Napster,*
239 F.3d 1004 (9th Cir. 2001) ............................................................19

*Acosta-Huerta v. Estelle,*
7 F.3d 139 (9th Cir. 1992) ...........................................................40, 56

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ...........................................................13, 44, 45

*Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts of Health,*
No. 25-CV-01620-LKG, 2025 WL 2377705 (D. Md. Aug. 14,
2025) .........................................................................................28, 29, 58

*Bd. of Regents of the Univ. of Wis. Sys. v. Southworth,*
529 U.S. 217 (2000) ..............................................................................47

*Bostock v. Clayton Cnty.,*
590 U.S. 644 (2020) ..............................................................................57

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ......................................................................11, 26

*Buchanan v. Warley,*
245 U.S. 60 (1917) ................................................................................34

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ........................................................59, 60

*C.P. v. Blue Cross Blue Shield of Ill.,*
No. 3:20-CV-06145-RJB, 2022 WL 17788148 (W.D. Wash. Dec.
19, 2022) ................................................................................................58

*City & Cnty. of S.F. v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ................................................*passim*

iii

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985)................................................................40

*Climate United Fund v. Citibank, N.A.*,
    No. 25-5122, 2025 WL 2502881 (D.C. Cir. Sept. 2, 2025) ...........................28

*Clinton v. City of N.Y.*,
    524 U.S. 417 (1998)................................................................54

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019)................................................................20

*Dep't of Educ. v. California*,
    604 U.S. 650 (2025)..............................................................26, 64

*Doe v. Horne*,
    115 F.4th 1083 (9th Cir. 2024)..............................................*passim*

*Doe v. Snyder*,
    28 F.4th 103 (9th Cir. 2022).......................................................57

*Elrod v. Burns*,
    427 U.S. 347 (1976)................................................................62

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)................................................................50

*FDA v. Alliance for Hippocratic Medicine*,
    602 U.S. 367 (2024)................................................................29

*Fellowship of Christian Athletes v. San Jose Unified Sch. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023).......................................................19

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)................................................................49

*Harik v. Cal. Teachers Ass'n*,
    326 F.3d 1042 (9th Cir. 2003)...................................................39, 63

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024), *cert. granted*, 145 S.Ct. 2871
  (July 3, 2025) ................................................................................................35

*Hernandez v. Sessions*,
  872 F.3d 976 (9th Cir. 2017) ................................................................15, 61

*Immigr. & Naturalization Serv. v. Chadha*,
  462 U.S. 919 (1983) ................................................................................58

*Karnoski v. Trump*,
  926 F.3d 1180 (9th Cir. 2019) ..........................................................35, 39

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
  567 U.S. 298 (2012) ................................................................................45

*Koala v. Khosla*,
  931 F.3d 887 (9th Cir. 2019) ............................................................13, 44

*Legal Services Corp. v.Velazquez*,
  531 U.S. 533 (2001) ......................................................................13, 44, 46

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ................................................................................58

*Lopez v. Candaele*,
  630 F.3d 775 (9th Cir. 2010) ........................................................*passim*

*Martin v. U.S.*,
  649 F.2d 701 (9th Cir. 1981) ................................................................25

*Massachusetts v. U.S.*,
  435 U.S. 444 (1978) ................................................................................55

*Md. Shall Issue, Inc. v. Hogan*,
  971 F.3d 199 (4th Cir. 2020) ................................................................29

*Megapulse, Inc. v. Lewis*,
  672 F.3d 959 (D.C. Cir. 1982) ......................................................25, 27

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ................................................................61, 63, 64

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown,*
    567 F.3d 521 (9th Cir. 2009) ...........................................................................20

*Nat'l Endowment for the Arts v. Finley,*
    524 U.S. 569 (1998) ...............................................................................*passim*

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n, ,*
    145 S. Ct. 2658 (2025) .........................................................................*passim*

*Nat'l Rifle Ass'n of Am. v. Vullo,*
    602 U.S. 175 (2024) .........................................................................................44

*Oregon v. Legal Servs. Corp.,*
    Nos. CV. 05-1443-PK, 05-1444-PK, 2006 WL 8439301 (D. Or.
    July 10, 2006) .................................................................................................31

*Orr v. Trump,*
    778 F. Supp. 3d 394 (D. Mass. 2025) .....................................................41, 42

*PFLAG, Inc. v. Trump,*
    769 F. Supp. 3d 405 (D. Md. 2025) .........................................................*passim*

*Planned Parenthood S. Atl. v. Baker,*
    941 F.3d 687 (4th Cir. 2019) ...........................................................................62

*Powers v. Ohio,*
    499 U.S. 400 (1991) ................................................................................28, 31

*R.I. Latino Arts v. Nat'l Endowment for the Arts,*
    No. 25-cv-00079-WES, 2025 WL 2689296 (D. R.I. Sept. 19,
    2025) ..............................................................................................................47

*RK Ventures, Inc., v. City of Seattle,*
    307 F.3d 1045 (9th Cir. 2002) ..................................................................33, 34

*Roe v. Critchfield,*
    137 F.4th 912 (9th Cir. 2025) ....................................................................35, 39

*Roman v. Wolf,*
    977 F.3d 935 (9th Cir. 2020) ...................................................................63

*Romer v. Evans,*
    517 U.S. 620 (1996) .........................................................................40, 42

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
    508 F. Supp. 3d 521 (N.D. Cal. 2020) .............................................50

*Schmitt v. Kaiser Found. Health Plan of Wash.,*
    965 F.3d 945 (9th Cir. 2020) ...................................................................57

*Shuttlesworth v. City of Birmingham,*
    382 U.S. 87 (1965) .........................................................................50

*Talbott v. U.S.,*
    775 F. Supp. 3d 283 (D.D.C. 2025) ...............................................41

*Texas v. Johnson,*
    491 U.S. 397 (1989) .........................................................................45

*Thakur v. Trump,*
    148 F.4th 1096 (9th Cir. 2025) ...............................................47, 49, 69

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) ...................................................................32

*Trump v. U.S.,*
    603 U.S. 593 (2024) .........................................................................54, 58

*U.S. v. Jae Gab Kim,*
    449 F.3d 933 (9th Cir. 2006) ...................................................................50

*U.S. v. Skrmetti,*
    145 S.Ct. 1816 (2025) .........................................................................42, 43

*U.S. v. Strong,*
    489 F.3d 1055 (9th Cir. 2007) ...................................................................40

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) .........................................................................34

*Washington v. Davis,*
    426 U.S. 229 (1976) ............................................................35

*Washington v. Trump,*
    768 F. Supp. 3d 1239 (W.D. Wash. 2025) ....................31, 38, 58

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) ...........................................29

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
    485 F. Supp. 3d 1 (D.D.C. 2020) ......................................32

*Zivotofsky v. Kerry,*
    576 U.S. 1 (2015) ............................................................56

**Federal Statutes**

28 U.S.C. § 1331 ...................................................................2

28 U.S.C. §§ 2201; 2202 ........................................................2

28 U.S.C. § 1292(a)(1) ...........................................................3

28 U.S.C. § 1294(1) ...............................................................3

28 U.S.C. § 1491(a) .........................................................10, 25

42 U.S.C. § 300ff ................................................................55

42 U.S.C. § 300ff-1 ..............................................................55

42 U.S.C. § 300ff-71 ............................................................55

42 U.S.C. § 300ff-121(a) .......................................................55

42 U.S.C. §§ 254b-1; 254b(a)(1) .............................................56

Administrative Procedure Act (APA) ........................................*passim*

Affordable Care Act, 42 U.S.C. § 18116 ...................................*passim*

Public Health Service Act, 42 U.S.C. § 300w-7 .......................54, 57, 58

**Regulations**

24 C.F.R. § 574.603(b) ...................................................................56

**Constitutional Provisions**

United States Constitution.............................................................*passim*

First Amendment to the United States Constitution ..............................*passim*

Fifth Amendment to the United States Constitution ..............................*passim*

**Executive Orders**

*Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, Exec. Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025)...................................................*passim*

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order No. 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025) ....................................................................................*passim*

*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Exec. Order No. 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ..........................................................................................6

*Ending Radical Indoctrination in K-12 Schooling*, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan 29, 2025)..........................................32

*Prioritizing Military Excellence and Readiness*, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025)........................................32

*Protecting Children from Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg. 8771 (Jan. 28, 2025) ......................................33

## INTRODUCTION

The District Court properly enjoined provisions of three Executive Orders designed to silence, defund, and punish nonprofit healthcare and community organizations for acknowledging the existence and dignity of transgender people and for engaging in speech and services that advance diversity, equity, inclusion, and accessibility.

Plaintiffs are mission-driven nonprofits that deliver lifesaving healthcare, HIV prevention and treatment, housing and supportive services, violence prevention and survivor care, LGBTQ+ history preservation, and educational and cultural programming to hundreds of thousands of LGBTQ+ people in communities across the country. Their work depends on speaking truthfully to and about the communities they serve, complying with congressional mandates to reach medically underserved populations, and refraining from discrimination. The challenged Executive Orders demand the opposite: They brand core aspects of Plaintiffs' missions as "illegal"; require the government to terminate "equity-related" funding; and command agencies to end support for programs that "promote gender ideology," a phrase the Government uses to mean speech and services that recognize transgender people.

1

The harms caused by the challenged provisions of the Executive Orders are neither speculative nor abstract. Agencies have already terminated Plaintiffs' grants and contracts pursuant to these Executive Orders, issued stop-work directives, and demanded that Plaintiffs strip words like "LGBT," "queer," "transgender," "pronoun," and "accessibility" from their program materials. Clinics have been forced to curtail HIV prevention, testing, and treatment; survivor services have been paused; staff have been diverted from care to crisis triage; and organizations have been chilled from training staff and partners on basic cultural competence. As the District Court correctly recognized, the Executive Orders have inflicted and threaten continuing constitutional injury and operational harm that cannot be undone. The District Court's order granting a preliminary injunction should be affirmed.

