No. 25-4988

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

SAN FRANCISCO AIDS FOUNDATION, *et al.*,

*Plaintiffs-Appellees,*

*v.*

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants.*

On Interlocutory Appeal from the United States District Court
for the Northern District of California

No. 4:25-cv-01824

The Honorable Jon S. Tigar

**BRIEF FOR AMICI CURIAE ILLINOIS, CALIFORNIA,
MASSACHUSETTS, COLORADO, CONNECTICUT,
DELAWARE, HAWAI'I, MAINE, MARYLAND, MICHIGAN,
MINNESOTA, NEVADA, NEW JERSEY, NEW YORK,
OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON
SUPPORTING PLAINTIFFS-APPELLEES AND AFFIRMANCE**

SARAH A. HUNGER
  *Deputy Solicitor General*
BRIANNA YANG
  *Assistant Attorney General*
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

Attorneys for State of Illinois

(*Additional counsel on next page*)

ROB BONTA
Attorney General
State of California

JAMES RICHARDSON
  *Deputy Attorney General*
WILLIAM H. DOWNER
  *Supervising Deputy Attorney*
  *General*
MICHAEL L. NEWMAN
  *Senior Assistant Attorney*
  *General*
300 South Spring Street
Los Angeles, California 90013
(213) 269-6698
William.Downer@doj.ca.gov
James.Richardson@doj.ca.gov
Michael.Newman@doj.ca.gov

Counsel for State of California

ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

ELIZABETH MATOS
  *Chief, Civil Rights Division*
DAVID UREÑA
  *Assistant Attorney General*
Civil Rights Division
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2345
Elizabeth.Matos@mass.gov

Counsel for Commonwealth of
Massachusetts

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

INTERESTS OF AMICI CURIAE ........................................................ 1

SUMMARY OF THE ARGUMENT ..................................................... 4

ARGUMENT ....................................................................................... 8

I.     Principles And Practices Related To Diversity, Equity, Inclusion, and Accessibility Are Grounded In Longstanding Antidiscrimination Laws And Confer Substantial Benefits To Amici States ................................................................. 8

II.    The Vague And Discriminatory Nature Of The Challenged Provisions Harm Amici States. ............................................. 15

      A.    The vague and unclear directives set forth in the Equity Termination Provision inflict substantial harm on amici States. ...................................................... 16

      B.    The discriminatory directives in the Gender Termination and Gender Promotion Provisions inflict substantial harm on amici States. ............................................................ 23

CONCLUSION ................................................................................. 28

CERTIFICATE OF COMPLIANCE ................................................. 31

CERTIFICATE OF SERVICE ........................................................... 32

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chicago Women in Trades v. Trump,*
    778 F. Supp. 3d 959 (N.D. Ill. 2025) .............................................. 21

*Groff v. DeJoy,*
    600 U.S. 447 (2023) ....................................................................... 10

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
    767 F. Supp. 3d 242 (D. Md.), op. clarified,
    769 F. Supp. 3d. 465 (D. Md. 2025)............................................... 21

*PFLAG v. Trump,*
    769 F. Supp. 3d 405 (D. Md. 2025)........................................... 23, 26

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ......................................................................... 3

*S.F. Unified Sch. Dist. v. AmeriCorps,*
    No. 25-cv-02425, 2025 WL 974298
    (N.D. Cal. Mar. 31, 2025) ............................................................. 21

*U.S. Airways, Inc. v. Barnett,*
    535 U.S. 391 (2002) ....................................................................... 10

**Statutes, Orders, and Regulations**

Exec. Order No. 14,151,
    Ending Radical and Wasteful Government DEI Programs and
    Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025) ........... 1, 2, 6, 8, 12

Exec. Order No. 14,168,
    Defending Women from Gender Ideology Extremism and
    Restoring Biological Truth to the Federal Government, 90 Fed.
    Reg. 8615 (Jan. 20, 2025) ...................................................... 1, 2, 6

Exec. Order No. 14,173,
> Ending Illegal Discrimination and Restoring Merit-Based
> Opportunity, 90 Fed. Reg. 8633 (Jan. 21, 2025) ............................ 1

20 U.S.C.
> § 1022e(b) ...................................................................... 18
> § 6672(b) ....................................................................... 17

42 U.S.C.
> § 3616a ........................................................................... 11
> § 12112(b) ...................................................................... 10

Equal Pay Act of 1963,
> Pub. L. No. 88-38, 77 Stat. 56 ..................................... 8

Civil Rights Act of 1964,
> Pub. L. No. 88-352, 78 Stat. 241 .................................. 8

Age Discrimination in Employment Act of 1967,
> Pub. L. No. 90-202, 81 Stat. 602 .................................. 8

Fair Housing Act of 1968,
> Pub. L. No. 90-284, §§ 801-901, 82 Stat. 73, 81-90 ......................... 8

Education Amendments of 1972,
> Pub. L. No. 92-318, 86 Stat. 235, 373-75 ......................... 9

Rehabilitation Act of 1973,
> Pub. L. No. 93-112, 87 Stat. 355 .................................. 9

Individuals with Disabilities Education Act,
> Pub. L. No. 94-142, 89 Stat. 773 (1975), *as amended by* Pub. L. No.
> 101-476, 104 Stat. 1103 (1990) ....................................... 9

Americans with Disabilities Act of 1990,
> Pub. L. No. 101-336, 104 Stat. 327 ............................... 9

Women in Apprenticeship and Nontraditional Occupations Act,
29 U.S.C. §§ 2501-2509 ................................................................ 11

Cal. Civ. Code §§ 51(b), 51(e)(5) ................................................ 24

Cal. Gov't Code §§ 12940(a), 12955 ............................................ 24

