No. 25-4988

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————

SAN FRANCISCO AIDS FOUNDATION, *et al.*,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, *et al.*,

Defendants-Appellants.

———————————————

On Appeal from the United States District Court
for the Northern District of California

———————————————

**REPLY BRIEF FOR APPELLANTS**

———————————————

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
  *Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
JACK STARCHER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................3

I.    Plaintiffs Have No Likelihood of Success on the
Merits .............................................................................................3

    A.    Plaintiffs identify no injury that justifies
prospective relief .................................................................3

    B.    The district court's order reinstating already-
terminated grants runs afoul of the Tucker Act ...........6

    C.    Plaintiffs' challenges fail on the merits ..........................8

        1.    First Amendment ...................................................8

        2.    Fifth Amendment Void-for-Vagueness .............16

        3.    Fifth Amendment Equal Protection ...................18

            a.    Third-party standing...................................18

            b.    Rational basis review applies.....................21

        4.    As-Applied Separation of Powers .....................26

II.    The Remaining Equitable Factors Favor the
Government....................................................................................29

III.    At the Very Least, the Injunction Is Overbroad .....................30

CONCLUSION .....................................................................................33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                       **Page(s)**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.,*
570 U.S. 205 (2013) ........................................................................ 9

*Arkansas Educ. Television Comm'n v. Forbes,*
523 U.S. 666 (1998) .......................................................................13

*Bowen v. Massachusetts,*
487 U.S. 879 (1988) ........................................................................ 8

*Building & Constr. Trades Dep't v. Allbaugh,*
295 F.3d 28 (D.C. Cir. 2002) ......................................................... 27

*City & County of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ....................................................... 27

*Department of Educ. v. California,*
145 S. Ct. 966 (2025) ..................................................................... 30

*East Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ......................................................... 14

*Finley v. National Endowment for the Arts,*
100 F.3d 671 (9th Cir. 1996), *rev'd,* 524 U.S. 569 (1998) ............. 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. TOC, Inc.,*
528 U.S. 167 (2000) ........................................................................ 3

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ....................................................................... 16

*Legal Aid Servs. of Or. v. Legal Servs. Corp.,*
608 F.3d 1084 (9th Cir. 2010) ....................................................... 12

*Legal Servs. Corp. v. Velazquez,*
531 U.S. 533 (2001) ................................................................. 11, 12

*Megapulse, Inc. v. Lewis,*
672 F.2d 959 (D.C. Cir. 1982) ........................................................ 6

*Moody v. NetChoice, LLC,*
 604 U.S. 707 (2024) ................................................................. 11

*National Endowment for the Arts v. Finley,*
 524 U.S. 569 (1998) ................................................................. 13

*National Rifle Ass'n of Am. v. Vullo,*
 602 U.S. 175 (2024) ................................................................. 11

*NIH v. American Pub. Health Ass'n,*
 No. 25A103, 2025 WL 2415669 (U.S. Aug. 21, 2025) ................................ 6, 7

*Peterson v. City of Greenville,*
 373 U.S. 244 (1963) ................................................................21

*Price v. Garland,*
 45 F.4th 1059 (D.C. Cir. 2022) .................................................. 13

*RK Ventures, Inc. v. City of Seattle,*
 307 F.3d 1045 (9th Cir. 2002) .................................................. 20, 21

*Romer v. Evans,*
 517 U.S. 620 (1996) ................................................................26

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump,*
 508 F. Supp. 3d 521 (N.D. Cal. 2020) ........................................... 17

*Thakur v. Trump,*
 148 F.4th 1096 (9th Cir. 2025) ................................................. 14

*Tingley v. Ferguson,*
 47 F.4th 1055 (9th Cir. 2022) .................................................. 19, 20

*Trump v. American Fed'n of Gov't Emps.,*
 145 S.Ct. 2635 (2025) ........................................................... 28-29

*Trump v. Hawaii,*
 585 U.S. 667 (2018) ............................................................. 25-26

*United Aeronautical Corp. v. U.S. Air Force,*
 80 F.4th 1017 (9th Cir. 2023) .................................................. 6

*United States v. Salerno*,
481 U.S. 739 (1987) ........................................................... 23

*United States v. Skrmetti*,
605 U.S. 495 (2025) ...................................................... 23, 24

*Warth v. Saldin*,
422 U.S. 490 (1975) ........................................................... 19

**Statutes:**

5 U.S.C. § 702 ........................................................................ 8

20 U.S.C. § 954(d)(1) ........................................................... 18

**Regulatory Materials:**

Exec. Order No. 13,985,
86 Fed. Reg. 7009 (Jan. 25, 2021) ............................... 14, 17

Exec. Order No. 14,151,
90 Fed. Reg. 8339 (Jan 29, 2025) ................................ 10, 26