## STATEMENT OF JURISDICTION

This action arises under 28 U.S.C. §§ 2201–2202 and the First and Fifth Amendments to the United States Constitution. The District Court had jurisdiction under 28 U.S.C. § 1331. It granted in part Plaintiffs' Motion for a Preliminary Injunction on June 9, 2025.

2

This Court has jurisdiction over appeals of preliminary injunction orders under 28 U.S.C. §§ 1292(a)(1) and 1294(1).

## STATEMENT OF THE ISSUES

1. Whether the District Court was correct in finding that Plaintiffs have standing to challenge the Equity Termination, Gender Termination, and Gender Promotion Provisions in three Executive Orders issued by President Donald J. Trump.

2. Whether the District Court properly ruled that Plaintiffs are likely to succeed on the merits of their claims under the Fifth Amendment's Equal Protection Component, the First Amendment's Freedom of Speech Clause, the Fifth Amendment's Due Process Clause, and the Separation of Powers under the U.S. Constitution.

3. Whether the District Court was correct in finding that Plaintiffs otherwise met the standard for issuance of a preliminary injunction because Plaintiffs demonstrated they would suffer irreparable harm without one and the balance of the equities favors Plaintiffs.

4. Whether the scope of the injunction is properly tailored to provide Plaintiffs complete relief.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes, rules, and regulations are set forth in an addendum to this brief. *See* Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A. The Challenged Executive Orders

On January 20, 2025, President Donald J. Trump signed Executive Order No. 14168, 90 Fed. Reg. 8615 (Jan. 20, 2025), titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (the "Gender Order"). The Gender Order expresses a disparaging and unscientific view of gender identity, repudiates the existence of transgender people by deeming their identities to be "false," orders their exclusion from government recognition and protection, and seeks to coerce others to do the same by terminating federal funding and thereby punishing those who hold contrary ideas.

The Gender Order states that a person's sex is an "immutable biological classification as either male or female" that "does not include the concept of 'gender identity,'" and that it is the "policy of the United States to recognize two sexes, male and female" which "are not changeable."

4

The Gender Order further asserts that "gender ideology" "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity, permitting the false claim that males can identify as and thus become women and vice versa, and requiring all institutions of society to regard this false claim as true." Section 3(e) of the Gender Order demands that agencies "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology," which is described as "an internal and subjective sense of self, disconnected from biological reality. . . ." Section 3(g) of the Gender Order prohibits federal funds from being used "to promote gender ideology" and directs each agency to "assess grant conditions and grantee preferences" to meet this directive. The Gender Order does not explain what it means to "promote" so-called "gender ideology." The Gender Order thus penalizes federal grantees, including Plaintiffs, whose speech, trainings, research, and/or health or social services acknowledge the existence of transgender people and who advocate for their equitable treatment in a manner that respects their identity.

President Trump also signed, on January 20, Executive Order 14151, 90 Fed. Reg. 8339 (Jan. 20, 2025), titled "Ending Radical and Wasteful Government DEI Programs and Preferencing" (the "DEI-1 Order"). The DEI-

1 Order asserts that "diversity, equity, inclusion, and accessibility," ("DEIA") and related programs are "illegal and immoral discrimination programs," and, among other things, directs agencies to terminate all "equity-related" grants or contracts.

Last, on January 21, 2025, President Trump signed Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025), titled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity" (the "DEI-2 Order" and, collectively with the Gender Order and the DEI-1 Order, the "Challenged Orders" or "Orders"). Like the DEI-1 Order, the DEI-2 Order expressly targets private actors, including Plaintiffs, and further asserts the supposed illegality of DEIA and outlines specific mechanisms to punish federal contractors and grantees that embrace, promote, or necessarily rely on principles of DEIA. *See* DEI-2 Order § 3.[1]

### B. Plaintiffs

Plaintiffs are a group of nonprofit organizations that receive federal funding to support their work of providing services to members of the

---

[1] While Plaintiffs challenged the DEI-2 Order below, no provision of it was enjoined by the District Court.

LGBTQ communities. 4-SER-855. "Speech, advocacy, and services advancing the civil rights and welfare of transgender individuals, and [] addressing systemic racism, sexism, and anti-LGBTQ bias," are central to each Plaintiff's mission. 4-SER-1076. Plaintiffs cannot "advertise, provide services, train staff, train other agencies or providers, or accomplish their core mission[s] and mandates under existing grants while simultaneously complying with the Executive Orders." 4-SER-864 (quoting declarations).

## C. Procedural History

Plaintiffs filed their Complaint on February 20, 2025, and challenged, among others, three provisions of the Challenged Orders for violating several aspects of the United States Constitution:

- **DEI-1 Order § 2(b)(i)** (the "Equity Termination Provision") — directing each agency, department, or commission head to terminate "all . . . 'equity-related' grants or contracts."

- **Gender Order § 3(e)** (the "Gender Termination Provision") — requiring agencies to "take all necessary steps, as permitted by law, to end the Federal funding of general ideology."

- **Gender Order § 3(g)** (the "Gender Promotion Provision") — Ordering that "Federal funds shall not be used to promote gender ideology" and requiring each agency to "assess grant conditions and grantee preferences [to] ensure grant funds do not promote gender ideology."

(collectively, the "Funding Provisions"). 4-SER-1066-1138.

7

Notably, Plaintiffs' Complaint does not include any claims for relief pursuant to the Administrative Procedure Act ("APA"). *See generally* 4-SER-1066-1138.

On March 3, 2025, Plaintiffs filed their Motion for a Preliminary Injunction, and nine declarations in support thereof, seeking to enjoin the Funding Provisions. *See generally,* 4-SER-845-86 (motion); 4-SER-887-1065 (declarations). On April 7, 2025, Plaintiffs submitted supplemental declarations to provide the District Court with evidence that, after the Complaint was filed, certain of their grant funding had been terminated by Defendants pursuant to the Funding Provisions. *See generally,* 3-SER-645-844 (declarations); *see also* 1-SER-001-300; 2-SER-302-313; 2-SER-370-532 (supplemental declarations).

The District Court heard oral arguments on May 22, 2025. 5-SER-1140. On June 9, 2025, the District Court issued a well-reasoned 52-page Order Granting in Part and Denying in Part Motion for Preliminary Injunction (the "Decision"). ER-9-60. On June 13, 2015, the District Court entered its Preliminary Injunction Order (the "Order"). ER-3-6. The Order enjoins Defendants from enforcing the Funding Provisions against Plaintiffs and further directs that Defendants are to reinstate "any terminated contract or

8

grant awards of Plaintiffs (whether a Plaintiff is a grantee or sub grantee) in accordance with the grant terms and conditions in place at the time the Complaint was filed." ER-5-6.

### D. The District Court's Decision and Order[2]

### i.    The District Court Held Plaintiffs Have Article III Standing to Challenge the Funding Provisions.

The Funding Provisions each relate to "the ineligibility of federal funding for certain categories of grants or contracts." ER-23. The District Court held that Plaintiffs have standing to challenge the Funding Provisions "because a 'loss of funds promised under federal law satisfies Article III's standing requirement[,]'" ER-23 (quoting *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018)), and Plaintiffs alleged that they are likely to lose — and offered unrebutted evidence that they *had already lost* — federal funding because of the Funding Provisions. ER-23-24.

The District Court rejected Defendants' argument that Plaintiffs lack standing to challenge the Funding Provisions because they constitute mere "policy directives." Rather, the District Court held that the Funding

---

[2] This section summarizes only those portions of the District Court's order relevant to this appeal.

Provisions "command specific action" due to their repeated use of the word "shall." ER-24. Indeed, as the District Court observed, "Plaintiffs ha[d] already received notices pursuant to the Challenged Orders terminating their grant awards." ER-25.

The District Court also held that Plaintiffs have third-party standing to assert the equal protection rights of their transgender patients, clients, and patrons because "[a]s healthcare providers, Plaintiffs have a close relationship to their transgender patients" such that they are effective proponents of their rights, and because Plaintiffs' transgender patients and clients "likely face barriers to being able to protect their own interests under these circumstances." ER-28-30.

Finally, the District Court held that it has jurisdiction to review Plaintiffs' challenges, rejecting Defendants' argument that Plaintiffs' claims were contract claims trigging United States Court of Federal Claims jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491(a). ER-26-28. The District Court correctly held that "Plaintiffs' claims are not 'at [their] essence' contract actions because both the source of the rights claimed and the remedies sought are not contractually based claims," but instead "are all based upon the Constitution — arising under the First and Fifth

10

Amendments, the Spending Clause, and the Separation of Powers." ER-27. The District Court also explained that because the Plaintiffs sought "exclusively injunctive and other equitable relief," the Court of Federal Claims could not exercise jurisdiction — only the District Court could — because the Court of Federal Claims "'has no power to grant equitable relief[.]'" ER-27 (quoting *Bowen v. Massachusetts,* 487 U.S. 879, 905 (1988)).

### ii. The District Court Held Plaintiffs Are Likely to Succeed on the Merits of Their Challenges to the Funding Provisions.

The District Court held that Plaintiffs are likely to succeed on the merits of their (i) Fifth Amendment Equal Protection challenges to the Gender Termination and Promotion Provisions, ER-30-34; (ii) First Amendment challenges to the Funding Provisions, ER-34-39; (iii) Fifth Amendment Due Process challenge, on both a facial and as-applied basis, to the Equity Termination Provision, ER-42-50; and (iv) as-applied Separation of Powers challenges to the Funding Provisions, ER-50-56.

First, the District Court held that Plaintiffs are likely to succeed on their claim that the Gender Termination and Promotion Provisions violate the Fifth Amendment's Equal Protection Component. ER-30-34. It was undisputed, and the District Court nonetheless held, that the Gender

Termination and Promotion Provisions are subject to heightened scrutiny. ER-31, ER-33 ("Defendants do not contest that heightened scrutiny applies to discrimination based on transgender status.").