Conn. Gen. Stat. §§ 10-15c, 46a-58 *et seq.* ............................... 24

D.C. Code § 2-1401.01 *et seq.* ................................................... 24

Del. Code tit. 6, ch. 45 & 46 ........................................................ 24

Del. Code tit. 19, ch. 7 ................................................................ 24

Haw. Rev. Stat. §§ 368-1, 378-2, 489-3, 515-3 ........................... 24

775 Ill. Comp. Stat. 5/1-102(A), 5/1-103(O-1), 5/1-103(Q) ...................... 24

Mass. Gen. Laws ch. 151B, § 4 .................................................... 24

Mass. Gen. Laws ch. 272, §§ 92A, 98 ......................................... 24

Md. Code, Educ. § 26-704 ............................................................ 24

Md. Code Ann., State Gov't §§ 20-606, 20-705 .......................... 24

Me. Rev. Stat. tit. 5, § 4551 *et seq.* ........................................... 24

Minn. Stat. §§ 363A.03, subd. 50; 363A.01 *et seq.* ................... 24

Nev. Rev. Stat. §§ 118.100, 284.150(3), 439.994, 449.101(1), 613.330 ... 24

N.J. Stat. Ann. §§ 10:5-1 *et seq.*, 17:48-6oo, 18A:36-41 ........... 24

N.Y. Exec. Law §§ 296, 296-a, 296-b ......................................... 24

N.Y. Civ. Rts. Law § 40-c .............................................................. 24

Or. Rev. Stat. §§ 659A.006, 659A.030, 659A.403, 659A.421 .................. 24

R.I. Gen. Laws §§ 11-24-2, 23-17-19, 28-5-5, 28-5.1-12, 28-6-18, 34-37-2, 34-37-4, 34-37-4.3, 34-37-5.2, 34-37-5.3, 34-37-5.4 .......................24

Vt. Stat. Ann. tit. 9 §§ 4502, 4503...........................................................24

Vt. Stat. Ann. tit. 21, § 495 ....................................................................24

Wash. Rev. Code §§ 49.60.030(1), 49.60.040(2), 49.60.040(29), 49.60.215.........................................................................................24

**Other Authorities**

Anand, Rohini & Mary-Frances Winters, *A Retrospective View of Corporate Diversity Training From 1964 to the Present*, 7 Acad. Mgmt. Learning & Ed. 356 (2008) ....................................................8

Badgett, M.V. Lee, et al., *Business Impact of LGBT-Supportive Workplace Policies*, Williams Inst. (2013)......................................12

Carter-Edwards, Lori, et al., *Diversity, Equity, Inclusion, and Access Are Necessary for Clinical Trial Site Readiness*, 7 J. Clinical & Translational Sci. 1 (2023) .............................13, 14

Cohen, Sascha, *This Is What Breast Cancer Activism Looked Like Before the Pink Ribbon*, Time (Oct. 17, 2016)...........................................13

Compl., *California v. Dep't of Ed.*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025) ...........................................................17, 18

Compl., *Washington v. Dep't of Ed.*, No. 25-cv-01228 (W.D. Wash. June 30, 2025)...........................................................19

*Diversity Matters Even More: The Case for Holistic Impact*, McKinsey & Co. (Dec. 5, 2023)....................................................................12

Drabish, Kelly & Laurie A. Theeke, *Health Impact of Stigma, Discrimination, Prejudice, and Bias Experienced by Transgender People: A Systematic Review of Quantitative Studies*, 43 Issues in Mental Health Nursing 111 (2022)...............................................26

Feldman, Jamie L., et al., *Health and Health Care Access in the US Transgender Population Health (TransPop) Survey*, Williams Inst. (2021) ................................................................................... 27

Girardin, Lauren, *Nonprofits Self-Censoring in Wake of Trump Actions*, Nonprofit Q. (Feb. 14, 2025) .......................................................... 22

Hatzenbuehler, Mark L., et al., *Protective School Climates and Reduced Risk for Suicide Ideation in Sexual Minority Youths*, 104 Am. J. Pub. Health 279 (2014) .................................................................. 15

Hernandez, Tanya Kateri, *Can CRT Save DEI?: Workplace Diversity, Equity & Inclusion in the Shadow of Anti-Affirmative Action*, 71 UCLA L. Rev. Discourse 282 (2024) ............................................... 8

Kidd, Jeremy, et al., *Prevalence of Substance Use and Mental Health Problems Among Transgender and Cisgender U.S. Adults: Results from a National Probability Sample*, 326 Psychiatry Rsch. 115339 (2023) ...................................................................................... 26

Knowles, Jason & Maggie Green, *Federal Funding Cuts Impacting Local Resources for LGBTQ+ Community: 'A Gut Punch,'* ABC7 Chicago (June 25, 2025) ............................................................... 25

Kratz, Julie, *The Little Known History of DEI and Why It's Critical to Its Survival*, Forbes (Dec. 29, 2024) .......................................... 8, 9

*Lives at Risk: Komen Calls on Congress to Restore Funding and Protect Lifesaving Breast Cancer Programs*, Susan G. Komen (Mar. 17, 2025) ...................................................................................... 13

Loyola Univ. Chi. Inst. for Racial Just., *DEI in K-12: Case Study Profiles* (2022) .................................................................... 14

Mallory, Christy, et al., *The Impact of Stigma and Discrimination Against LGBT People in Michigan*, Williams Inst. (2019) ............ 26

vi

McShane, Julianne, *DOGE Killed Dozens of Grants that Supported Women Workers*, Mother Jones (May 7, 2025) ............................ 20

Moran, Samantha A., et al. *LGBTQ+ Youth Policy and Mental Health: Indirect Effects Through School Experiences*, 35 J. Rsch. on Adolescence 1 (2024) ........................................................ 14, 15