Exec. Order. No. 14,168,
90 Fed. Reg. 8615 (Jan. 30, 2025) ................. 10, 21, 22, 26

**Other Authority:**

Order, *National Ass'n of Diversity Officers in Higher
Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025),
ECF No. 29 ...................................................................... 9-10

## INTRODUCTION

The district court erroneously enjoined commonplace policy directives from the President that merely instruct federal officers to deploy preexisting authority to ensure that government funds are expended in ways that further presidential priorities to the maximum extent allowed by law. To make matters worse, the court went further and ordered the government to reinstate and continue paying plaintiffs pursuant to the terms of numerous grant agreements. As the Supreme Court has twice made clear recently, the district court lacked jurisdiction to order the government to continue paying plaintiffs under the terms of those grant agreements, because any entitlement to those funds sounds in contractual theories that must be channeled to the Court of Federal Claims under the Tucker Act.

Although the Tucker Act does not foreclose plaintiffs' claims for forward-looking injunctive relief against the directives contained in the challenged Orders, those claims face numerous fatal defects of their own. Plaintiffs try to preemptively prevent the government from terminating their grants going forward. But whether and why the government might terminate any of plaintiffs' grants in the future is too speculative and

indefinite to give plaintiffs' standing to raise these claims now. Even assuming plaintiffs could establish standing to litigate those constitutional challenges, each of plaintiffs' constitutional theories is inconsistent with precedent.

In response, plaintiffs—like the district court—fail to grapple with what the provisions they challenge actually say. Instead, they spend the bulk of their response tilting at atextual hypotheticals that presuppose either that government actors will purport to act pursuant to the challenged provisions in ways that contravene both the text of those provisions and existing federal law, or that an unspoken intent behind facially neutral provisions makes those provisions constitutionally suspect. Putting aside the significant ripeness and standing problems plaintiffs' arguments present, none of plaintiffs' arguments supports the injunction the district court entered—or, indeed, any injunction against the Executive Orders themselves. If plaintiffs think a particular action by a government actor is unlawful, the proper remedy is to wait for that dispute to materialize, challenge that action in the appropriate forum, and seek relief from the allegedly unlawful conduct.

Plaintiffs' facial constitutional challenges fail for numerous independent reasons, so the district court's preliminary injunction must be vacated.

## ARGUMENT

### I.    Plaintiffs Have No Likelihood of Success on the Merits.

#### A.    Plaintiffs identify no injury that justifies prospective relief.

In arguing that the district court had jurisdiction to consider their claims for prospective injunctive relief, plaintiffs focus primarily on the fact that they allege that they held grants that were already terminated "pursuant to" the challenged Orders.  Resp. 22.  But as explained below and in the government's opening brief, *infra* pp. 6-8; Br. 22-26, any theory of standing based on those already-completed terminations stumbles right at the gate because, under the Tucker Act, the district court had no authority to remedy those injuries.  Any order directing the government to reinstate terminated grants would run headlong into the Supreme Court's stay decisions in *NIH* and *Education*.  And in any event, plaintiffs need a basis for standing for every form of relief sought and thus independently must establish standing to seek prospective relief.  *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. TOC, Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff

3

must demonstrate standing separately for each form of relief sought."). Plaintiffs do not seriously dispute that an injunction prohibiting the government from implementing the challenged provisions going forward does not itself redress already-completed grant terminations.

Plaintiffs' contention that grants they continue to hold will be terminated in the future is too speculative to support standing for a forward-looking injunction. The timing of plaintiffs' challenge makes any fear of future terminations based on the challenged provisions particularly speculative. Plaintiffs challenge directives issued by the President in January 2025. They did not obtain the preliminary injunction at issue in this appeal until nearly six months later. And, according to plaintiffs' theory of their case, the government was actively implementing the directives they now challenge during the intervening six months. Plaintiffs give no reason to think it is likely that grants that were *not* terminated pursuant to the challenged provisions during that six-month period will be belatedly terminated in the future pursuant to those January 2025 presidential directives.

It is even more speculative what legal issues might be presented by any such future terminations. Here, the fundamental disconnect

4

underlying plaintiffs' entire case bears emphasis: Plaintiffs bring facial challenges to general policy directives contained in Executive Orders, rather than any particular agency action implementing those directives. As the Fourth Circuit noted in staying a similar injunction, the decision to facially challenge general presidential directives rather than any particular agency action raises both standing and ripeness problems. As discussed in more detail below, those ripeness problems are particularly pronounced here because many of plaintiffs' facial constitutional claims assume that those implementing the challenged provisions will interpret or apply them in ways that are inconsistent with what the provisions actually say. If plaintiffs' fears come to pass, such that they think the termination of any particular contract in the future is unlawful, they could challenge it in a concrete factual scenario in the appropriate forum. But plaintiffs may not preemptively prevent the President from directing his subordinates to pursue general policy objectives by reevaluating grant funding priorities using preexisting legal authority.