In reaching this result, the District Court rejected Defendants' argument that the Gender Order is not discriminatory action but is "merely rhetoric" because that argument "flies in the face of the facts, given that Defendants have already terminated several of Plaintiffs' federal grants pursuant to [the Gender Order]." ER-31. The District Court also held that the Gender Termination and Promotion Provisions "do not serve important governmental objectives sufficient to survive heightened scrutiny." ER-34. Indeed, as the District Court observed, Defendants did not offer any argument that either provision advances any legitimate government interest. ER-33.

The District Court also held that Plaintiffs are likely to succeed on their First Amendment challenge to the Funding Provisions for two reasons. ER-34-39. First, the Funding Provisions' "blanket withholding of funding for all programs that are 'equity-related' or that 'promote gender ideology' is entirely untethered to any 'legitimate objective[]' or 'programmatic message' of the programs they burden to justify their intrusion on protected speech."

12

ER-36 (citing *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 548 (2001); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("*AID*")).

Second, the District Court held that the Funding Provisions likely violate Plaintiffs' First Amendment rights because the Provisions "withhold[] subsidies for a censorious purpose — aiming to suppress the dangerous ideas of 'equity,' 'DEI,' and 'gender ideology.'" ER-38 (citing *Koala v. Khosla,* 931 F.3d 887, 898 (9th Cir. 2019); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998)). This was so because the Funding Provisions "[do] not merely selectively fund[] some programs but not others" but instead, "render[] ineligible for funding *all* activities, speech, and conduct that is even related to the dangerous ideas it has identified" while "tolerating speech in opposition to those ideas." ER-38 (emphasis in original).

Next, the District Court held that Plaintiffs are likely to succeed on their claim that the Equity Termination Provision is unconstitutionally vague, both facially and as applied. ER-42-48. The District Court held that the Equity Termination Provision is unconstitutionally vague on its face because it directs agencies to terminate "equity-related grants or contracts" without defining what "equity-related" means. ER-46. As a result, grantees,

13

including Plaintiffs, are compelled to "steer far too clear of the 'forbidden area' of anything related to the broad and undefined term of 'equity.'" ER-44 (cleaned up) (citing *Finley*, 524 U.S. at 588). The District Court also held the Equity Termination Provision is unconstitutionally vague as applied to Plaintiffs because it "expressly command[s] action" and noted that "various agencies have already taken such action against Plaintiffs" in accordance with it. ER-43.

Finally, the District Court held that Plaintiffs are likely to succeed on the merits of their Separation of Powers challenge to all three Funding Provisions because, as applied to Plaintiffs, the Funding Provisions are contrary to Congress's mandates in several statutes under which Plaintiffs receive funds. ER-52-56.

### iii.   The District Court Held that Plaintiffs Are Likely to Suffer Irreparable Harm Absent a Preliminary Injunction and the Balance of Harms Favors Plaintiffs.

Because "it is 'well established that the deprivation of constitutional rights unquestionably constitutes irreparable injury[,]'" and Plaintiffs had shown that the Funding Provisions likely violate their and their clients' equal protection rights and Plaintiffs' First and Fifth Amendments rights, the District Court easily concluded that Plaintiffs also made a sufficient showing

of irreparable harm that would result from enforcement of the Funding Provisions. ER-56-57 (quoting *Hernandez v. Sessions,* 872 F.3d 976, 994 (9th Cir. 2017) (cleaned up)).

Finally, the District Court found that the balance of the harms and the public interest weigh in Plaintiffs' favor because an injunction "would not prevent the Executive from taking any number of lawful actions to implement the President's priorities" such that the Defendants would not suffer any harm from being unable to enforce the unlawful Funding Provisions. ER-58.

## SUMMARY OF ARGUMENT

The District Court correctly enjoined the Executive Orders' Funding Provisions: the Equity Termination Provision of the DEI-1 Order, and the Gender Termination and Promotion Provisions of the Gender Order. The Court's ruling rests on four independent grounds, each sufficient on its own, and together dispositive.

First, Equal Protection. The Gender Termination and Gender Promotion Provisions purposefully discriminate based on transgender status and facially classify programs by whether they "promote" so-called "gender ideology," which the Government admitted includes serving

transgender people in a manner that respects their identities by, for example, using their preferred gender pronouns. ER-48. In this Circuit, discrimination based on transgender status triggers heightened scrutiny, which Defendants neither contest nor satisfy. The Government identified no important objective advanced by defunding services because those services respect patients' gender identities; the Orders instead rest on naked animus and a directive to exclude, which fails any level of review.

Second, Free Speech. The Funding Provisions target ideas that the Government disfavors — "equity," "DEI," and "gender ideology" — and impose a categorical funding ban untethered to any congressionally authorized program or statutory purpose. Even when the Government subsidizes, it may not wield the purse to suppress viewpoints or leverage conditions to regulate speech beyond the contours of funded programs. Here, Defendants have done both: They have censored Plaintiffs' content and rendered ineligible for funding any speech or activity even "related" to the Government's disfavored ideas, while tolerating opposing speech. The Constitution does not permit such invidious viewpoint discrimination.

Third, Due Process. The Equity Termination Provision is unconstitutionally vague, both on its face and as applied. It commands the

16

termination of all "equity-related" grants and contracts without defining "equity-related," invites arbitrary and discriminatory enforcement throughout the entire federal grants landscape, and provides no fair notice of what speech or services must be abandoned to avoid defunding. The chilling effect is immediate and severe: to protect their patients and funding, Plaintiffs have been compelled to steer far clear of an undefined "forbidden area," unconstitutionally censoring core aspects of their missions.

Fourth, Separation of Powers. As applied to Plaintiffs, the Funding Provisions usurp Congress's exclusive power of the purse and conflict with statutes that authorize and fund the very programs Defendants seek to defund or condition — including the Ryan White HIV/AIDS Program, Housing Opportunities for Persons With AIDS, Federally Qualified Health Center statute, and nondiscrimination mandates in Section 1557 of the Affordable Care Act and Section 1908 of the Public Health Service Act. The President may not amend or repeal Acts of Congress by executive fiat, nor may agencies terminate congressionally appropriated funds because recipients acknowledge transgender people or employ equity-focused community outreach required by statute.

Defendants' threshold defenses fail for the same reasons: Plaintiffs have Article III standing because they already have lost funding, face imminent additional losses, and endure an ongoing chilling effect on protected speech traceable to the Orders and redressable by injunction. The Tucker Act does not divest jurisdiction because Plaintiffs assert constitutional claims and seek equitable relief, not contract damages. In addition, Plaintiffs' third-party standing to vindicate their transgender patients' equal protection rights is well-established, given the close provider-patient relationship and the obvious barriers those patients face to suing in their own names.

The equities and public interest strongly favor affirming. It is always in the public interest to prevent constitutional violations and to preserve access to healthcare, housing, violence-prevention, and community services for vulnerable people. Enjoining the Funding Provisions does not "disable" the Executive; it merely requires Defendants to pursue policy goals through lawful means, not by censoring and punishing speech, discriminating against transgender people and repudiating their very existence, and overriding Congress.

18

The Executive Orders threaten to dismantle Plaintiffs' work by silencing and defunding those who serve the very communities Congress has directed agencies to reach. The Constitution forbids this. The preliminary injunction should be affirmed.

## STANDARD OF REVIEW

This Court reviews grants of preliminary injunctions for abuse of discretion. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Bd. of Educ.*, 82 F.4th 664, 680 (9th Cir. 2023) (en banc). A district court abuses its discretion when it "utilizes an erroneous legal standard or clearly erroneous finding of fact." *Id.* (cleaned up). If the district court is claimed to have relied on an erroneous legal premise in reaching its decision to grant the preliminary injunction, this Court will review the underlying issue of law *de novo*. *See A&M Records v. Napster*, 239 F.3d 1004, 1013 (9th Cir. 2001).

## ARGUMENT

## I.     The District Court Correctly Ruled that Plaintiffs Have Standing.

### A.     Plaintiffs Have Article III Standing.

Plaintiffs readily satisfy Article III standing requirements under settled law: "To have standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's

challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019) (quotation marks omitted). "As a general rule, in an injunctive case this court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009).

First, Plaintiffs have shown an injury in fact that constitutes "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010). "A loss of funds promised under federal law," as has already occurred here, "satisfies Article III's standing requirement." *City & Cnty. of S.F.*, 897 F.3d at 1235 (quotations omitted).

The Government's response to Plaintiffs' injuries is to make the absurd argument that because Plaintiffs have *already* suffered an injury, Plaintiffs somehow lack standing to obtain a preliminary injunction restoring the very funds they lost because of the Funding Provisions and/or to prevent future similar injuries under the Funding Provisions. Gov't. Br. at 19–20. This

argument ignores the entire point of an injunction, which is to prevent ongoing irreparable harm.

As to pre-enforcement challenges, "[b]ecause constitutional challenges based on the First Amendment present unique standing considerations, plaintiffs may establish an injury in fact without first suffering a direct injury from the challenged restriction." *Lopez*, 630 F.3d at 785 (quotation marks omitted). In such pre-enforcement cases, the plaintiff may meet constitutional standing requirements by demonstrating, as Plaintiffs did below, "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* (quotation marks omitted).

In the pre-enforcement posture, courts consider three related inquiries: (1) whether plaintiffs have shown a reasonable likelihood that the government will enforce the challenged law against them; (2) whether the plaintiffs have established that they intend to violate the challenged law; and (3) whether the challenged law is applicable to the plaintiffs, either by its terms or as interpreted by the government. *See id.* at 786. The District Court correctly held that Plaintiffs established all three factors.

### B.     Plaintiffs Have Standing to Challenge the Funding Provisions.

As the District Court recognized, Plaintiffs challenged the Funding Provisions "in part on the basis that they have lost or will likely lose federal funding for their organizational activities." ER-23. The Government argues that Plaintiffs lack standing based on the fiction that the District Court rooted its findings in "allegations" and "abstract findings" alone. Gov't. Br. at 19. But this argument is belied by the record: As the District Court observed, Plaintiffs received notices pursuant to the Challenged Orders terminating their awards. ER-23-25 (discussing same); *see* 4-SER-1038-43; 4-SER-991, 993; 4-SER-978-79.