Pichler, Shaun, et al., *Do LGBT-Supportive Corporate Policies Enhance Firm Performance?*, 57 Hum. Res. Mgmt. 263 (2018) .................. 12

Press Release, Statement Re Federal WANTO Grant Termination, Vermont Works for Women (May 9, 2025) ................................... 20

Schultz, Brooke, *Trump Ends $1 Billion in Mental Health Grants for Schools*, EducationWeek (Apr. 30, 2025) ...................................... 19

Veltman, Chloe, *PBS Shutters DEI Office*, NPR (Feb. 11, 2025) ........... 22

## INTERESTS OF AMICI CURIAE

The amici States of Illinois, California, Massachusetts, Colorado, Connecticut, Delaware, Hawaiʻi, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington ("amici States") submit this brief in support of plaintiffs-appellees pursuant to Federal Rule of Appellate Procedure 29(a)(2).

In January 2025, President Trump issued a series of Executive Orders that broadly target programs promoting diversity, equity, inclusion, and accessibility (referred to as "DEI" or "DEIA") and, additionally, initiatives promoting "gender ideology."[1]  Plaintiffs filed suit challenging several provisions of three of these Orders, alleging that they impose unlawful burdens on organizations that provide critical services to LGBTQ communities.  *See* ER9-10.[2]  In particular,

---

[1]  *See* Exec. Order No. 14,151, Ending Radical and Wasteful Government DEI Programs and Preferencing, 90 Fed. Reg. 8339 (Jan. 20, 2025); Exec. Order No. 14,168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025); Exec. Order 14,173, 90 Fed. Reg. 8633, Ending Illegal Discrimination and Restoring Merit-Based Opportunity (Jan. 21, 2025).

[2]  This brief adopts the district court's use of LGBTQ to refer to "lesbian, gay, bisexual, transgender, and queer."  ER9.

1

many of the plaintiff organizations offer healthcare, social, and other community-based services to transgender individuals. *Id.*

At issue in this appeal are the three provisions of the Executive Orders that the district court preliminarily enjoined. ER4-8; Appellants' Br. 12-16. The first—which is found in one of the Orders deeming programs related to diversity, equity, inclusion, and accessibility to be "illegal," "immoral," and "shameful"—directs executive agencies to "terminate . . . 'equity-related' grants or contracts" ("Equity Termination Provision").[3] The second and third are found in the Order addressing "gender ideology," defined in part as "the false claim that males can identify as and thus become women and vice versa."[4] As relevant here, that Order directs executive agencies to "take all necessary steps . . . to end the Federal funding of gender ideology" ("Gender Termination Provision"), and "assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology" ("Gender Promotion Provision") (collectively, with the Equity

---

[3] *See* Exec. Order No. 14,151 §§1, 2.

[4] *See* Exec. Order No. 14,168, Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government, 90 Fed. Reg. 8615 (Jan. 20, 2025).

Termination Provision, the "Challenged Provisions").[5]  The district court's preliminary injunction rested upon its conclusion that plaintiffs were likely to succeed on the merits of their claims that the Equity Termination Provision was unconstitutionally vague in violation of the Fifth Amendment, that the Gender Termination Provision and the Gender Promotion Provision discriminated on the basis of transgender status in violation of the Fifth Amendment, and that all three provisions abridged plaintiffs' freedom of expression in violation of the First Amendment.  ER31, 39, 44.[6]

Amici States have a fundamental interest in ensuring that all of their residents can reap "the benefits of wide participation in political, economic, and cultural life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984).  As such, amici States embrace diversity, equity, inclusion, accessibility, and related principles, and are deeply committed to enforcing civil rights laws to ensure a safe, welcoming environment for all.  As detailed below, *infra* Section I, abundant research shows that DEIA-informed practices, including those involving the LGBTQ

---

[5] *See* Exec. Order No. 14,168 §§ 2, 3.

[6]  The district court denied plaintiffs' motion as to six other provisions of the three challenged Executive Orders.  ER9-10.

3

community, are key to advancing these interests. To that end, amici
States rely on federal grant programs and contracts to fund activities
incorporating diversity, equity, inclusion, and accessibility principles.
Likewise, amici States are home to many recipients of federal grants
and contracts that involve such activities. The Challenged Provisions,
however, direct federal agencies to impose vague and unlawful burdens
on funding recipients that could interfere with the provision of critical
services within amici States, including, as relevant here, to our
transgender residents. Accordingly, amici States urge this Court to
affirm the district court's preliminary injunction.

## SUMMARY OF THE ARGUMENT

As the district court rightly determined, plaintiffs are likely to
prevail on their constitutional claims because the Challenged Provisions
"reflect an effort to censor constitutionally protected speech and services
promoting DEI and recognizing the existence of transgender people."
ER10. In reaching this conclusion, the court explained in relevant part
that the challenged Executive Orders contain no meaningful definitions
or other guideposts for terms that are critical to understanding and
implementing the Equity Termination Provision. ER44-47. As a result,

the Provision "invites arbitrary and discriminatory enforcement and does not provide sufficient notice to grantees as to what types of speech or activity they must avoid to prevent termination of their grants or contracts—compelling grantees and grant applicants to steer far too clear of the forbidden area of anything related to the broad and undefined term of "equity."  ER44 (cleaned up).

As to the Gender Termination Provision and the Gender Promotion Provision, the district court explained that "[b]y singling out grants that *serve* transgender people, the [Executive] Order necessarily singles out *transgender people* and excludes them from being able to benefit from federal funds."  ER32 (emphasis in original).  Such facial and purposeful discrimination, ER32-33, the court reasoned, fails any level of scrutiny applied to their equal protection claim, ER33-34.  Amici States agree with plaintiffs that they are likely to succeed on the merits of these and other claims because of the flaws in the Executive Orders.  Amici States write separately, however, to highlight two issues that are particularly germane to their interests.