**B.     The district court's order reinstating already-terminated grants runs afoul of the Tucker Act.**

The district court lacked authority to issue an injunction ordering the government to reinstate and pay plaintiffs pursuant to terminated grant agreements.  As the government explained in its opening brief (Br. 22-26), the Supreme Court has recently made clear in materially similar circumstances that district courts lack jurisdiction to consider any claims "'based on' [a plaintiff's] research-related grants or to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *NIH v. American Pub. Health Ass'n*, No. 25A103, 2025 WL 2415669, at *1 (U.S. Aug. 21, 2025).  Instead, the Tucker Act provides the Court of Federal Claims exclusive jurisdiction over those kinds of suits.  The district court therefore lacked jurisdiction to consider plaintiffs' claims to the extent they sought reinstatement of already-terminated grants because (1) the entitlement to grant money that plaintiffs assert originates in the grant agreements themselves and (2) the relief plaintiffs seek is an order for the payment of money.  *See Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also United Aeronautical Corp. v. U.S. Air Force*, 80 F.4th 1017, 1025 (9th Cir. 2023) (noting that this Court applies *Megapulse*).

6

None of plaintiffs' responses can salvage the district court's order to reinstate terminated grant funds. Although plaintiffs characterize their claims as constitutional, to the extent that they seek to obtain an order requiring the government to comply with the terms of their grant agreements, their claims sound in contract. Plaintiffs do not articulate any basis for entitlement to government funds other than their contractual rights, and indeed they premise some of their supposed constitutional claims in significant part on a supposed distinction between the rights of those who already *have* government contracts and those who may seek them. *See* Resp. 46-47. The district court's order to reinstate (and continue paying plaintiffs under) terminated grants thus necessarily adjudicates the sort of contract claim that the Tucker Act directs to the Court of Federal Claims.

Although plaintiffs also seek to preclude prospective enforcement of certain directives contained in the challenged Orders, the Supreme Court made clear in *NIH* that the presence of such prospective claims does not entitle a plaintiff to pursue an order requiring the government to pay money under a contract. *See NIH*, 2025 WL 2415669, at *2 (Barrett, J., concurring). The government has never urged that the Tucker Act

precludes claims for prospective relief, *contra* Resp. 27 & n.3, although those claims fail for other reasons, *see supra* pp. 3-5, *infra* pp. 8-29. But plaintiffs cannot bootstrap those claims to evade the Tucker Act's preclusion of the contract claims to which that statute applies.

Plaintiffs' reliance on *Bowen v. Massachusetts*, 487 U.S. 879 (1988), is also unavailing. *See* Resp. 25-26. That case did not involve a contract at all but instead involved the separate preclusion of Administrative Procedure Act review for claims seeking money damages. *See* 5 U.S.C. § 702 (authorizing only claims for "relief other than money damages"); *see also id.* (prohibiting relief "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought").

### C. Plaintiffs' challenges fail on the merits.

Even if the district court had jurisdiction to consider plaintiffs' various constitutional challenges, none is likely to succeed.

#### 1. First Amendment

Each of the challenged provisions merely directs agencies, to the maximum extent allowed by law, to deploy preexisting authority to ensure that government funds are not spent to support programs and activities that the government no longer believes to be in the public interest. As

8

explained in the government's opening brief, those provisions look only to the nature of the funded programs and do not penalize or scrutinize recipients' speech outside the funded initiative. That kind of decision making about what the government will (and will not) fund is subject only to deferential First Amendment review, and the district court erred by analogizing to cases where the government seeks to use funding conditions to coerce or control a recipient's speech more broadly.

In response to this black letter law, plaintiffs respond with an array of precedents that are irrelevant to the questions presented in this case. Plaintiffs first press a point that not even the district court accepted: They say that the Orders are unlawful because they seek to "leverage funding to regulate speech outside of the program." Resp. 43 (quoting *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013)). In a similar vein, plaintiffs assert that the challenged provisions "mandate that recipients of federal funds not 'promote gender ideology' or 'DEI.'" Resp. 44. But the challenged provisions don't say that, as the district court acknowledged. ER-36 (assuming that provisions apply "only to activities paid for by the federal government"); *see also* Order at 9, *National Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14,

9

2025), ECF No. 29 (Harris, J. concurring) ("The Executive Orders do not purport to establish the illegality of all efforts to advance diversity, equity or inclusion, and they should not be so understood."). The challenged provisions are clear that they are focused on what the government is actually funding, not on what funding recipients do on their own time and dime. *See* Exec. Order No. 14,151, § 2(b)(i), 90 Fed. Reg. 8339, 8339 (Jan 29, 2025) (DEI Order) (directing agencies to "terminate, to the maximum extent allowed by law, … 'equity-related' grants or contracts"); Exec. Order. No. 14,168, § 3(e), 90 Fed. Reg. 8615, 8616 (Jan. 30, 2025) (Gender Ideology Order) (directing agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology").