For this reason alone, the Government's standing arguments ring hollow. Ignoring the record, and the law, the Government argues that "[i]t is speculative that plaintiffs will experience additional contract terminations, and even more speculative what legal issues might be presented by any such termination." Gov't. Br. at 21. This argument disregards the facts: Plaintiffs have already received grant termination notices, which demonstrate the post-enforcement nature of Plaintiff's claims. At the very least, the grant termination notices present "strong evidence" that pre-enforcement plaintiffs face a credible threat of state action. *See Lopez*, 630 F.3d at 786.

The same logic defeats the Government's arguments that Plaintiffs lack standing because their facial challenges target "general directives" contained in the Challenged Orders. Gov't. Br. at 20. The Funding Provisions at issue have already been enforced against certain Plaintiffs — evidencing a credible threat of future enforcement against surviving grants. *See Lopez*, 630 F.3d at 786. In all events, the Funding Provisions are not mere "general directives," as the Government feigns; rather, "[t]hey command specific action." ER-24.

Plaintiffs are not legally required to wait for each individual grant to be terminated before seeking an injunction, as the Government suggests, when the Funding Provisions unambiguously command agencies to take action. *See* ER-24-25 (noting the Funding Provisions state that agencies "shall" take various actions); *see also City & Cnty. of S.F.*, 897 F.3d at 1240 ("Because the Executive Order unambiguously commands action, here there is more than a mere possibility that some agency might make a legally suspect decision." (quotations omitted)); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 431 (D. Md. 2025).

Moreover, there is nothing logically inconsistent about an order requiring the Government to reinstate grants that were unconstitutionally

23

terminated and enjoining the Government from further enforcing the unlawful Funding Provisions against Plaintiffs' surviving grants. The Government's reliance on *National Institutes of Health v. American Public Health Association* is misplaced because the plaintiffs there challenged the termination of their grants pursuant to the APA, not based on violations of the United States Constitution. 145 S.Ct. 2658 (Mem.) (2025) ("*APHA*").

The Government's heavy reliance on the non-binding opinion *National Ass'n of Diversity Officers in Higher Education v. Trump* is similarly misplaced. No. 25-1189, Dkt. No. 29, at *1–10 (4th Cir. Mar. 14, 2025) ("*Diversity Officers*"). Far from a decision on the merits, the Fourth Circuit stayed the preliminary injunction at issue while on appeal, making no express findings regarding the plaintiffs' standing. *Id.* In fact, each member of the *Diversity Officers* panel made clear that their analysis issuing a stay would be different if, like here, the administration took specific actions to enforce the Orders. *See id.* at *4 n.1 (Diaz, C.J., concurring) ("I . . . reserve judgment on how the administration enforces these executive orders, which may well implicate cognizable First and Fifth Amendment concerns."); *id.* at *7 (Harris, J., concurring) ("But my vote to grant the stay comes with a caveat" that agency enforcement actions "may well raise serious First Amendment and Due

24

Process concerns"); *id.* at *9 (Rushing, J., concurring) (expressing view that claims were not justiciable where "this case does not challenge any particular agency action implementing the Executive Orders").

This result is easily squared with the District Court's order finding that Plaintiffs likely have standing based in part on specific enforcement actions already taken against Plaintiffs. *See also City & Cnty. of S.F.*, 897 F.3d at 1235–37; *Lopez*, 630 F.3d at 786.

**C.     The Tucker Act Does Not Apply Because Plaintiffs Bring Constitutional Law Claims, Not Contract or APA Claims.**

The Tucker Act provides for exclusive jurisdiction in the Court of Federal Claims *only* over actions based upon "any express or implied contract with the United States" in excess of $10,000. *See* 28 U.S.C. § 1491(a). An action only triggers the Act's exclusive jurisdiction when the claim is "at its essence" a contract claim. *Martin v. U.S.*, 649 F.2d 701, 704–05 (9th Cir. 1981); *Megapulse, Inc. v. Lewis*, 672 F.3d 959, 968 (D.C. Cir. 1982). Plaintiffs' claims are constitutional in nature, not contractual, and seek to remedy constitutional violations by the Executive Branch. *See* 4-SER-1136-37 (prayers for relief). The fact that the remedy in this instance may require the government to withdraw termination notices and reinstate grant funds "is

25

not a sufficient reason to characterize the relief as 'money damages'" and change the action to one sounding in contract. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).

The U.S. Supreme Court's recent statements on the Tucker Act do not change the analysis. The Court's two-page *per curiam* opinion in *Department of Education v. California* considered an APA claim brought in the District of Massachusetts to enjoin agency termination of certain education-related grants. 604 U.S. 650 (2025) (per curiam). The Court issued a stay after concluding that the Government would likely be successful in demonstrating that the District Court lacked jurisdiction "to order the payment of money under the APA." *Id.* at 651. The Court reasoned that the Federal Court of Claims was "likely" the proper court for jurisdiction pursuant to the Tucker Act. *Id.* Similarly, the U.S. Supreme Court issued an administrative stay over an injunction in *APHA*, 145 S.Ct. at 2658. The Court concluded that the plaintiff's APA claims were "likely" improper in the District Court. *Id.*

Based in part on these recent cases, the Government argues that "when a party seeks to force the government to comply with the terms of a contract or grant, the proper remedy is typically suit under the Tucker Act, not the

26

APA." Gov't. Br. at 23. This argument fails to engage with the most basic premise of the cases on which it relies: No APA claims or contract claims are at issue here. Rather, Plaintiffs' claims are based on violations of multiple provisions of the United States Constitution. As the District Court correctly observed, "Plaintiffs' claims are not 'at [their] essence' contract actions because both the source of the rights claimed and the remedies sought are not contractually based." ER-27. "Plaintiffs' claims are all based upon the Constitution — arising under the First and Fifth Amendments, the Spending Clause, and the Separation of Powers." ER-27. Plaintiffs' claims "are not breach of contract claims just because they 'require some reference to or incorporation of a contract.'" ER-27 (quoting *Megapulse*, 672 F.3d at 967–68). Accordingly, the District Court correctly found that it has jurisdiction to hear this dispute.[3]

---

[3] Even courts skeptical of jurisdiction over APA claims in cases involving grant funding agree that the Tucker Act does not divest federal district courts of jurisdiction over *constitutional* claims. *See, e.g., Climate United Fund v. Citibank, N.A.*, No. 25-5122, 2025 WL 2502881, at *10 (D.C. Cir. Sept. 2, 2025) (noting "district court had jurisdiction over [separation of powers] claim"); *Am. Ass'n of Physicians for Hum. Rts., Inc. v. Nat'l Insts. of Health*, No. 25-CV-01620-LKG, 2025 WL 2377705 (D. Md. Aug. 14, 2025) ("*Physicians for Human Rights*") (granting preliminary injunction in NIH funding case based on likelihood of success on equal protection and Section 1557 claims).

**D.** **Plaintiffs Have Third-Party and Individual Standing to Assert Equal Protection Claims Against the Gender Termination and Gender Promotion Provisions.**

As to third-party standing, Plaintiffs again meet Article III demands to assert equal protection claims against the Gender Termination and Promotion Provisions. To assert a third party's rights, (1) "[t]he litigant must have suffered an 'injury in fact'"; (2) "the litigant must have a close relationship to the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (citation omitted). As to the latter two requirements, "[t]he Supreme Court has 'been quite forgiving.'" *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 215 (4th Cir. 2020), as amended (Aug. 31, 2020) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)).

First, as established above, Plaintiffs have been injured by the Gender Termination and Promotion Provisions such that they have standing to challenge those provisions of the Gender Order. This case, therefore, is nothing like *FDA v. Alliance for Hippocratic Medicine,* 602 U.S. 367 (2024), relied on by the Government. Gov't Br. at 44. In that case, doctors filed suit in a representative capacity to vindicate their patients' current or potential injuries, even though the doctors conceded that they had not suffered and

28

would not suffer any injury themselves. *Id.* at 393 n.5. Here, Plaintiffs have been and will continue to be injured by the Gender Termination and Promotion Provisions and thus satisfy the "injury" requirement of third-party standing as a result.

Second, "[a]s healthcare providers, Plaintiffs have a close relationship to their transgender patients and are likely 'fully or very nearly, as effective a proponent of the right' as those patients." ER-28 (quoting *Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017)); *see also Washington*, 847 F.3d at 1160 ("[D]octors have been permitted to assert the rights of their patients."); *Physicians for Human Rights*, 2025 WL 2377705, at *10 ("The Plaintiffs have also shown that they have a close relationship to the LGBTQI+ community, due to their research and work in the area of LGBTQI+ health.").

Unable to dispute this fact, the Government instead argues that, because some litigants have initiated lawsuits challenging the Gender Order, "this is not a case where potential individual litigants face 'daunting' barriers or have 'little incentive' to litigate their own claims." Gov't. Br. at 46 (citations omitted).

It cannot seriously be disputed that transgender persons face the threat of discrimination, considering the bare animus laid against them in the

Gender Order. As the District Court found, "transgender individuals in particular face obvious barriers to filing suit to assert their own rights, since disclosure of their transgender status exposes them to 'a substantial risk of stigma, discrimination, intimidation, violence, and danger.'" ER-29 (quoting *Arroyo González v. Rosselló Nevares*, 305 F. Supp. 3d 327, 333 (D.P.R. 2018)). Indeed, the Gender Order expressly punishes organizations that acknowledge the very existence of or provide services to transgender people.

As the record reflects, many transgender people rely on Plaintiffs for lifesaving services, including medical care and housing. There is no more daunting barrier or disincentive to file suit than the threat of losing access to services necessary for survival. The District Court was correct to find that "Plaintiffs' transgender patients and clients likely face barriers to being able to protect their own interests under these circumstances." ER-29. *See also Washington v. Trump,* 768 F. Supp. 3d 1239, 1258 (W.D. Wash. 2025).