First, amici States disagree with the underlying premise of the Executive Orders—that practices intended to further "DEIA," "DEI," or

5

"equity" are "shameful," "immoral," and even "illegal" and that
initiatives related to "gender ideology" are "corrosive" and "wrong."[7] As
further explained below, DEIA-informed principles and practices are
grounded in, and have played an essential role in, enforcing compliance
with longstanding civil rights laws in a wide range of contexts,
including employment and housing. And, even when unnecessary to
comply with legal obligations, many entities have broadly adopted
lawful DEIA-related principles and practices, including those aimed at
supporting LGBTQ individuals, precisely because they produce robust
benefits.

Second, the Executive Orders are causing immense harm to amici
States and our residents, including our transgender residents that the
Challenged Provisions seek to erase. As the district court correctly
recognized, the lack of clear standards or terms in the Equity
Termination Provision has resulted in substantial confusion and
uncertainty. ER46-47. Given the impossibility of determining what
activities the administration may consider to be "DEIA" or "equity-
related," amici States are placed in an untenable position. The Orders

---

[7] *See* Exec. Order No. 14,151 § 1; Exec. Order No. 14,168 § 1.

also have had a chilling effect on private entities, many of which have self-censored by eliminating any conceivably "DEIA-related" programming and references to avoid abrupt loss of their funding and other harsh consequences. Finally, the threatened and actual termination of funding pursuant to the Gender Termination and Gender Promotion Provisions has harmed amici States' LGBTQ, and especially transgender, residents by removing critical services in a purposefully discriminatory manner.

As a result, if not enjoined, the Challenged Provisions will harm residents in amici States by depriving them of the many valuable benefits associated with workplaces, schools, and communities that have adopted practices related to diversity, equity, inclusion, and accessibility and to supporting transgender individuals. Amici States thus respectfully request that this Court affirm the district court's decision granting a preliminary injunction.

**ARGUMENT**

I. **Principles And Practices Related To Diversity, Equity, Inclusion, and Accessibility Are Grounded In Longstanding Antidiscrimination Laws And Confer Substantial Benefits To Amici States.**

The Executive Order addressing diversity, equity, inclusion, and accessibility begins from the mistaken premise that "DEIA" refers to an unlawful, harmful, and even "illegal" set of policies that should be eradicated.[8] As amici States know from experience, this is incorrect in several respects.

At the threshold, modern diversity, equity, inclusion, and accessibility practices are firmly rooted in longstanding, landmark civil rights legislation from the 1960s,[9] including the Equal Pay Act of

---

[8] *See* Exec. Order No. 14,151 §1.

[9] *See, e.g.*, Tanya Kateri Hernandez, *Can CRT Save DEI?: Workplace Diversity, Equity & Inclusion in the Shadow of Anti-Affirmative Action*, 71 UCLA L. Rev. Discourse 282, 291 (2024) (explaining that, to promote compliance with these new civil rights laws, many businesses and organizations held "[e]arly iterations of DEI training," which primarily focused "on educating institutions about legal prohibitions and avoiding lawsuits"); *see also* Rohini Anand & Mary-Frances Winters, *A Retrospective View of Corporate Diversity Training from 1964 to the Present*, 7 Acad. Mgmt. Learning & Ed. 356, 357 (2008); Julie Kratz, *The Little Known History of DEI and Why It's Critical to Its Survival*, Forbes (Dec. 29, 2024), https://tinyurl.com/3mundfcn/.

1963,[10] the Civil Rights Act of 1964,[11] the Age Discrimination in Employment Act of 1967,[12] and the Fair Housing Act of 1968.[13] These statutes established a legal framework for recognizing, rectifying, and preventing discrimination on the basis of characteristics including race, color, religion, sex, national origin, and age.[14] Other key antidiscrimination laws subsequently built upon this foundation, such as Title IX of the Education Amendments of 1972,[15] which prohibited sex-based discrimination in educational institutions that receive federal funding, and the Rehabilitation Act of 1973,[16] the Individuals with Disabilities Education Act,[17] and the Americans with Disabilities Act of

---

[10] Pub. L. No. 88-38, 77 Stat. 56.

[11] Pub. L. No. 88-352, 78 Stat. 241.

[12] Pub. L. No. 90-202, 81 Stat. 602.

[13] Pub. L. No. 90-284, §§ 801-901, 82 Stat. 73, 81-90.

[14] *See, e.g.*, Kratz, *supra* note 3.

[15] Pub. L. No. 92-318, 86 Stat. 235, 373-75.

[16] Pub. L. No. 93-112, 87 Stat. 355.

[17] Pub. L. No. 94-142, 89 Stat. 773 (1975) (short title changed to Individuals with Disabilities Act by Pub. L. No. 101-476, 104 Stat. 1103 (1990))

1990,[18] which outlawed discrimination based on disability by federal funding recipients, in public schools, and in all areas of public life.

Furthermore, and contrary to the Order's assertion otherwise, many well-established practices designed to promote diversity, equity, inclusion, and accessibility are, in fact, *required* by these antidiscrimination laws and integral to ensuring they are adequately enforced. For instance, federal laws requiring employers to ensure that employees and job applicants are not discriminated against on the basis of protected characteristics have long required employers to take active steps toward diversity, equity, inclusion, and accessibility. Under this framework, for example, employers must affirmatively make changes—even to neutral policies and requirements—in order to accommodate employees' religious beliefs or disabilities. *See Groff v. DeJoy*, 600 U.S. 447, 470 (2023) (Title VII of the Civil Rights Act requires employers to accommodate an employee's sincere religious beliefs unless "the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business"); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 395 (2002) (The Americans with

---

[18] Pub. L. No. 101-336, 104 Stat. 327.