Plaintiffs' attempts to muddy the waters on this point are particularly unavailing given that they brought—and succeeded on—a facial First Amendment challenge. Thus, it is not enough for plaintiffs to suggest that the challenged provisions *could* be interpreted to govern conduct outside the program or that some agencies have applied the provisions in a way that might apply to purely private conduct. Instead, they must show that the provisions' "unconstitutional applications substantially outweigh its

10

constitutional ones." *Moody v. NetChoice, LLC*, 604 U.S. 707, 723 (2024). Plaintiffs fall far short of making that demanding showing.

Next, plaintiffs rely (Resp. 44) on the Supreme Court's decision in *National Rifle Ass'n of America v. Vullo*, 602 U.S. 175, 180 (2024), for the proposition that "Government officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." That proposition, which plaintiffs cite to again attack the straw man that the grant terminations here were premised on conduct outside the grant program, adds little to the analysis. As explained, it is well established that declining to fund certain projects—or choosing to fund some projects instead of others—is not akin to "coerc[ive]" conduct that "punish[es] or suppress[es] views the government disfavors."

Plaintiffs fare no better when they finally turn to First Amendment cases involving government funding decisions. Like the district court, plaintiffs rely on *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 536 (2001), for the proposition that, even in the context of funding conditions, the First Amendment prohibits content- or viewpoint-based distinctions unless those distinctions further specific "legitimate objectives" enumerated by Congress. *See* Resp. 43, 46-47. But as explained in the government's

11

opening brief, *Velazquez* is inapposite here because the program at issue there was treated as a "limited public forum."  Br. 32-33; *see also Legal Aid Servs. of Or. v. Legal Servs. Corp.*, 608 F.3d 1084 (9th Cir. 2010).  The Supreme Court and this Court have long differentiated between funding schemes that make funding "generally available to all who meet some basic standard" and competitive schemes that make funding available only for a select few.  531 U.S. at 546.  The former category creates a kind of "limited public forum," which the government must operate in a viewpoint-neutral manner.

But this is not a limited public forum case.  The district court did not conclude otherwise.  And plaintiffs do not dispute that the grants they received are competitive grants, awarded only to a select few applicants based on criteria and policy preferences established by the awarding agency within the pertinent legal framework.  Resp. 48.  While plaintiffs suggest in passing that *Finley* indicates that "competitive funding scheme[s]" are also "a type of limited public forum," *id.*, that suggestion is belied by even a cursory review of *Finley*.  Indeed, as explained in the government's opening brief, the holding of *Finley* is exactly the opposite.  Br. 34-35.  The Ninth Circuit decision that the Supreme Court rejected in

12

*Finley*—like the district court's decision here—analogized the competitive grant process at issue there to cases like *Velazquez* that address funding streams that are open to all comers. *See Finley v. National Endowment for the Arts*, 100 F.3d 671, 683 (9th Cir. 1996) ("Although [the agency] awarded only 88 grants from an applicant pool of 5,168, it cannot provide those scarce grants to favor a particular viewpoint."), *rev'd*, 524 U.S. 569 (1998). The Supreme Court expressly rejected that reliance on limited public forum cases, saying that the "competitive process according to which grants [we]re allocated" distinguished it from limited public forum cases and warranted a lower standard of First Amendment scrutiny. 524 U.S. at 586; *see also Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022) (noting that the Supreme Court has cautioned that courts should not "extend[ ] the public forum doctrine 'in a mechanical way' to contexts that meaningfully differ from those in which the doctrine has traditionally been applied" (quoting *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672-73 (1998))).

Plaintiffs alternatively say that this case is somehow distinguishable from *Finley* because this case involves terminating discretionary grant funding rather than awarding discretionary grants in the first instance. *See*

13

Resp. 46-47.[1] But that distinction makes no sense. Imagine an entity that did not obtain a grant in 2021, when the government preferred equity-advancing programs, *see* Exec. Order No. 13,985, § 1, 86 Fed. Reg. 7009, 7009 (Jan. 25, 2021), because the government instead chose to give the grant to one of plaintiffs' programs that was deemed more equity-advancing. Under plaintiffs' view, that entity would have no recourse under the First Amendment, while entities like plaintiffs who benefited from those content-based preferences on the front end enjoy additional First