Moreover, Plaintiffs need only show "*some* hinderance" to their patients', clients', and patrons' ability to sue; Plaintiffs need not show, as the Government suggests, that these third parties have a complete inability to sue. *Powers*, 499 U.S. at 410–11 (emphasis added). Plaintiffs met this requirement by showing that their patients are "some of the most vulnerable

members of society, experiencing poverty, homelessness, and substance abuse" and that the "lack of capacity and/or financial resources hinders many of Plaintiffs' patients from protecting their own interests." ER-29. *See, e.g.*, 4-SER-892, 893; 4-SER-924; 4-SER-938, 942-43; 4-SER-950, 958, 959; 4-SER-964; 4-SER-1002, 1003; 4-SER-1020, 1025, 1028-30. The District Court found that Plaintiffs' patients are hindered by much more than fear — the hindrance lies in the patients' position at the very bottom of the socio-economic ladder. *See* ER-29; *see also Oregon v. Legal Servs. Corp.*, Nos. CV. 05-1443-PK, 05-1444-PK, 2006 WL 8439301, at *12 (D. Or. July 10, 2006) (holding third parties were "hindered from bringing a separate suit due to poverty and the lack of available legal representation").

The Government ignores these facts, and the District Court's reliance on them, and instead tries to sidestep the issue by focusing only on the fear of stigma and retaliation that the District Court noted also evidenced the hindrance Plaintiffs' patients face to asserting their own rights. Gov't. Br. at 45–46. The Government claims that this fear of stigma and retaliation is non-existent or should not be considered because other individual plaintiffs have sued to challenge the Gender Order. But this "prong does not require an absolute bar from suit. It is enough that patients' fear of stigmatization

31

operates as a powerful deterrent to bringing suit." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 36 (D.D.C. 2020) (cleaned up) (rejecting Defendants' argument here). Moreover, there is nothing in the record to suggest that the plaintiffs in the other cases the Government cites are similarly situated to Plaintiffs' patients. *See* ER-29.

Nor is this a case, like *Tingley v. Ferguson,* 47 F.4th 1055 (9th Cir. 2022), relied on by the Government, where the *only* hindrance claimed by the plaintiff was "speculative" fear of stigma and retaliation. Here, it cannot be disputed that transgender people *will* face discrimination, harassment, and stigma. Indeed, the present sociopolitical environment is one where the current administration has sought to *terrorize* transgender people. The administration has demonized and targeted transgender people for discrimination and exclusion through numerous executive actions seeking to deny transgender people's existence throughout society, including the workplace, schools, restrooms, the military, prisons, research, and the arts. *See*, *e.g.*, Gender Order §§ 3-5; *Ending Radical Indoctrination in K–12 Schooling*, Exec. Order No. 14190, 90 Fed. Reg. 8853 (Jan. 29, 2025); *Protecting Children from Chemical and Surgical Mutilation*, Exec. Order No. 14187, 90 Fed. Reg.

8771 (Jan. 28, 2025); *Prioritizing Military Excellence and Readiness*, Exec. Order No. 14183, 90 Fed. Reg. 8757 (Jan. 27, 2025).

In addition, Plaintiffs have standing on their own to challenge the Orders under the Fifth Amendment's Equal Protection Component. In *RK Ventures, Inc., v. City of Seattle*,  this Court affirmed nightclub owners' standing to bring an equal protection claim challenging the city's efforts to stop establishments from playing music that appealed to African Americans, forcing the club to be sold at a loss to a nearby club that catered to white clientele. 307 F.3d 1045, 1050 (9th Cir. 2002). This Court found there was "no bar to standing under the Equal Protection Clause where an individual alleges a personal injury stemming from his or her association with members of a protected class." *Id.* at 1055. Because the owners "were the direct targets of the city's alleged racial discrimination due to their association with their African American patrons," they had standing "to assert *their own equal protection claims*." *Id.* at 1056 (emphasis added). Such is the case here where "the Gender Order withholds federal funding based on the transgender status of the individuals that [Plaintiffs] serve." ER-32; *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 260–61 (1977) (noting "little doubt" that nonprofit housing developer had standing to

33

challenge city's denial of a zoning permit needed to build racially integrated housing); *Buchanan v. Warley*, 245 U.S. 60, 73 (1917) (concluding that a white plaintiff had standing to challenge a city ordinance that barred him from selling his home to a Black man).

## II. The District Court Correctly Determined that Plaintiffs Are Likely to Succeed on the Merits of Their Claims under Fifth Amendment Equal Protection, First Amendment Freedom of Speech, Fifth Amendment Due Process, and Separation of Powers.

### A. The Gender Order's Facially Discriminatory Animus Against Transgender People Fails Any Standard of Review.

#### 1.  Fifth Amendment Equal Protection

"[T]he Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). When faced with an Equal Protection claim, this Court will determine "what level of scrutiny applies to a classification under a law or policy" and then determine "whether the policy at issue survives that level of scrutiny." *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2024), *cert. granted*, 145 S.Ct. 2871 (July 3, 2025).

It is the law of this Circuit that "classifications based on sex call for a heightened standard of review" and "the same framework applies to

classifications based on transgender status." *Roe v. Critchfield*, 137 F.4th 912, 922 (9th Cir. 2025); *see also Doe v. Horne*, 115 F.4th 1083, 1102 (9th Cir. 2024); *Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019). Indeed, "discrimination on the basis of transgender status is a form of sex-based discrimination" for equal protection purposes. *Hecox*, 104 F.4th at 1073.

To survive heightened scrutiny, a "classification must serve important governmental objectives and must be substantially related to achievement of those objectives." *Horne*, 115 F.4th at 1106 (cleaned up). It is the Government's burden to demonstrate an "exceedingly persuasive justification" for the classification. *Id.* at 1106-07. In so doing, the justification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.* at 1106-07 (quoting *U.S. v. Virginia*, 518 U.S. 515, 531 (1996)).

### 2. The Gender Order Fails Heightened Scrutiny.

The District Court properly found that the Gender Order discriminates based on the transgender status of the individuals the Plaintiffs serve, triggering heightened scrutiny. ER-30; *Horne*, 115 F.4th at 1106. The Gender Order's express purpose is to impose federal funding restrictions that preclude providing services that "acknowledge the existence of transgender

people because doing so in the operation of such programs is considered the 'promotion of gender ideology.'" ER-32 (quoting Gender Order § 2(f)). At the District Court, and here, the Government does not contest that heightened scrutiny applies to discrimination based on transgender status. ER-31; Gov't. Br. at 51, n.4.

In addition, the Gender Order classifies based on sex. It expressly defines sex to "not include the concept of gender identity" and asserts that transgender identities are "false" identities that "[do] not provide a meaningful basis for identification and cannot be recognized as a replacement for sex." Gender Order §§ 2(a), (f)-(g).

The District Court correctly concluded that the Gender Order fails heightened scrutiny because the Government cannot point to *a* legitimate government interest in discriminating against transgender people, let alone the "important" interest required. ER-32-33. Disapproving of transgender people, discouraging people from expressing their gender identities, and directing agencies and federal grantees to do the same are plainly illegitimate purposes that demonstrate that the Gender Order was issued for the sole purpose of discriminating against transgender people.

36

Discrimination against an entire group of people is never a legitimate governmental interest. *See Horne*, 115 F.4th at 1102.

This conclusion is well supported by the record. Plaintiffs' declarations provide substantial and compelling evidence that the restrictions in the Gender Order prevent Plaintiffs from carrying out their core missions, which include serving their transgender clients and patients in an equitable manner that by necessity acknowledges their identities. *See, e.g.*, 1-SER-002-300; 2-SER-302-313; 2-SER-370-532; 3-SER-645-843; 4-SER-887-1065 (compiling declarations submitted in support of preliminary injunction). While this frustration of purpose is the objective of the Gender Order, it is plainly unconstitutional.

The Government argues — in the face of the District Court's express findings and record evidence — that "plaintiffs would have to establish that the Executive Order instructs agencies to take actions that discriminate on the basis of some protected status." Gov't. Br. at 47. The District Court found precisely that: The Funding Provisions instructed agencies, and agencies acted in accordance with those instructions, to terminate Plaintiffs' grants and funding. ER-24-25. *See also* 4-SER-1039-43; 4-SER-991; 4-SER-993; 4-SER-

978-79 (notices received by plaintiffs terminating federal grants pursuant to the Orders).

The District Court is not alone in this regard with respect to the Gender Order. *See*, *e.g.*, *PFLAG*, 769 F. Supp. 3d at 441; *Washington*, 768 F. Supp. 3d at 1254. The Government contradicts itself, on one hand arguing that there is no action for Plaintiffs to challenge, Gov't. Br. at 47, and yet on the other hand, acknowledging that "the Order only requires agencies to terminate funding that promotes 'gender ideology.'" Gov't. Br. at 49. As the Court found, and the Government does not refute, the Government has "already terminated several of Plaintiffs' federal grants." ER-31.

The District Court properly found that there are no "important government objectives sufficient to survive heightened scrutiny" present in the Gender Order. ER-34. The Government does not challenge this finding and fails to identify even one important government objective served by discriminating against transgender persons.

### 3. The Gender Order Fails Even Rational Basis Review.

To the extent that the Government attempts to argue that transgender status should be subject to rational basis review, in contravention of this Court's precedents, *Horne*, 115 F.4th 1102-03; *Critchfield*, 137 F.4th at 922;

*Karnoski*, 926 F.3d at 1201, that argument is waived on two grounds: (1) because it was not made to the District Court; and (2) the Government's cursory treatment of the issue for the first time to this Court in a footnote is insufficient to warrant review.

In the District Court, the Government did not seriously engage with Plaintiffs' Equal Protection arguments or articulate what level of scrutiny should apply to transgender status. 3-SER-628-31. This Court will generally not consider an issue raised for the first time on appeal. *See Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1052 (9th Cir. 2003). Therefore, the Government has waived any argument that rational basis review applies.

In its opening brief now, the Government alludes in a footnote that it may argue that rational basis review applies. Gov't. Br. at 51 n.4. This Court has explained that "[i]ssues raised in a brief which are not supported by argument are deemed abandoned." *Acosta-Huerta v. Estelle*, 7 F.3d 139, 144 (9th Cir. 1992); *see also U.S. v. Strong*, 489 F.3d 1055, 1060 n.4 (9th Cir. 2007) ("The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal." (cleaned up)).