Disabilities Act "says that an employer who fails to make 'reasonable accommodations to the known physical or mental limitations of an [employee] with a disability' discriminates '*unless*' the employer 'can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.'" (quoting 42 U.S.C. § 12112(b)(5)(A))).

Many entities, moreover, provide services related to diversity, equity, inclusion, and accessibility with federal funds that have been specifically appropriated for that purpose. For example, Congress for decades has appropriated funds under the Women in Apprenticeship and Nontraditional Occupations Act, 29 U.S.C. §§ 2501-2509, which provides grants to community-based organizations to help women, employers, and trade unions overcome barriers to full and effective participation in occupations where women make up less than 25% of the workforce. And in the context of housing, Congress has provided funds under the Fair Housing Initiative Program to private nonprofit housing organizations that carry out investigatory, enforcement, education, and outreach activities aimed at rooting out discrimination in the provision of housing, including "new or sophisticated forms of discrimination." 42 U.S.C. § 3616a(b)-(d). These programs not only reflect principles of

diversity, equity, inclusion, and accessibility but also are designed to support the enforcement of civil rights laws, not to undermine them.

Finally, empirical research confirms that policies and principles promoting diversity, equity, inclusion, and accessibility—including practices aimed at supporting LGBTQ communities—are well-recognized, lawful methods of achieving critical social and economic benefits for amici States, their residents, and their businesses. They are not, as the Order suggests, "waste[ful]" or "shameful."[19]

Indeed, DEIA-focused strategies can bring significant value to universities, corporations, and other institutions. Research shows that diversity drives economic growth in numerous ways. Companies with strong, diverse leadership teams overperform compared to companies that are more homogenous: diversity is associated with higher financial returns and higher social and environmental impact scores.[20] In particular, studies have shown that when private firms implement LGBTQ-friendly policies, they experience increases in firm value,

---

[19] *See* Exec. Order No. 14,151 §1.

[20] *Diversity Matters Even More: The Case for Holistic Impact*, McKinsey & Co. (Dec. 5, 2023), https://tinyurl.com/263af5h8.

productivity, and profitability.[21]  And diverse workforces help to attract new clients and customers, such as individuals identifying as LGBTQ and those who value an inclusive workplace.[22]

Principles and practices related to diversity, equity, inclusion, and accessibility have also proven critical to advances in healthcare. Greater equity in research funding for diseases that disproportionately affect women, for example, has led to medical advances that have dramatically increased survival rates for diseases like breast cancer.[23] Similarly, in the context of clinical trials, it is crucial that the development of new treatments be based on DEIA-informed practices to ensure researchers are selecting participants (and acting on behalf of future patients) who represent a fair cross-section of the American

---

[21]  Shaun Pichler et al., *Do LGBT-Supportive Corporate Policies Enhance Firm Performance?*, 57 Hum. Res. Mgmt. 263, 263 (2018).

[22]  M.V. Lee Badgett et al., *Business Impact of LGBT-Supportive Workplace Policies*, Williams Inst. 26 (2013).

[23]  *See, e.g.*, *Lives at Risk:  Komen Calls on Congress to Restore Funding and Protect Lifesaving Breast Cancer Programs*, Susan G. Komen (Mar. 17, 2025), https://tinyurl.com/55x4xs3b (investment in breast cancer research contributed to the over 44% drop in breast cancer mortality over past 3.5 decades); *see also* Sascha Cohen, *This Is What Breast Cancer Activism Looked Like Before the Pink Ribbon*, Time (Oct. 17, 2016), https://tinyurl.com/mpr5xvda (describing "decades of committed activism" to secure resources to combat breast cancer).

public with respect to race, ethnicity, sex, and other demographic factors.[24]  Understanding and implementing DEIA-informed best practices helps researchers to successfully recruit and retain the participants necessary to successfully execute their studies.[25]

Education, too, benefits from the work of organizations applying principles and practices related to diversity, equity, inclusion, and accessibility.  In K-12 settings, these principles have fostered initiatives to provide meals to students living with food insecurity, ensure that teachers sufficiently understand students' backgrounds to provide effective instruction, integrate students with disabilities among their peers, and ensure that subjects like sex education achieve their goals of advancing the health and safety of all students.[26]  Inclusive school environments are not only critical for LGBTQ students, but also impact the broader school community.  Fostering an inclusive environment for

---

[24] *See*, *e.g.*, Lori Carter-Edwards et al., *Diversity, Equity, Inclusion, and Access Are Necessary for Clinical Trial Site Readiness*, 7 J. Clinical & Translational Sci. 1, 1 (2023) ("The lack of representation in clinical trials has impeded innovation, compromised generalizability of evidence, and may undermine trust in the clinical trials enterprise.").

[25] *Id.*

[26] Loyola Univ. Chi. Inst. for Racial Just., *DEI in K-12: Case Study Profiles* (2022), https://tinyurl.com/bdfs4dt6.

14

LGBTQ students is associated with less bias-based bullying, more positive perceptions of school safety, and improved academic achievement.[27]  Indeed, school support for wellbeing and safety is necessary to enhance learning and development for all students.[28]  And one study shows that LGBTQ+ students in supportive school climates are less likely to have suicidal thoughts.[29]

Although these examples are far from exhaustive, they demonstrate the wide variety of practices that promote diversity, equity, inclusion, and accessibility that are both lawful and beneficial for amici States, their businesses, and their residents.