---

[1] On this score, plaintiffs cite the stay motion decision in *Thakur v. Trump*, 148 F.4th 1096 (9th Cir. 2025), but they do not argue that a stay decision is binding on a subsequent panel considering the merits of a preliminary injunction appeal. *See* Resp. 47, 48. Nor could they. The stay decision in *Thakur* made clear that it turned on "the record at th[e] [stay motion] stage" and, even then, was making only an initial, predictive judgment. *Id.* at 1107-08; *see also East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 661 & n.3 (9th Cir. 2021) (explaining that a stay decision lacks precedential force because its "predictive analysis" turns on the "probabilistic" standard governing motions to stay a preliminary injunction pending appeal). In addition, *Thakur*'s analysis turned on the fact that the *Thakur* plaintiffs—unlike the plaintiffs here and in *Finley*—raised an "as-applied [First Amendment] challenge." *Id.* at 1107-08 (noting that the Supreme Court in *Finley* "had no occasion ... to address an as-applied challenge").

14

Amendment protections that prevent the government from changing its priorities.

In a similar vein, plaintiffs say this is an instance "where the Government chose funding consistent with the statutory scheme and now seeks to rescind the funding based on viewpoint." Resp. 47-48. To the extent plaintiffs mean to suggest that certain statutory schemes *require* the government to fund the kinds of projects covered by the challenged provisions, that assertion goes to plaintiffs' as-applied statutory arguments, *see infra* pp. 26-29, and provides no support for plaintiffs' facial First Amendment claims. More fundamentally, plaintiffs' point implicitly concedes the asymmetrical nature of their argument by acknowledging that the government can—and perhaps, in their view, *must*—differentiate between grant recipients based on viewpoint when making funding decisions. As already discussed, there is no valid basis to think that the First Amendment condones that kind of viewpoint discrimination at the front end but then prohibits the government from taking into account the same considerations when deciding whether to continue funding a project. And of course, to the extent plaintiffs seek to enforce reliance rights that

arise from their contracts with the government, they must do so in the Court of Federal Claims. *See supra* pp. 6-8.

### 2. Fifth Amendment Void-for-Vagueness

Policy directives contained in Executive Orders—which merely direct executive officials to take actions to further presidential goals—are not the same thing as criminal statutes or regulations—which directly govern and constrain private conduct under threat of some penalty. Plaintiffs offer virtually no response to those obvious differences. Plaintiffs agree (Resp. 49-50) that the void-for-vagueness doctrine is designed to ensure the public has notice of what conduct is prohibited by law and to protect against arbitrary enforcement of the requirements with which the public must comply. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). As explained in the government's brief, none of those concerns is triggered by intra-executive directives, however vague. Br. 37.

Neither plaintiffs nor the district court cite any precedent from this Court or any sister circuit supporting the novel assertion that presidential directives to his own subordinates must satisfy void-for-vagueness standards. Presidents can give directions to their subordinates in many forms, including telephone calls, statements at Cabinet meetings, or other

16

policy steers that subordinates then exercise their discretion to flesh out into concrete agency decisions. The idea that all such directions must satisfy the same standards as criminal statutes is extraordinary.

The only authority plaintiffs can muster in support of that remarkable proposition (Resp. 50) is a single district court preliminary-injunction decision from 2020—which itself cited no precedent for the idea that Executive Orders can be subject to Fifth Amendment vagueness review—that was never appealed because the case was mooted by the withdrawal of the challenged Executive Order less than a month after the preliminary injunction issued. *See Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 539 (N.D. Cal. 2020); Exec. Order No. 13,985, 86 Fed. Reg. 7009 (revoking challenged Executive Order). There is no basis for using such a slender reed to upend all manner of presidential direction to subordinate officials.

In any event, even apart from the dispositive point that the Executive Orders are directed at Executive Branch officials and not at plaintiffs, plaintiffs have no coherent response to Supreme Court cases like *Finley* that hold there is no constitutional guarantee of clarity in grant or contract criteria. Indeed, the criteria at issue in *Finley* were at least as "opaque" as

17

the terms used in the challenged provisions, directing funding to promote "artistic excellence and artistic merit … , taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1).  Yet the Supreme Court nevertheless refused to demand greater clarity, noting that a contrary holding would invalidate any government funding program that sought to issue awards based on subjective criteria.