Even if the Government did not waive its argument that rational basis review applies, the Gender Order does not pass scrutiny under any standard because it is transparently motivated by a "bare desire to harm" transgender people. *Romer v. Evans*, 517 U.S. 620, 635 (1996) (citation omitted). Our Constitution forbids policies based on such "negative attitudes" and "irrational prejudice." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448, 450 (1985). The Gender Order was issued for the openly discriminatory purpose of expressing governmental disapproval of transgender people and rendering them unequal to others: "Here, the Gender Order's stated purpose is to deny the existence of transgender persons entirely." ER-33. "As one other court considering the Gender Order explained, the Court 'cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist.'" ER-34 (quoting *PFLAG*, 769 F. Supp. 3d at 444).

The Gender Order's express purpose is to declare the existence of transgender people as "unmoored from biological facts" and "false." Gender Order §§ 1, 2(f). This is a facially discriminatory objective. The Government seeks to achieve this objective by denying funds only to those grantees and organizations who recognize the existence and dignity of transgender

40

people. As an example, Defendants took the position at the preliminary injunction hearing that "an organization would lose its federal funding if it, in its day-to-day work on [*sic*] within the federally funded program, refers to clients by a pronoun other than Mr., Ms., Mrs., or Miss." ER-37. *See* 5-SER-1174:22-1175:14 (transcript of hearing).

Moreover, the context surrounding the Gender Order further demonstrates the Government's intent to adversely affect transgender people. The Gender Order was "part of a constellation of close-in-time executive actions directed at transgender Americans that contained powerfully demeaning language." *Orr v. Trump*, 778 F. Supp. 3d 394, 417 (D. Mass. 2025); *see also Talbott v. U.S.*, 775 F. Supp. 3d 283, 331 (D.D.C. 2025); Section I.D, *supra*, at 33. "Although aimed at different policy goals, each of these related orders, in tone and language, conveys a fundamental moral disapproval of transgender Americans." *Orr*, 778 F. Supp. 3d at 417.

The Gender Order's broad scope and derogatory language demonstrates that its purpose is to "impose[] a 'broad and undifferentiated disability' on a discrete group of people." *Id.* at 415 (quoting *Romer*, 517 U.S. at 632). There is no legitimate government interest in this objective. As the District Court noted, even the stated interests of the Government do not

41

come close to "justif[ying] the overt discrimination practiced here." ER-34 (quoting *Horne*, 115 F.4th at 1108).

*U.S. v. Skrmetti*, 145 S.Ct. 1816 (2025), does not alter the District Court's conclusion. *Skrmetti* addressed a narrow set of medical regulations and has little bearing on the explicit facial classifications drawn by the Gender Order. The Supreme Court emphasized that it was considering a statute that regulated "age and medical use" in restricting certain treatments for minors, not executive action that singled out an entire group of people based on identity in the form of sex or transgender status. *Id.* at 1835–37. The Court was careful to distinguish laws that regulate "a class of treatments or conditions" from laws that "regulate a class of *persons* identified on the basis of a specified characteristic." *Id.* at 1834 n.3 (emphasis in original). According to the Supreme Court, the Tennessee law fell into the former category. *Id.* The Gender Order clearly is the latter: The Order's stated purpose is to deny the existence of transgender people entirely. Gender Order §§ 1, 2(f); *see* ER-33. Moreover, *Skrmetti* recognized that where, as here, a law is "motivated by an invidious discriminatory purpose," "heightened review" is triggered. 145 S.Ct. at 1820.

Here, far from classifying solely based on "topics," Gov't. Br. at 9, "[b]y singling out grants that *serve* transgender people, the Gender Order necessarily singles out *transgender people* and excludes them from being able to benefit from federal funds." ER-32 (emphasis in original). The Gender Order thus directly regulates based on a class of *persons* in an unconstitutional manner.

### B. The Funding Provisions Violate Plaintiffs' First Amendment Rights Because They Target Ideas the Government Disfavors and Impose a Categorical Ban on Funding Untethered to any Congressionally Authorized Program.

#### 1. The First Amendment

The First Amendment to the United States Constitution limits the types of conditions that the government may attach to federal funds. "A funding condition can result in an unconstitutional burden on First Amendment rights" if the condition "seek[s] to leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214–15.

Likewise, a funding condition that "is not relevant to the objectives of the program" can place an unconstitutional burden on First Amendment rights, *id.* at 214, including government regulation of speech deemed necessary for the program's legitimate objectives, *Velazquez*, 521 U.S. at 548.

43

Moreover, the government may not use the provision of subsidies to suppress "dangerous ideas." *Finley,* 524 U.S. at 587; *see also Khosla*, 931 F.3d at 898  (the government cannot withhold benefits for a censorious purpose). A unanimous Supreme Court recently reconfirmed this principle: "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

### 2.   The Funding Provisions

The Executive Orders mandate that recipients of federal funds not "promote gender ideology" or "DEI" and related concepts that the Government dislikes. "The express purpose of the Gender Order is to root out the 'extrem[e],' 'false claims' of gender identity that contradict the Government's view that there is only one 'biological reality of sex.'" ER-38 (quoting Gender Order §§ 1, 2(f)). "Similarly, the DEI-1 Order aims to eliminate DEI- and equity-related expression that it considers 'radical' and 'immoral.'" ER-38 (citing DEI-1 Order).

"It is, however, a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'"

44

*AID*, 570 U.S. at 213 (quoting *Rumsfeld v. F. for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 61 (2006)); *see also Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 309 (2012) ("The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." (citations omitted)). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989) (collecting cases). The Government's attempt to do so by way of the Executive Orders is subject to "the most exacting scrutiny." *Id.* at 412.

Under even the most cursory examination, the Government fails to justify its actions. Defendants attempt to eviscerate the protections of the First Amendment by claiming that the government can choose what activities it funds. But that is not what is happening here. Instead, the government is announcing what can and cannot be said and punishing those that do not comply by stripping funding from those who "promote gender ideology" and terminating "equity-related" grants. Gender Order §§ 3(e), (g); DEI-1 Order § 2(b)(i).

45

Here, the District Court correctly found that "even if the Funding Provisions apply only to activities paid for by the federal government — rather than to the recipients' private activity — their blanket withholding of funding for all programs that are 'equity-related' or that 'promote gender ideology' is entirely untethered to any 'legitimate objective' or 'programmatic message' of the programs they burden to justify their intrusion on protected speech." ER-36 (quoting *Velazquez*, 531 U.S. at 548).

The Government argues that the District Court misreads *Velazquez*, and that the case implicates the "limited public forum" doctrine, which has no application to the instant case. Gov't. Br. at 32-35. The Government is misguided.

*Velazquez* requires that when the government establishes a funding scheme that is open to all comers (a type of "limited public forum") and decides to fund activity in that forum, the government must be "viewpoint neutral." 531 U.S. at 546; *see also Bd. of Regents of the Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 230 (2000). However, crucially, this is not a case where an agency is deciding to "fund a program." Rather, it is one where agencies are directed to terminate funding — or threaten to terminate funding — on the basis of their connection to "equity-related" principles,

46

"DEI," and "gender ideology," i.e., the viewpoints of the grantees. *See* ER-38.

The Funding Provisions do not purport to terminate funding on the basis of the specific program requirements or connection to the funds' statutory schemes. *See generally* Funding Provisions. Rather, the agencies selected grants for termination based on viewpoint. *See Thakur v. Trump*, 148 F.4th 1096, 1108 (9th Cir. 2025) (upholding preliminary injunction where "the agencies selected grants for termination based on viewpoint"); *R.I. Latino Arts v. Nat'l Endowment for the Arts*, No. 25-cv-00079-WES, 2025 WL 2689296, at *10 (D.R.I. Sept. 19, 2025) (holding that policy to "disfavor applications that promote gender ideology precisely because they promote gender ideology . . . is presumptively invalid because it is viewpoint discriminatory"). In all instances, when the government decides to grant funding or terminate funding, the government cannot "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints." *Finley*, 524 U.S. at 587.

This is an instance where the Government chose funding consistent with the statutory scheme and now seeks to rescind the funding based on

viewpoint. The District Court correctly found that the Government cannot do so.

The Government further argues that *Finley* allows it to "choose grants that advance its policy goals and reject grants that do not," Gov't. Br. at 33, when it "selectively fund[s] a program." *Finley*, 524 U.S. at 588. The Government's selective quotations do not tell the whole story. In *Finley*, the Court affirmed that Congress has "wide latitude to set spending priorities" even in a competitive funding scheme (a type of limited public forum) "according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *Id.* at 571. That is, when Congress decides to grant public funds to a particular project, it is allowed to choose its spending priorities and limit receipt of those funds in line with its policy priorities. *Id.* In so doing, as the Court explained in *Finley*, the government has not "discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of another."

However, when Congress has already funded an activity and set aside funds for a specific purpose, the Executive branch may not terminate the funding purely on viewpoint discrimination. *See Thakur*, 118 F.4th at 1108 (quoting *Finley*, 524 U.S. at 587). Indeed, in *Finley*, the Court warned that

48

"even in the provision of subsidies," the government may not "leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints" or "aim at the suppression of dangerous ideas." *Finley*, 524 U.S. at 587; *see Thakur*, 118 F.4th at 1108 (cleaned up).

That is precisely what the Government has done. In seeking to implement its "policy objectives," it has acted with an axe and discriminated based on viewpoint in plain contradiction of the First Amendment.

### C. The District Court Correctly Determined that the Equity Termination Provision is Void for Vagueness on Both a Facial and As-Applied Basis.

#### 1.  Fifth Amendment Due Process

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (cleaned up). The two primary concerns with vague laws are that "(1) they do not give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly'; and (2) they encourage arbitrary and discriminatory enforcement by not providing explicit standards." *U.S.*

*v. Jae Gab Kim*, 449 F.3d 933, 941–42 (9th Cir. 2006). Importantly, vague laws that implicate First Amendment rights also have the "potential for arbitrarily suppressing First Amendment liberties." *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 91 (1965)).