## II. The Vague And Discriminatory Nature Of The Challenged Provisions Harm Amici States.

In addition to inaccurately characterizing diversity, equity, inclusion, and accessibility policies and practices as illegal and harmful, the Challenged Provisions direct agencies to terminate grants and

---

[27]  Samantha A. Moran et al., *LGBTQ+ Youth Policy and Mental Health: Indirect Effects Through School Experiences*, 35 J. Rsch. on Adolescence 1 (2024).

[28]  *Id.*

[29]  Mark L. Hatzenbuehler et al., *Protective School Climates and Reduced Risk for Suicide Ideation in Sexual Minority Youths*, 104 Am. J. Pub. Health 279 (2014).

contracts that are deemed "equity related" and prohibit federal funding of "gender ideology." As the district court explained, these provisions are likely unconstitutional because the government cannot "single out protected communities for disfavored treatment" or impose requirements "in such a vague manner that all federal grantees and contractors are left to wonder what activities or expression they can engage in without risking the funding on which they depend." ER10. The implementation of the Challenged Provisions, moreover, has inflicted a wide range of harms on amici States, as well as private organizations subject to these directives and the individuals that they serve.

> ### A. The vague and unclear directives set forth in the Equity Termination Provision inflict substantial harm on amici States.

To start, the Equity Termination Provision directs agencies to implement vague and unclear standards to the detriment of amici States, their residents, and private entities that rely on federal funding subject to this Provision.

For their part, amici States have received numerous notices from federal agencies that threaten, terminate, or otherwise implicate

billions of dollars in federal funding for essential services like basic K-12 education, highway infrastructure, public health, workforce development, and environmental protection. Many of these notices claim that the targeted programs promote, involve, or take part in "DEI" or "DEIA" initiatives.[30] But as explained, the Order does not provide any workable definition of key terms like "DEI," "DEIA, "diversity," "equity," "inclusion," and "accessibility." And the federal agencies implementing the Equity Termination Provision have not provided any clarity. Instead, the agency communications merely repeat, without any meaningful elaboration, the vague and undefined phrases used in the Orders. As a result, grantees cannot anticipate which funding streams will be cancelled, nor understand the specific reasons for terminations, leaving amici States and other institutions unable to properly respond to and plan for the loss of federal funding.

For example, the Department of Education terminated $600 million in funding for Teacher Quality Partnership and Supporting

---

[30] *See, e.g.*, Compl. ¶ 117, *California v. Dep't of Ed.*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025).

Effective Educator Development grants.[31]  These grants, authorized and established by Congress, support teacher recruiting in "traditionally underserved" areas, 20 U.S.C. § 6672(a), and teacher training in "providing instruction to diverse populations, including children with disabilities, limited English proficient students, and children from low-income families," *id.* § 1022e(b).  These grants are critical for addressing teacher shortages and supporting teacher development in amici States, and the grant terminations will stymie amici States' commitment to providing high-quality K-12 education to our students.  But the termination notices offer no substantive explanation for the terminations, and instead simply repeat the vague and undefined phrases in the Executive Order.  Indeed, the boilerplate, template termination letters sent to grant recipients note only that the Department does not support or fund "programs or organizations that

---

[31] *See* Compl. ¶ 1, *California v. Dep't of Ed.*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025).

promote or take part in diversity, equity, and inclusion ("DEI") initiatives" or other "[i]llegal DEI policies and practices."[32]

Federal agencies have also informally cited the Equity Termination Provision as a reason for grant terminations, even though they did not specifically identify it in official notices as the underlying reason for the decision. The Department of Education, for instance, discontinued $1 billion in grants for mental health services and professionals in K-12 schools.[33] Those letters notifying the grantees of the discontinuances lack any specific, tailored reasons for the cancellation; instead, each boilerplate notice states only that the programs "reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration."[34]

---

[32] *See* Compl. ¶ 117, *California v. Dep't of Ed.*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025).

[33] *See* Brooke Schultz, *Trump Ends $1 Billion in Mental Health Grants for Schools*, EducationWeek (Apr. 30, 2025), https://tinyurl.com/2s3r88t4.

[34] *See* Compl. ¶ 80, *Washington v. Dep't of Ed.*, No. 25-cv-01228 (W.D. Wash. June 30, 2025). The four stated potential reasons for the termination are that the programs "violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds." *Id.*

19

Later comments from the Department of Education spokesperson suggested that the Department discontinued the grants because of its view that "grant recipients used the funding to implement race-based actions like recruiting quotas."[35]

As evidenced by this case, similar termination notices have been sent to private organizations as well. *E.g.*, ER23-24. By way of another example, the Department of Labor terminated numerous grants aimed at supporting women's participation in trade industries, such as construction and manufacturing, and addressing workplace harassment and gender-based violence. In its termination letters, the Department noted that the cancelled programs no longer support the Department's "priorities for its grant funding, including with regard to diversity, equity, inclusion, and accessibility."[36] One such termination letter, sent to Vermont Works for Women, noted that their plan to offer "gender

---

[35] Schultz, *Trump Ends $1 Billion in Mental Health Grants for Schools*; *see also* Compl. ¶ 82, *Washington v. Dep't of Ed.*, No. 25-cv-01228 (W.D. Wash. June 30, 2025) (noting that the Department conceded it targeted these grants for their perceived DEI efforts).

[36] *See* Julianne McShane, *DOGE Killed Dozens of Grants that Supported Women Workers*, Mother Jones (May 7, 2025), https://tinyurl.com/y24wcsrj; Press Release, Statement Re Federal WANTO Grant Termination, Vermont Works for Women (May 9, 2025), https://tinyurl.com/2hkvdpaw.

equity training and technical assistance" demonstrates "misalignment with the Department's priorities,"[37] but offered no explanation as to why such training is misaligned with Department priorities, nor what the Department priorities on diversity, equity, inclusion, and accessibility actually are.