### 3.     Fifth Amendment Equal Protection

For multiple independent reasons, the district court erred in concluding that plaintiffs are likely to succeed on the merits of their facial equal-protection challenge to the gender-ideology provisions.

a.     <u>Third-party standing</u>: Plaintiffs have never argued that the challenged gender ideology provisions violate *their* equal-protection rights directly.  Plaintiffs are "mission-driven nonprofits" that count transgender people among their clients.  Resp. 1.  But plaintiffs have never claimed to have experienced differential or discriminatory treatment based on their own sex or transgender status—indeed, as organizations, plaintiffs do not themselves have a sex or transgender status.  So, plaintiffs do not dispute that they are asserting equal-protection claims solely in a third-party

18

capacity—purporting to represent the equal-protection rights of parties not before this Court.  This kind of third-party standing is the exception, not the norm.  *Warth v. Saldin*, 422 U.S. 490, 499 (1975) (a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

As explained in the government's opening brief (Br. 45), this Court's decision in *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), is fatal to plaintiffs' theory of third-party standing.  Br. 46.  Plaintiffs' response to *Tingley* is to assert that "transgender people *will* face discrimination, harassment, and stigma" if they challenge these Orders, whereas the stigma in *Tingley* was only speculative.  Resp. 32.  But this Court's reasoning in *Tingley* explaining why the stigma was speculative there applies with full force here: The Court emphasized that (1) people like the plaintiff's patients had "brought their own lawsuits" raising their own rights in other states; (2) "[p]seudonymous filing" would be appropriate to address any concerns about patient privacy and potential stigma; and (3) the plaintiff failed to explain why pseudonymous filing would not remedy stigma concerns or why "his clients are different from those in other states who brought their own lawsuits."  47 F.4th at 1069-70.  Here, similarly,

19

numerous transgender individuals across the country have brought equal protection challenges to the Gender Ideology Order, pseudonymous filing is available, and plaintiffs have offered no explanation of how their "clients are different from those in other states who brought their own lawsuits." *Id.* Because plaintiffs' theory of third-party standing here suffers the same deficiencies this Court identified in *Tingley*, it should reach the same result here and hold that plaintiffs cannot take the extraordinary step of asserting the equal-protection rights of others.

Plaintiffs alternatively argue that, even if they cannot establish third-party standing, this Court's decision in *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045 (9th Cir. 2002), means that they have standing to assert their own equal-protection challenge against the Gender Ideology Order. But they have no equal-protection claim akin to the one recognized in *RK Ventures.* There, this Court held that owners of a club could assert equal-protection rights based on allegations that they had been targeted in enforcement proceedings brought by the City based on their association with "their African-American patrons." *Id.* at 1055. But the Court reached that conclusion by analogizing to cases where the alleged government conduct would effectively require the plaintiff himself to discriminate

based on race in order to comply: "A 'law compelling persons to discriminate against other persons because of race' is a 'palpable violation of the Fourteenth Amendment.'" *Id.* (quoting *Peterson v. City of Greenville*, 373 U.S. 244, 248 (1963)). Here, plaintiffs are not being punished for their association with anyone; instead, the government takes issue with the content of their subsidized activities.

    b. <u>Rational basis review applies</u>: Even if plaintiffs had standing to raise equal-protection claims, those facial equal-protection challenges fail on the merits. As the government explained at length, the Gender Ideology Order is subject only to rational-basis review because it does not classify based on any suspect classification. "Gender Ideology," as defined in the Order, refers to "replac[ing] the biological category of sex with an ever-shifting concept of self-assessed gender identity," thereby "diminish[ing] sex as an identifiable or useful category." Gender Ideology Order § 2(f), 90 Fed. Reg. at 8615-16. This includes the idea that "there is a vast spectrum of genders that are disconnected from one's sex" and the idea that others must substitute biological sex with self-assessed gender identity for all purposes. *Id.*

21

As explained in the government's opening brief, none of that categorizes anyone based on sex or transgender status. Br. 47-48. Indeed, plaintiffs can express no disagreement with the core point underlying that definition: that sex and gender identity are different, and that both serve distinct functions such that it is inappropriate to simply equate sex with gender identity or vice versa. *See* Gender Ideology Order § 2(g), 90 Fed. Reg. at 8616 (noting that gender identity is an "internal and subjective sense of self" that "does not provide a meaningful basis for identification and cannot be recognized as a replacement for sex").

Plaintiffs offer essentially no response to any of this.[2] In particular, they do not even attempt to establish that the government seeks to offer services to some individuals but not to others, to offer different services to different individuals based on any characteristic (protected or otherwise),

---

[2] Plaintiffs say that the government "waived its argument that rational basis review applies." Resp. 39. Plaintiffs appear to mean only that the government has not contested that Ninth Circuit precedent recognizes that discrimination based on transgender status triggers heighted scrutiny. That does not mean the government conceded that the provisions challenged here discriminate based on transgender status; to the contrary, the government squarely argued in district court that the challenged provisions "do not purport to withhold federal funding based on any protected characteristic of the recipients." 3-SER-629.

or to do anything that would satisfy the standard prerequisites for a discrimination claim. Instead, plaintiffs largely ignore what the gender-ideology provisions say and instead seek to cast the district court's characterizations of the provisions as if they were the provisions themselves. Resp. 35-36. But particularly in the context of a facial challenge—where plaintiffs bear the burden of showing that "no set of circumstances exists under which the [challenged provisions] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987)—this Court may not disregard what the provisions actually say in evaluating whether they are facially discriminatory in the first place. Once the district court's characterizations are put aside, plaintiffs have little to say in response to the fact that nothing in the Gender Ideology Order facially classifies or differentiates between people based on either their sex or their transgender status.