Under the First and Fifth Amendments, "speakers are protected from arbitrary and discriminatory enforcement of vague standards." *Finley*, 524 U.S. at 588. These principles apply with equal weight to Executive Orders, which are subject to due process review. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 539 (N.D. Cal. 2020) (finding that an Executive Order provision conditioning federal funds on the "recipient's certification that it will not use federal funds to 'promote' certain concepts [including] . . . that 'an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously' was "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited").

Although they attempt to argue otherwise, Gov't. Br. at 37, the Government can point to no case law supporting their position that Executive Orders are not subject to due process review. It is simply not

50

credible to argue that executive action implicating constitutional freedoms is immune from due process requirements.

2.    The Term "Equity-related" Is Unconstitutionally Vague.

The Equity Termination Provision is vague because it permits no objective way to determine which speech activities are permitted and which are prohibited. This uncertainty creates a chilling effect — precisely the type of harm and overbreadth of enforcement that the void-for-vagueness doctrine seeks to mitigate. As the District Court found, "[t]he vagueness of the term 'equity-related grants or contracts' invites arbitrary and discriminatory enforcement and does not provide sufficient notice to grantees as to what types of speech or activity they must avoid to prevent termination of their grants or contracts — compelling grantees and grant applicants to 'steer far too clear of [the] forbidden area' of anything related to the broad and undefined term of 'equity.'" ER-44 (quoting *Finley*, 524 U.S. at 588).

The Government argues that the term "equity-related" is like the condition at issue in *Finley*. The condition at issue in *Finley* required members of the National Endowment for the Arts (NEA) to take into consideration "decency and respect," among other factors, when deciding

51

whether to fund projects. *Finley*, 524 U.S. at 576. This is categorically different from the condition at issue here. The vague language in *Finley* was one of many subjective standards that the NEA had to take into consideration when making its decisions. *Id.* In contrast, the "equity-related" provision stands alone, and as the District Court found, "renders categorically ineligible for funding any contract or grant" based on this singular determination. Order at 37. There are no guidelines as to what "equity-related" means. *See* DEI-1 Order § 2(b)(1).

Indeed, it is precisely the type of standard that begets arbitrary and capricious enforcement — that enforcement will not be predictable or known, but subject to the political whims of the Executive branch. The First and Fifth Amendment do not allow such discretion.

Indeed, the DEI-1 Order does not define what "equity" or "equity-related" means at all. *See* DE1-Order. And the Government has avoided offering any concrete definition of the term, taking the position that it need not put forward any definition. ER-46; 5-SER-1174:4–9 ("[W]hat we're saying is we're not putting forward a definition for [equity]."). The District Court found that "the uncertainty created by the Equity Termination Provision has left grantees to interpret for themselves which of their awarded grants even

52

fall under the scope of the provision." ER-46. *See* 4-SER-974-79; 4-SER-991; 4-SER-1035; 1-SER-026.

Because the Equity Termination Provision proscribes a "forbidden area of speech across all federally funded grants or contract" without guidance about how grantees can comply, it is precisely the type of vague, arbitrary, and unconstitutional language that the Fifth Amendment's due process jurisprudence forbids. *See* ER-47 (quoted language) (cleaned up); *see Finley*, 524 U.S. at 588.

### D. The Funding Provisions Are Ultra Vires and Violate the Separation of Powers on an As-Applied Basis Because They Conflict with Statutes Applicable to Plaintiffs.

The Funding Provisions are *ultra vires* because they are contrary to the following statutory schemes: (1) the Ryan White Program; (2) Housing Opportunities for People with AIDS ("HOPWA"); (3) the statutory framework governing Federally Qualified Health Centers ("FQHCs"); (4) the Affordable Care Act ("ACA"); and (5) the Public Health Service Act ("PHSA").

The President does not have unilateral authority to disregard Acts of Congress or to stop the flow of funds that Congress has expressly authorized. The Executive Orders seek to usurp Congress's authority by

conditioning federal grants on grantees not promoting "gender ideology," or "DEI." Gender Order § 3(g); DEI-1 Order § 2(b)(ii)–(iii); DEI-2 Order § 3(b)(iv). By attempting to do so, the President has acted outside of his authority.

"No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. U.S.*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Congress authorizes and allocates funds for federal grants in the annual appropriations bill or by federal statute. Federal grants are federal law, and conditioning or cancelling federal grants amounts to amending or repealing federal law, which the Executive Branch has no constitutional or statutory authority to do. *See Clinton v. City of N.Y.*, 524 U.S. 417, 444 (1998) (holding cancellations "are the functional equivalent of partial repeals of Acts of Congress").

Consistent with these principles, Congress "may impose appropriate conditions on the use of federal property or privileges." *Massachusetts v. U.S.*, 435 U.S. 444, 461 (1978). "Aside from the power of veto, the President is without authority to thwart congressional will by cancelling appropriations passed by Congress." *City & Cnty. of S.F.*, 897 F.3d at 1232.

The Ryan White HIV/AIDS Program provides grants to family-centered care for youth in communities disproportionately affected by HIV. *See* 42 U.S.C. §§ 300ff; 300ff-71. The statute's purpose is to "address the disproportionate impact of HIV/AIDS on, and the disparities in access, treatment, care, and outcomes for, racial and ethnic minorities." 42 U.S.C. § 300ff-121(a). The statute mandates that "the Secretary shall develop a formula for the awarding of grants . . . that ensures that *funding is provided based on the distribution of populations disproportionately impacted* by HIV/AIDS." *Id.*

Congress placed one condition on these grants: The funds may not be used to provide "individuals with hypodermic needles or syringes so that such individuals may use illegal drugs." 42 U.S.C. § 300ff-1. Congress did not condition such grants on whether the recipient promotes "gender ideology" or "DEI." Accordingly, the Executive Orders force a Presidential policy that is "incompatible with the expressed or implied will of Congress," *Zivotofsky v. Kerry*, 576 U.S. 1, 10 (2015), and unconstitutionally intrudes upon the Congressional prerogative to control the public fisc.

Likewise, HOPWA regulations reinforce the prioritization of marginalized populations. The HOPWA regulations provide that a "grantee

or project sponsor must adopt procedures to ensure that all persons who qualify for the assistance, regardless of their race, color, religion, sex, age, national origin, familial status, or handicap, know of the availability of the HOPWA program." 24 C.F.R. § 574.603(b). The Government did not argue that the Equity Termination provision requires that a grantee must adopt a procedure that "prioritizes outreach based on equitable principles," and the District Court considered the argument waived. *See* ER-53. Because the Government does not attempt to make such an argument on appeal, this Court should consider it waived as well. *See* Gov't. Br. at 57-58; *Estelle*, 7 F.3d at 144.

The statutory framework for FQHCs requires them to provide medical care to "medically underserved populations" and specific minority groups facing systemic barriers to healthcare access. *See* 42 U.S.C. § 254b(a)(1); *see also* 42 U.S.C. § 254b-1 (authorizing states to determine medically underserved populations eligible for funding). As the District Court found, the Equity Termination provision directly conflicts with the FQHC statutory requirements that funding be allocated to core "equity-related" purposes. ER-53.

56

Moreover, the Gender Order facially discriminates based on sex and transgender status. *See* Section II.A.2, *supra*, at 36-38. Such discrimination is unlawful under Section 1557 of the ACA, 42 U.S.C. § 18116, and Section 1908 of the PHSA, 42 U.S.C. § 300w-7. Section 1557 of the ACA imposes on health entities an "affirmative obligation not to discriminate in the provision of health care." *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020).

In *Bostock v. Clayton County*, a Title VII case, the Supreme Court held that "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." 590 U.S. 644, 660 (2020). And because "[w]e construe Title IX's protections consistently with those of Title VII," *Doe v. Snyder*, 28 F.4th 103, 114 (9th Cir. 2022), there can be no doubt that "Section 1557 forbids sex discrimination based on transgender status." *C.P. v. Blue Cross Blue Shield of Ill.*, No. 3:20-CV-06145-RJB, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *see also Physicians for Human Rights*, 2025 WL 2377705, at *11.

The same reasoning extends to Section 1908 of the PHSA, which is nearly identical in wording to Section 1557 of the ACA. *See PFLAG*, 769 F. Supp. 3d at 442–43. The Gender Order attempts to override federal statutes

with the President's unilateral declaration that federally funded institutions must repudiate the existence of transgender people. *See* Gender Order §§ 1, 2.

Under these statutes, there is no scenario in which the new discriminatory condition imposed by the President does not conflict with the nondiscrimination mandate set by Congress. When the President usurps congressional authority and infringes on the constitutional rights of individuals, the essential role of the judiciary is to "say what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024). Congress has not imposed conditions on federal grants regarding gender ideology or DEI. Because the Executive Orders did not abide by the "single, finely wrought and exhaustively considered, procedure" for amending or repealing federal legislation, they are unlawful. *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983); *see also Washington*, 768 F. Supp. 3d at 1263 (holding that because the Funding Provisions "purport to condition congressionally appropriated funds in a manner that effectively rewrites the law, they usurp Congress's legislative role and thus amount to an end run around the separation of powers").

The District Court also found that the qualifiers "to the maximum extent allowed by law" in the Equity Termination Provision and "as permitted by law" in the Gender Termination Provision do not act to save the Executive Orders. DEI-1 Order § 2(b)(i); Gender Order § 3(g). Here, the Government asserts again that this case is akin to *Building & Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002). Gov't. Br. at 55. There, the D.C. Circuit considered an executive order that sought to bar federal agencies from entering into labor agreements. *Allbaugh*, 295 F.3d at 29. The order contained a savings clause limiting an agency's power to enter into contracts "to the extent permitted by law." *Id.* The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision . . . does not justify an injunction." *Id.* Although *Allbaugh* recognized, at least *in the context of a facial challenge*, that such limiting language might be viewed as sufficient to constrain an executive order to legal enforcement and raise concerns of ripeness, the District Court below ruled on the basis of an as-applied challenge in the context of specific statutes that define program goals and confine executive authority.