Unsurprisingly, given these circumstances, multiple lower courts (including the district court below) have recognized that the "muddied language" of the government's DEI-related Executive Orders has "spurred a chilling effect" for a wide range of private businesses, institutions, and organizations. *S.F. Unified Sch. Dist. v. AmeriCorps*, No. 25-cv-02425-EMC, 2025 WL 974298, at *4 (N.D. Cal. Mar. 31, 2025); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 290 (D. Md.), op. clarified, 769 F. Supp. 3d 465 (D. Md. 2025) (the Orders "chill speech as to anyone the government might conceivably choose to accuse of engaging in speech about 'equity' or 'diversity' or 'DEI'"). As one court recently noted, few recipients of federal funds are in a position to weather the abrupt

---

[37] Statement Re Federal WANTO Grant Termination, Vermont Works for Women.

termination of their federal funding, to "put their organizations at risk by suing the government," or to "risk False Claims Act litigation." *Chicago Women in Trades v. Trump,* 778 F. Supp. 3d 959, 994 (N.D. Ill. 2025). Accordingly, when faced with the Equity Termination Provision and related provisions of the Executive Orders, "grantees and contractors will take the safer route, keep their heads down, and choose to simply stop speaking on anything remotely related to what the government might consider as promoting DEI or equity." *Id.*

Indeed, some recipients of federal funds have already begun removing references that even arguably invoke DEIA from their activities and cutting related offices and programs.[38] For example, "organizations that support victims of domestic and intimate partner violence have been editing or deleting websites and other public resources to eliminate language the Trump administration might find objectionable."[39] These examples "are more than isolated incidents," as

---

[38] *See, e.g.*, Chloe Veltman, *PBS Shutters DEI Office*, NPR (Feb. 11, 2025), https://tinyurl.com/2h3bjw6k (quoting PBS's president as stating that it closed its DEI office and eliminated all staff members serving in that office "to best ensure we are in compliance with the President's executive order around Diversity, Equity, and Inclusion").

[39] Lauren Girardin, *Nonprofits Self-Censoring in Wake of Trump Actions*, Nonprofit Q. (Feb. 14, 2025), https://tinyurl.com/53t526v8.

observers have noted that "[e]vidence of widespread self-censorship has been mounting."[40]

### B. The discriminatory directives in the Gender Termination and Gender Promotion Provisions inflict substantial harm on amici States.

As the district court correctly determined, the Gender Termination and Gender Promotion Provisions impermissibly discriminate based on transgender status by directing agencies to terminate federal grants that serve—or seemingly even acknowledge—transgender people. ER32; *see also PFLAG v. Trump*, 769 F. Supp. 3d 405, 444 (D. Md. 2025) ("The Court cannot fathom discrimination more direct than the plain pronouncement of a policy resting on the premise that the group to which the policy is directed does not exist."). This purposeful discrimination, as well as the manner in which these Provisions have been implemented, has caused substantial harm to amici States, their residents, and private entities.

As explained, *see supra* Section II.A., any threatened or actual loss of funding—whether it be to agencies in amici States or to organizations providing critical services to our residents—causes harm within our

---

[40] *Id.*

States. And here, the harm is further pronounced by the fact that the grants targeted by the Gender Termination and Gender Promotion Provisions serve transgender individuals, who are already among the most vulnerable members of our society and who are recognized and protected in amici States.[41]

As the district court noted, these Provisions are not merely "rhetoric"; on the contrary, many of the plaintiff organizations have already had federal grants terminated, including a grant funding "the San Francisco Bay Transgender Alliance for Health Resources . . . , a program to reduce and prevent new cases of HIV transmission among young trans people of color . . . in accordance with both the HIV

---

[41] *See, e.g.*, Mass. Gen. Laws ch. 151B, §4; Mass. Gen. Laws ch. 272, §§92A, 98; Cal. Civ. Code §§51(b), 51(e)(5); Cal. Gov't Code §§12940(a), 12955; Md. Code, Educ. §26-704; Conn. Gen. Stat. §§10-15c, 46a-58 *et seq.*; Del. Code tit. 6, ch. 45 & 46; Del. Code tit. 19, ch. 7; D.C. Code §2-1401.01 *et seq.*; Haw. Rev. Stat. §§368-1, 378-2, 489-3, 515-3; 775 Ill. Comp. Stat. 5/1-102(A), 5/1-103(O-1), 5/1-103(Q); Me. Rev. Stat. tit. 5, §4551 *et seq.*; Md. Code Ann., State Gov't §§20-606, 20-705; Minn. Stat. §§363A.03, subd. 50; 363A.01 *et seq.*; Nev. Rev. Stat. §§118.100, 284.150(3), 439.994, 449.101(1), 613.330; N.J. Stat. Ann. §§10:5-1 *et seq.*, 17:48-6oo, 18A:36-41; N.Y. Exec. Law §§296, 296-a, 296-b; N.Y. Civ. Rts. Law §40-c; Or. Rev. Stat. §§659A.006, 659A.030, 659A.403, 659A.421; R.I. Gen. Laws §§11-24-2, 23-17-19, 28-5-5, 28-5.1-12, 28-6-18, 34-37-2, 34-37-4, 34-37-4.3, 34-37-5.2, 34-37-5.3, 34-37-5.4; Vt. Stat. Ann. tit. 9, §§4502, 4503; Vt. Stat. Ann. tit. 21, §495; Wash. Rev. Code §§49.60.030(1), 49.60.040(2), 49.60.040(29), 49.60.215.