As explained in the government's opening brief, plaintiffs' argument that the Order classifies based on sex or transgender status is also foreclosed by the Supreme Court's decision in *United States v. Skrmetti*, 605 U.S. 495 (2025). *See* Br. 49-51. Plaintiffs respond that this case is different because, unlike in *Skrmetti*, the challenged provisions feature "explicit

23

facial classifications." Resp. 42. It is entirely unclear what plaintiffs mean by this; as discussed, the provisions do not apply differently to people with different characteristics.

To the extent plaintiffs suggest that the mere invocation of principles relating to transgender status constitutes an impermissible classification, the Supreme Court squarely rejected that argument in *Skrmetti.* The statute the Supreme Court considered there, like the Order, referred both to sex of the patient and concepts like gender dysphoria, gender identity disorder, and gender incongruence. *See* 605 U.S. at 511. Indeed, the statute at issue in *Skrmetti* went further by classifying what treatments were prohibited based in part on the patient's sex. *See id.* None of that, the Supreme Court held, meant that the law treated people differently based on sex or transgender status. What mattered, the Supreme Court made clear, is that the two groups the statute created—those who could and could not receive treatment—were not defined based exclusively on sex or transgender status. *See id.* at 518-19.

The same is true here. The two groups created by the Order— programs that will continue to get funding and those that will not—are not defined exclusively (or even partially) by transgender status or sex. And

24

transgender people will still be able to receive services from federally funded programs that do not run afoul of the Order's prohibition on funding gender ideology.

Plaintiffs object (Resp. 38-39) to a footnote in the government's opening brief noting that the Supreme Court has granted certiorari to consider whether to overturn this Circuit's precedent holding that laws differentiating based on transgender status trigger intermediate scrutiny. The footnote simply makes the unremarkable point that, if the Supreme Court overturns this Court's precedent on that question, the government would have yet another ground on which the preliminary injunction must be reversed. But for the reasons already given, there are ample grounds to reverse even as the law in this Circuit currently stands.

Finally, plaintiffs briefly argue (Resp. 40-41) that the Order would violate the Equal Protection Clause even under rational-basis review. But those arguments largely repeat their assertion that the text of the Order evinces some clear purpose to target or harm transgender people. As already discussed, the Order's operative provisions, including its definition of Gender Ideology, do not evince any "desire to harm" transgender people—let alone a "bare desire" to do so. *See Trump v. Hawaii*, 585 U.S.

25

667, 706 (2018) (explaining that facially neutral action will be found unconstitutional only where it is "impossible to 'discern a relationship to legitimate interests'" or where "policy is 'inexplicable by anything but animus'" (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996))). That plaintiffs disagree with how the current Administration views the relationship between sex and gender identity, and their respective roles in society, does not establish a "bare desire to harm" transgender people.

### 4. As-Applied Separation of Powers

Finally, for the reasons given in the government's opening brief, the district court erred in assuming that agencies charged with implementing the challenged provisions would ignore what the provisions say in doing so. Plaintiffs do not seriously dispute in their response that the provisions they challenge direct agencies to terminate funding only to the extent authorized by law. *See* DEI Order § 2(b)(i), 90 Fed. Reg. at 8339 (directing agencies to "terminate, to the maximum extent allowed by law, … 'equity-related' grants or contracts"), Gender Ideology Order § 3(e), 90 Fed. Reg. at 8616 (directing agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology").

Instead, plaintiffs insist that those "as authorized by law" qualifications can be disregarded entirely. Resp. 59. That would be a remarkably atextual way to construe an Executive Order, to say nothing of its incompatibility with the Court's general practice of seeking out constitutional constructions rather than unconstitutional ones. As explained in the government's opening brief, the D.C. Circuit has held in materially similar circumstances that a permitted-by-law qualifier "instructs the agency to follow the law," Br. at 33, and that "[t]he mere possibility that some agency might make a legally suspect decision" in the future does not provide a basis to preemptively enjoin the provision. *Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002). This Court's decision in *City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), is not to the contrary. As the government explained, that decision was premised on the Court's view that various aspects of the Executive Order gave a sufficiently "clear and specific" directive that would have been overridden by the ordinary reading of the permitted-by-law qualifier there. *Id*. at 1239. It cannot plausibly stand for the proposition that such qualifiers should be ignored as a general matter.