Even on a facial basis, the Challenged Orders are significantly different than those at issue in *Allbaugh*. Rather than a mere "possibility," of unlawful

59

agency action, these Orders "unambiguously command action" by expressly requiring agencies to terminate grants and contracts that violate the vague strictures of the Orders. As the District Court properly concluded, the language in the present Orders is significantly more similar to those considered by this Court in *City & County of San Francisco*, 897 F.3d at 1240. *See* ER-56.

The Government reiterates its arguments that *Allbaugh* controls and suggests that an injunction is inappropriate because "implementation of [the Orders] may in some circumstances be constrained by law." Gov't. Br. at 56. However, unlike in *Allbaugh*, where there was a remote possibility that an agency's authority would have been violated, here, there is record evidence that the Orders have been used to illegally terminate grants for doing exactly what Congress authorized when it appropriated the funding for the grants. *See, e.g.*, 4-SER-1039-43; 4-SER-991; 4-SER-993; 4-SER-978-79.

The Government fails to engage with the record evidence demonstrating that funding has been revoked based on these Orders. The District Court explicitly found that "agencies have already begun terminating grants or contracts pursuant to these provisions — even though such terminations conflict with the statutory requirements cited above." ER-

56 (citing 4-SER-1039-43; 3-SER-722-24; 1-SER-002-005). Because the Funding Provisions direct agencies to terminate grants expressly authorized by statute and condition funding on recipients acting in ways Congress has expressly forbidden as a condition of funding, the Orders are "incompatible with the will of Congress," *PFLAG*, 769 F. Supp. 3d at 442, and thus violate the carefully crafted separation of powers outlined in the Constitution.

## III. The District Court Properly Determined that Plaintiffs Otherwise Established the Elements Necessary for a Preliminary Injunction.

### A. Plaintiffs Made a Sufficient Showing of Irreparable Harm.

Because Plaintiffs have demonstrated that the Challenged Orders all are likely to violate Plaintiffs' Constitutional rights, the showing of irreparable harm is plain. It is "well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Especially in the First Amendment context, the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (citation omitted).

As the extensive record here establishes, there is substantial evidence that enforcement of the Funding Provisions will have immediate and detrimental effects to Plaintiffs and to Plaintiffs' clients, warranting preliminary injunctive relief. *See* 4-SER-893 (explaining that the Orders "will cause our clients to die — either through self-harm, murder, untreated disease, overdose, or being arrested because they are unhoused" and "[w]ithout this funding, the populations we serve would suffer in immeasurable ways"); 4-SER-958 (noting the lack of funding "will result in sicker patients and lower participation within the healthcare system"); 4-SER-1020-24 (explaining that without funding, one plaintiff will be unable to provide street medicine teams, will have to cease work reversing overdoses and providing HIV-related testing and medication, and will have to close emergency shelters and transitional housing). Acts that "diminish[] access to high-quality health care" cause irreparable harm. *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019).

## B.    The Balance of Harms and Public Interest Factors Favor Plaintiffs.

"Where the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors

merge." *Roman v. Wolf*, 977 F.3d 935, 940-41 (9th Cir. 2020). Plaintiffs have demonstrated a likelihood of success in proving violations of their constitutional rights. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up).

The harms suffered by Plaintiffs are immediate and of great importance to the public interest. Plaintiffs serve underrepresented and vulnerable populations in their communities, providing access to health care and other services for all communities. For example, stripping funding to these organizations will have deleterious impacts on the greater community — including increased spread of HIV and other transmissible diseases. 4-SER-893; 4-SER-958-59; 4-SER-998-1000, 1008-09; 4-SER-1031. Furthermore, Plaintiffs have established specific operational harms that they have suffered and will continue to suffer absent an injunction.

The Government has little interest in forcing its preferred viewpoint through illegal intrusions into funding decisions. And as the District Court explained, an injunction in favor of Plaintiffs does not tie the Government's hands. ER-58. The Government has numerous ways to proceed with its policy agenda "including promulgating regulations, proposing legislation,

or taking litigation positions." ER-58. The Government cannot, however, mandate its viewpoints in ways that are in plain contradiction to Plaintiffs' rights, statutory schemes, and the Constitution.

The Government argues that two recent stays from the U.S. Supreme Court suggest that the balancing must weigh in its favor. *See APHA*, 145 S.Ct. at 2658; *California*, 604 U.S. at 651–52. In each, the Supreme Court considered a petition for an emergency stay of an order requiring the Government to disburse funds. In both cases, the Court granted the stay, reasoning that the Government had demonstrated "irreparable harm" because there was no guarantee that, if the Government ultimately prevailed, the parties would be able to return the improperly granted money to the Government. *See APHA*, 145 S.Ct. at 2658; *California*, 604 U.S. at 652.

In both *APHA* and *California*, the plaintiffs brought claims under the APA, not the Constitution. *APHA*, 145 S.Ct. at 2658; *California*, 605 U.S. at 651–52. Therefore, although the Government may have an interest in recovering grant funds, as this Court has recognized, vindicating the violation of Constitutional rights is "always in the public interest." *Melendres*, 695 F.3d at 1002. Moreover, without such funding, Plaintiffs and their clients will face an immediate, swift, and potentially devastating lack

of resources. *See* ER-56-57. Record evidence shows that Plaintiffs' clients are in danger of losing their lives if Plaintiffs lose funding for the services they provide. *See* 4-SER-893. Not only will their clients go without healthcare and related services, but Plaintiffs' clients and organizations will be chilled from speaking about topics that are foundational to the organizations' missions and purposes. Additionally, without an injunction, the Court would allow the Executive to eviscerate funding priorities established by Congress. The potential harm to the Government in the form of inability to recover grant funds pales in comparison to the violation of Plaintiffs' constitutional rights and potential loss of life of Plaintiffs' patients and clients.

The Government also claims that it will be irreparably harmed because the President will be unable to carry out his policy objectives. But the President does not have a legitimate interest in carrying out policy objectives accomplished through illegal means that violate the Constitution and Acts of Congress.

A balancing of the equities is just that. Although the Government may have some interest, in this instance, the Plaintiffs' interests tip the scales: Their Constitutional rights are at risk.

IV.  **The Injunction is Properly Tailored to Provide Plaintiffs Complete Relief.**

It is simply not credible that Plaintiffs' grants, which were terminated on the heels of the issuance of these Executive Orders, were terminated for any reason other than the President's unlawful directives. As the District Court correctly noted, Plaintiffs received termination notices that directly referenced the Executive Orders. ER-23-24 (citing 4-SER-991 (termination notice from the Centers for Disease Control (CDC) explaining that to implement the DEI-1 Order, a Plaintiff must "immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion' (DEI) at every level and activity" that was supported by CDC funds); 4-SER-993 (termination notice from the CDC explaining that to implement the Gender Order, "any vestige, remnant, or re-named piece of any gender ideology programs funded by the U.S. government under this award are immediately, completely, and permanently terminated"); 4-SER-978-79 (termination notice from HRSA, stating that effectively immediately, HRSA grant funds "may not be used for activities that do not align with" the DEI-1 Order or the Gender Order and that any "vestige, remnant, or re-named piece of any programs in conflict

with these E.O.s are terminated in whole or in part")). While Defendants, informed by litigation, may have omitted direct citation to the Executive Orders in later grant terminations, the context, lack of any other explanation, and temporal proximity between the issuance of the Executive Orders and the grant terminations are sufficient for the District Court to have found that the two are likely causally related even for such terminations.

Finally, the District Court's Order is only applicable to Plaintiffs. There is no more narrow construction that the District Court could have used when fashioning this remedy.

## CONCLUSION

For the foregoing reasons, Defendants' appeal should be denied in its entirety.

Respectfully submitted,

*s/ Jose Abrigo*

Camilla B. Taylor
*ctaylor@lambdalegal.org*
Kenneth D. Upton, Jr.
*kupton@lambdalegal.org*
**Lambda Legal Defense and
Education Fund, Inc.**
3656 North Halsted Street
Chicago, Illinois 60613-5974
312-663-4413

Jose Abrigo
*jabrigo@lambdalegal.org*
Omar Gonzalez-Pagan
*ogonzalez-pagan@lambdalegal.org*
**Lambda Legal Defense and
Education Fund, Inc.**
120 Wall Street, 19th Floor
New York, New York 10005-3919
212-809-8585

Jennifer C. Pizer
*jpizer@lambdalegal.org*
Pelecanos*
*pelecanos@lambdalegal.org*
**Lambda Legal Defense and
Education Fund, Inc.**
800 South Figueroa Street, Ste. 1260
Los Angeles, California 90017-2521
213-382-7600

Karen L. Loewy
*kloewy@lambdalegal.org*
**Lambda Legal Defense and
Education Fund, Inc.**
815 16th Street NW, Suite 4140
Washington, DC 20006-4101
202-804-6245

*\*Mailing address only*

**Counsel for Plaintiffs-Appellees**

68

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants state that they are aware of the following related cases pending in this Court:

1.      *Thakur v. Trump*, No. 25-4249, raises issues similar or related to this appeal. *Thakur* involves similar First Amendment challenges to one of the Executive Orders at issue in this appeal. In addition, *Thakur* raises similar questions about district court jurisdiction to consider grant-related claims under the Tucker Act. The Court's published order denying denied the Government's motion for a partial stay pending appeal: *Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025).

2.      *Washington v. Trump*, No. 25-1922, similarly challenges the Gender Promotion and Gender Termination Provisions under the Fifth Amendment's Equal Protection Component, among other grounds, as it pertains to the provision of gender-affirming medical care.

*s/ Jose Abrigo*

69

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s): 25-4988**

I am the attorney or self-represented party.

**This brief contains 12,970 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** *s/ Jose Abrigo*                    **Date** October 2, 2025

70

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

_s/ Jose Abrigo_