National Strategic Plan and the CDC's High-Impact, Status-Neutral HIV Prevention approach." ER31 (internal quotations omitted). Similar grants have been terminated across the country, including several in Illinois providing critical services to LGBTQ populations, such as mental health services, HIV and STI prevention services, and alcohol and drug use rehabilitation services.[42] The loss of federal funding has caused many in the LGBTQ populations served by these institutions to fear for their health and livelihoods. One service provider remarked that she has had "clients call [her] and say, 'Am I going to lose my housing? Am I not going to have access to get my medication that I need for my health?'"[43]

Furthermore, as the district court rightly recognized, the implementation of the orders by federal agencies has caused "confusion," ER32, that further harms organizations operating within amici States. As relevant here, many of the organizations have "received a notice from a government agency informing them that any

---

[42] *See* Jason Knowles & Maggie Green, *Federal Funding Cuts Impacting Local Resources for LGBTQ+ Community: 'A Gut Punch,'* ABC7 Chicago (June 25, 2025), https://tinyurl.com/3d88csph.

[43] *Id.*

programs in conflict with [Executive Order 14,168] and funded by the federal government are immediately and permanently terminated." ER31; *see also PFLAG*, 769 F. Supp. 3d at 417-18. But without further information, grantees are left "to deduce for themselves which particular grants have been terminated." ER32. And as explained, *supra* Section II.A., this lack of clarity with respect to the scope and application of the Challenged Provisions interferes with program operations by leaving grant recipients unable to properly respond to and plan for the loss of federal funding.

Finally, removing critical healthcare and social services for transgender individuals—and doing so in such a flagrantly discriminatory manner—will only further exacerbate the negative mental and physical health outcomes that these services are designed to treat. More than 80 percent of transgender adults in the United States have had suicidal thoughts, and more than 40 percent have attempted suicide.[44] Transgender individuals are also at high risk of depression,

---

[44] Jeremy Kidd et al., *Prevalence of Substance Use and Mental Health Problems Among Transgender and Cisgender U.S. Adults: Results from a National Probability Sample*, 326 Psychiatry Rsch. 115339 (2023).

substance abuse, anxiety disorders, and eating disorders.[45]  When in need of treatment, transgender individuals are more likely to seek out LGBTQ or transgender-specific health clinics or providers:  64 percent of transgender people have accessed specialized clinics, and 82 percent of transgender people say they would like to visit one.[46]  By singling out these clinics and providers, the Gender Termination and Gender Promotion Provisions are eliminating the services that our transgender residents use to obtain the care that they need.

* * *

At bottom, allowing defendants to continue to act on the Challenged Provisions will not only give the federal government a vehicle to attempt to coerce amici States and other federal grantees and contractors to halt virtually any activity that the current administration disfavors, but it will also chill nonprofits, businesses,

---

[45]  Christy Mallory et al., *The Impact of Stigma and Discrimination Against LGBT People in Michigan*, Williams Inst. (2019); Kerry Drabish & Laurie A. Theeke, *Health Impact of Stigma, Discrimination, Prejudice, and Bias Experienced by Transgender People: A Systematic Review of Quantitative Studies*, 43 Issues in Mental Health Nursing 111 (2022).

[46]  Jamie L. Feldman et al., *Health and Health Care Access in the US Transgender Population Health (TransPop) Survey*, Williams Inst. (2021).

schools, and other entities from undertaking important work. This will cause immeasurable harm to amici States and their residents who rely on practices and programs that advance and support diversity, equity, inclusion, and accessibility to combat discrimination and that provide critical services to transgender individuals living within their borders.

## CONCLUSION

This Court should affirm the district court's order granting plaintiffs' motion for a preliminary injunction.

October 9, 2025

Respectfully submitted,

KWAME RAOUL
Attorney General
State of Illinois

JANE ELINOR NOTZ
Solicitor General

/s/ Sarah A. Hunger
SARAH A. HUNGER
Deputy Solicitor General
BRIANNA YANG
Assistant Attorney General
115 South LaSalle Street
Chicago, Illinois 60603
(312) 814-5202
Sarah.Hunger@ilag.gov

ROB BONTA
Attorney General
State of California

JAMES RICHARDSON
*Deputy Attorney General*
WILLIAM H. DOWNER
*Supervising Deputy Attorney General*
MICHAEL L. NEWMAN
*Senior Assistant Attorney General*
300 South Spring Street
Los Angeles, California 90013
(213) 269-6698
William.Downer@doj.ca.gov
James.Richardson@doj.ca.gov
Michael.Newman@doj.ca.gov

Counsel for State of California


ANDREA JOY CAMPBELL
Attorney General
Commonwealth of Massachusetts

ELIZABETH MATOS
*Chief, Civil Rights Division*
DAVID UREÑA
*Assistant Attorney General*
Civil Rights Division
One Ashburton Place
Boston, Massachusetts 02108
(617) 963-2345
Elizabeth.Matos@mass.gov

Counsel for Commonwealth of Massachusetts


PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway
Denver, CO 80203

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
820 N. French Street
Wilmington, DE 19801


WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

ANNE E. LOPEZ
*Attorney General*
*State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

AARON M. FREY
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. MLK Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
*Attorney General*
*State of New Jersey*
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

DAN RAYFIELD
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Maine Street
Providence, RI 02903

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, VT 05609

NICHOLAS W. BROWN
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) because it contains 5,137 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii). This brief complies with the typeface requirement of Rules 32(a)(4), 32(a)(5), and 32(a)(6) because the brief is double-spaced and has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word.

/s/ Sarah A. Hunger
SARAH A. HUNGER

October 9, 2025

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2025, I electronically filed the foregoing Brief of Amicus Curiae State of Illinois, et al. with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Sarah A. Hunger
SARAH A. HUNGER

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 25-4988

I am the attorney or self-represented party.

**This brief contains** 5,137 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.

☐ a party or parties are filing a single brief in response to multiple briefs.

☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Sarah A. Hunger **Date** 10/09/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*