27

Even putting those problems aside, three of plaintiffs' as-applied challenges—those for grants under the Ryan White Program, the Housing Opportunities for People with Aids (HOPWA) program, and the Federally Qualified Health Centers (FQHC) programs—suffer from additional threshold problems because plaintiffs identify no grant that has been terminated under those statutes (though, even if they did, their claims would properly be pursued only under the Tucker Act as discussed above).[3]  Plaintiffs do not demonstrate otherwise in their response.  They say that "there is record evidence that the Orders have been used to illegally terminate grants," Resp. 60, but conspicuously fail to cite any record evidence that the Orders have been relied upon to terminate grants under the Ryan White Program, the HOPWA program, or the FQHC program.  And of course, any argument that a particular grant termination was invalid under a particular statutory scheme could be appropriately litigated in a concrete case presenting that issue.  *See Trump v. American*

---

[3] As explained in the government's opening brief (Br. 58), plaintiffs' arguments about two other statutes—the Affordable Care Act and Public Health Service Act—collapse entirely with plaintiffs' equal-protection arguments and fail for the same reasons discussed above.  *See supra* pp. 18-25.

28

*Fed'n of Gov't Emps.*, 145 S.Ct. 2635, 2535 (2025) (Sotomayor, J. concurring) (noting that challenged "Executive Order direct[ing] agencies to plan reorganizations and reductions in force 'consistent with applicable law'" did not give the Court occasion to consider "resulting" implementing actions by agencies).

Plaintiffs alternatively complain that the government "fails to engage with the record evidence demonstrating that funding has been revoked based on these Orders." Resp. 60. It is unremarkable that some agencies have followed the President's direction and terminated funding when they believed that doing so was consistent with applicable law. To the extent those actions are relevant, they illustrate that concerns about the legality of a particular termination can be litigated in a concrete factual scenario and highlight the absence of any such scenario relating to the Ryan White Program, the HOPWA program, and the FQHC program.

## II. The Remaining Equitable Factors Favor the Government.

Because plaintiffs cannot establish a likelihood of success on the merits, the injunction should be reversed for that reason alone. But in any event, the remaining factors—irreparable harm, the balance of harms, and the public interest—likewise favor the government and fail to support the

29

district court's injunction. Unsurprisingly, plaintiffs' arguments on each of those factors merely restate their arguments on the merits. *See* Resp. Br. 50-56.

And even if plaintiffs were likely to prevail on the merits, the remaining factors still would not support a preliminary injunction. The district court's injunction thwarts the government's implementation of a vital presidential initiative. Conversely, any monetary harm that plaintiffs face from the cancelling of their grants is not irreparable, as monetary harms can always be fully remedied by a damages award at the conclusion of litigation in the appropriate forum. Conversely, as the Supreme Court explained in granting the government's motions for stays in two cases involving materially similar injunctive relief—*Education* and *NIH*—the government suffers irreparable harm when it is ordered to continue funding grants it finds to no longer be in the public interest because it is "unlikely to recover the grant funds once they are disbursed." *Department of Educ. v. California*, 145 S. Ct. 966, 969 (2025) (per curiam).

## III.    At the Very Least, the Injunction Is Overbroad.

Plaintiffs do not seriously dispute that there is no basis to enjoin the agencies from terminating grants for reasons unrelated to the challenged

30

Executive Orders. Thus, plaintiffs cannot dispute that the preliminary injunction they received is overbroad to the extent it orders defendants to reinstate a list of specific grant and contract awards (and any other grant award that had been terminated since plaintiffs' complaint was filed) *regardless* of whether those awards were terminated pursuant to the challenged provisions.

Instead, plaintiffs argue that the overbreadth of the district court's order makes no practical difference because it is not "credible" to think that any of their grant awards that were terminated before the preliminary injunction issued were terminated for any reason other than the directives contained in the challenged provisions. Resp. 66. But that is a question that the district court should have—but did not—consider in the first instance before granting its overbroad injunction. Indeed, as plaintiffs acknowledge, there is at least one obvious basis to suspect that some grants were terminated for different reasons: There are meaningful differences among the terminations they have identified, with some expressly referencing the challenged provisions and others giving other reasons for the terminations. *See* Resp. 66-67.

At the very least, this Court should vacate the district court's preliminary injunction to the extent it orders the government to reinstate grants without regard to whether they were terminated pursuant to the challenged provisions.

## CONCLUSION

For the foregoing reasons and those given in the government's opening brief, the district court's preliminary injunction should be vacated or, at the very least, vacated in part.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

YAAKOV M. ROTH
  *Principal Deputy Assistant*
    *Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
*/s Jack Starcher*_____
JACK STARCHER
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7515*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-8877*

December 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,235 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Book Antiqua 14-point font, a proportionally spaced typeface.

*s/ Jack Starcher*
Jack Starcher

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Jack Starcher*

Jack Starcher